UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TNC KAZCHROME JSC<br><br>       Plaintiffs,<br>v.<br><br>UNITED STATES,<br><br>       Defendant. | Court No. 25-00128 |

**COMPLAINT**

  Plaintiff TNC Kazchrome JSC ("Kazchrome"), by and through its counsel, files this Complaint to challenge the unlawful decision by the Department of Commerce ("Commerce") to apply an adverse and punitive subsidy rate of 265.52 percent to a respondent that participated fully and properly throughout a one-year investigation. Commerce initially calculated a 2.71 percent rate and then reversed course purporting to identify new factual information – that was demonstrably on the record since the first month of the investigation. Commerce's decision is unlawful, divorced from the factual record, and irreparably harmful to the company, after its clear and fulsome cooperation in the underlying investigation. Plaintiff alleges and states as follows:

**ADMINISTRATIVE DETERMINATION TO BE REVIEWED**

  1. Plaintiff seeks judicial review of the Final Determination issued by Commerce in the countervailing duty ("CVD") investigation of ferrosilicon from the Republic of Kazakhstan (Case No. C-834-813). The period of investigation ("POI") was January 1, 2023, through December 31, 2023. Notice of the final determination was published in the *Federal Register* on March 28, 2025. *See Ferrosilicon from the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,108 (Dep't of Commerce, Mar. 28, 2025)

1

("Final Determination"); *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan*, Case No. C-834-813 (Mar. 21, 2025) ("Final IDM"). It was through this Final Determination that Commerce first applied adverse facts available ("AFA") to Kazchrome. Commerce then published an amended final determination to correct for ministerial errors related to the other mandatory respondent and increased the AFA rate for Kazchrome based on errors identified for the other company. *See Ferrosilicon from Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce, May 20, 2025) ("Amended Final Determination and Order"); *see also* Memorandum from Peter Shaw to Elizabeth Eastwood, *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Analysis of Ministerial Error Allegations*, Case No. C-834-813 (Apr. 15, 2025) ("Ministerial Error Amendment").

2. Commerce published the Order, based on the Final Determination and Amended Final Determination, in the Federal Register on May 20, 2025. *See* Amended Final Determination and Order.

## JURISDICTION

3. The U.S. Court of International Trade has jurisdiction over this action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c).

## STANDING

4. Plaintiff is a Kazakhstani producer and exporter of ferrosilicon, the merchandise subject to the Order at issue. Plaintiff participated in Commerce's investigation that resulted in

2

the contested finding by submitting information and argument on the record. Plaintiff is therefore an interested party within the meaning of 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF ACTION

5. Commerce published the Order in the *Federal Register* on May 20, 2025. Plaintiff filed the Summons on June 20, 2025, within 30 days of the publication of the Order.[1] Plaintiff files this Complaint within 30 days of the filing of the Summons. Accordingly, Plaintiff has filed the Summons and Complaint within the time limits set forth in 19 U.S.C. § 1516a(a)(2)(A) and Rule 3(a)(3) of the Rules of the Court of International Trade.

## PROCEDURAL HISTORY AND BACKGROUND

6. Commerce's decision to apply AFA to a fully cooperative respondent – who participated through submission of thousands of pages of evidence and data and four full on-site days of verification in Aktobe, Kazakhstan – is unsupported by substantial evidence on the record and otherwise not in accordance with law as averred in Counts I through III set forth herein.

7. On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively "Petitioners") filed a petition for antidumping duty ("AD") and CVD measures on imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia. *See Ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation: Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, on Behalf of CC Metals and Alloys LLC and Ferroglobe USA,*

---

[1] June 20, 2025 is the last day of the 30-day period following publication of the CVD Order because June 19, 2025 is a federal holiday. *See* Rule 6(a)(1)(C) of the Rules of the Court of International Trade ("When the period is stated in days or a longer unit of time . . . include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

3

*Inc.*, Case Nos. A-351-860, A-834-812, A-557-828, A-821-838, C-351-861, C-834-813, C-557-829, and C-821-839 (Mar. 28, 2024).

8. Commerce initiated CVD investigations with respect to ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia on April 17, 2025. *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 31,133 (Dep't of Commerce, Apr. 24, 2024). For Kazakhstan, Commerce initiated an investigation into 21 different programs that were alleged by Petitioners. Ultimately, by the end of the investigation, Commerce reviewed 25 total programs.

9. Of these 25 programs, 15 programs had criteria that either required the company to have a special contract with the Government of Kazakhstan ("GOK") or be physically located within a "special economic zone." In other words, Commerce could – and did - determine actual use of the programs at issue in a straight-forward and document-based manner, including through its verification of the GOK and confirmation of the existence (or lack thereof) of such special contracts directly in the GOK's records.

10. On May 3, 2024, Commerce issued the CVD questionnaire, in which it selected TELF AG ("TELF") and YDD Corporation / YDD Corporation LLP ("YDD") as the mandatory respondents in its CVD investigation. *See Investigation of Ferrosilicon from Kazakhstan: Countervailing Duty Questionnaire*, Case No. C-834-813 (May 3, 2024).

11. Because the import record appeared unclear on the foreign producer entity (of no fault of Kazchrome's), Kazchrome formally sought consideration by Commerce that it be selected as a respondent on May 10, 2024. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Kazchrome's Extension Request for Comments on Supplemental CBP Data and Voluntary Respondent Status*, Case No. C-834-813 (May 10, 2024).

4

Kazchrome's unaffiliated importer, TELF, agreed and in a letter dated May 14, 2024, TELF argued that it should not have been selected as a mandatory respondent in the AD or CVD investigations as it was neither the exporter or producer. TELF urged Commerce to select Kazchrome as a mandatory respondent in TELF's stead in both investigations. *See* Letter from Cassidy Levy Kent (USA) LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: TELF Comments on Company Address*, Case Nos. A-834-812 and C-834-813 (May 14, 2024), at 1-2 ("TELF's May 14, 2024 Submission").

12. In support of this request, TELF explained that it was not affiliated with Kazchrome, is a Swiss company that is out of scope of any Kazakhstan government programs, and that it was a purchaser and reseller in the United States of Kazchrome-produced ferrosilicon at issue. *See id.* at 3-4. Therefore, TELF argued that Kazchrome would be the appropriate entity for Commerce to select as a mandatory respondent in its AD and CVD investigations into ferrosilicon from Kazakhstan. *See id*. Kazchrome subsequently expressed its support for TELF's request to Commerce. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Respondent Selection Supplemental Questionnaire Response*, Case No. C-834-813 (May 23, 2024), at 1.

13. Commerce selected Kazchrome following these submissions, and Kazchrome proceeded to respond to the affiliated companies questionnaire (submitted May 31, 2024), the Section III questionnaire (submitted on June 17, 2024 and June 20, 2024 in two parts, per granted extensions), and three supplemental questionnaires (submitted on June 13, 2024, August 16, 2024, and August 28, 2024).

14. Over eight months of investigation, Commerce thoroughly investigated 25 total subsidy programs alleged by Petitioners and conducted on-site verification in Kazakhstan of the

5

thousands of pages of detailed records submitted by Kazchrome, plus records provided by the GOK. The result of its investigation of nine alleged tax programs, seven lending programs, two grants, three allegations regarding the provision of land for less-than-adequate-remuneration, and four subsequently-identified programs was a calculated rate of 2.71 percent related to one tax program that ties very specifically to non-subject merchandise. All other programs were determined not to have been used. The only way for Commerce to have found this preliminary margin at all is by ignoring the lengthy and detailed evidence that demonstrated that the previously-provided government tax incentive related entirely to production of non-subject merchandise – namely, ferrochrome.

15. Nevertheless, the 2.71 percent margin pales in comparison to Commerce's pivot from the preliminary to the final determination, where it applied a 265.38 percent rate based on AFA. Commerce claimed that it was doing so because it learned for the first time at verification that the GOK has an ownership interest in Kazchrome's ultimate parent company, Eurasian Resources Group S.a.r.l ("ERG"), a Luxembourg company that is neither eligible for Kazakhstan government-provided subsidies nor required to provide complete questionnaire responses, per Commerce policy. As an initial matter, this fact of ownership was disclosed and on the record as early as May 14, 2024, well before verification in September 2024.

16. Commerce was first aware of this interest through TELF's submission, where it stated the following:

> ERG is in turn owned by Alexander Machkevitch (approximately 20 percent), Patokh Chodiev (approximately 20 percent), the heirs of Alijan Ibragimov (approximately 20 percent), **and the Republic of Kazakhstan (40 percent).**

*See* TELF's May 14, 2024 Submission, at 4 fn. 6 and Exhibit 3.

17.     Evidence from ERG's website was also included as Exhibit 3, which sets out that "the State Property and Privatisation Committee of the Ministry of Finance of the Republic of Kazakhstan owns the remaining 40% {interest}." *See id*. at Exhibit 3.

18.     Further, Kazchrome's June 17, 2024 Questionnaire Response included several of Kazchrome's consolidated and standalone financial statements, all of which noted the GOK's interest in ERG in Note 4. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Section III Response*, Case No. C-834-813 (June 17, 2024) ("Kazchrome's June 17, 2024 Questionnaire Response"); *See* Kazchrome's June 17, 2024 Questionnaire Response, at Exhibits GEN-2, GEN 3, GEN-4, GEN-5, GEN-6 and GEN-14.

19.     Simply put, this information was not withheld. Quite the opposite – the record confirms that the GOK's financial interest in ERG was disclosed in *several* places through different submissions prior to on-site verification on September 18-20, 2024, and even in a form similar to what was provided as a verification exhibit.

20.     Of primary importance – and an additional reason that AFA was unlawful here – ERG is a Luxembourg company. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Affiliated Companies Questionnaire Responses*, Case No. C-834-813 (May 31, 2024) ("Kazchrome's Affiliated Companies QR"), at 4; Kazchrome's June 17, 2024 Questionnaire Response, at 1.

21.     In accordance with 19 C.F.R. § 351.527(a), Commerce is precluded from finding that a subsidy exists if the subsidy is supplied "{b}y a government of a country other than the country in which the recipient firm is located …"[2] Commerce therefore would be precluded from

---

[2]     Commerce eliminated section 351.527 in its 2024 amendments to its regulations. *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws,* 89 Fed. Reg. 20,766, 20,826 (Dep't of Commerce, Mar. 25, 2024). However, these amendments apply only to proceedings initiated on or after April 24, 2024. *See id.* at 20,766. Because this

finding that any subsidies provided to ERG by the GOK are countervailable because ERG is a Luxembourg company. This ownership interest can simply not support the result that Commerce set out.

22. As such, the fact that the GOK holds an interest in ERG does not change the facts or the applicable regulatory limitations on attribution under section 351.527(a). ERG is still a Luxembourg company and the regulatory limitations still apply. Thus, although ERG is a cross-owned affiliate of Kazchrome (a fact that has also been fully and properly disclosed in Kazchrome's responses), any theoretical subsidy provided by the GOK to ERG cannot be attributable to Kazchrome.

23. Despite numerous supplemental questionnaires to Kazchrome, Commerce never asked for further information regarding ERG or a full questionnaire response for ERG --- nor would it have made legal sense to do so given the regulatory limitations on attribution and the plain facts that ERG is not domiciled in Kazakhstan, nor is it a producer of subject ferrosilicon.

24. Petitioners had pressed for AFA on this issue (along with several other issues throughout the investigation that Commerce rejected), and Kazchrome had therefore set out these points in its rebuttal case brief of December 20, 2024 and reiterated its response to these claims in the administrative hearing that was held. Notwithstanding Kazchrome's participation throughout each and every step (including the hearing), Commerce ignored the record evidence and facts and issued a decision based entirely on AFA, effectively disregarding all submissions made by Kazchrome, TELF, and the GOK with respect to Kazchrome's lack of use of the 25 programs at issue.

---

investigation was initiated on April 17, 2024, these amendments do not apply, and section 351.527 remains applicable. To the extent that the entire decision contested in this action rests on Commerce's conclusion that transnational subsidies may have been relevant, it is erroneous as a matter of law.

## STATEMENT OF CLAIMS

25. Commerce initiated an investigation into 21 separate programs allegedly maintained by the GOK and then added an additional four programs during the investigation. For the vast majority of these programs, eligibility is tied to a company's operations within a special economic zone or dependent on the company's maintenance of a special contract with the GOK. It is undisputed that Kazchrome does not operate in the relevant zone and has no such contracts under the identified programs. Indeed, the GOK verification validated these assertions. As such, Kazchrome was not even eligible for the majority of the programs initiated in Kazakhstan.

26. After Kazchrome had submitted more than one thousand pages of documentation and data in response to at least four separate questionnaires, Commerce calculated a preliminary CVD margin of 2.71 percent on the basis that Kazchrome had one loan program (not even alleged by Petitioners) that demonstrably applied to *another* product – ferrochrome – that is not in scope.

27. That preliminary margin was then subject to on-site verification in Aktobe, Kazakhstan, where company officials participated in four days of on-site review, through which it was confirmed that Kazchrome does not use or benefit from any of the programs at issue.

28. During verification, Kazchrome demonstrated that the tax incentive program that had been identified in the preliminary determination was tied to a specific facility that produced only out-of-scope product, and therefore Kazchrome should be subject to no subsidy determinations at all.

29. In fact, Commerce is not permitted by statute to find that a countervailable benefit was conferred "*with respect to the manufacture, production, or export of a class or kind of merchandise*" where a respondent demonstrates non-attribution of the subsidy at issue to subject merchandise. *See* 19 U.S.C. § 1671(a)(1).

9

30. In accordance with this statutory mandate, Commerce has promulgated regulations and developed longstanding practice, both of which require it to attribute subsidies tied to the production or sale of a particular product only to that product. With respect to programs that afford income tax exemptions or reductions, Commerce has additional guidance pursuant to an update to its regulations (19 C.F.R § 351.509(d)) that codified some of its longstanding practices related to attribution. Section 351.509(d) outlines Commerce's normal practice of finding income tax exemptions not to be tied to particular products because income taxes generally relate to the overall operations of a company. Even so, Commerce must still determine whether the alleged benefits are in fact provided to the overall operations of the company based on the record. If the record demonstrates that the benefits are not provided to the overall operations of the company, then Commerce must find that the income tax program is tied.

31. At the time of the preliminary determination, Commerce calculated a 2.71 percent subsidy rate because it failed to consider whether the alleged benefits were in fact provided to the overall operations of Kazchrome. In that way, Commerce has failed to fulfil the statutory mandate. Further, Commerce also ignored evidence that demonstrated the alleged benefits were not provided to the overall operations of Kazchrome. The record shows that the GOK and Kazchrome entered into an investment contract that afforded Kazchrome an income tax exemption for income resulting from production activities at a specific smelting plant in a specific factory that produced only out-of-scope ferrochrome, not the ferrosilicon at issue in this investigation. The record demonstrates that the program and any resulting alleged benefits were not tied to the subject merchandise in the investigation and not provided to the overall operations of the company. In contrast, the program was tied to the production of ferrochrome at a specific smelting plant dedicated to ferrochrome production.

32. These facts were demonstrated to Commerce through records, submitted prior to the preliminary determination, and through an extensive on-site verification in Aktobe where Commerce officials participated in a full facility tour and witnessed not only the actual ferrochrome production but also had the opportunity to visually inspect the facility that is fenced in and isolated from the remainder of the operations, due to the strict requirements that the facility be subject to requirements under the terms of the GOK investment incentives.

33. In Kazchrome's case brief before Commerce, this was the sole issue it raised, demonstrating that Commerce must reverse its finding that this program conferred a countervailable benefit due to the clear and demonstrable non-attribution of the program to in-scope ferrosilicon.

34. Commerce barely addressed this matter in the final determination. Rather, Commerce considered the 2.71 percent preliminary subsidy rate and inflated it to a punitively-high 265.38 percent rate (which was later increased even further to 265.53 percent in a further demonstration of its unlawful application of another respondent's use of the programs to Kazchrome, as discussed more fully below). Commerce unlawfully applied AFA in the final determination on the basis that the GOK maintains an ownership interest in a non-Kazakhstani parent company of Kazchrome – a fact that has been on the record since the first affiliated companies responses were submitted and for which Commerce never issued a single follow-up question. Commerce inaccurately noted the fact was not on the record until verification and then unlawfully gave the ownership interest legal significance that it does not have. Namely, Commerce purported to identify Kazchrome's responses as incomplete when Kazchrome fully responded to all questions on affiliation within the requirements of the questionnaires and Commerce policy.

35. Commerce failed to abide by the prerequisites required to apply AFA. In fact, strict requirements must be satisfied before Commerce may reject information submitted by the respondent and apply "facts otherwise available" ("FA") or AFA. Moreover, any decision by Commerce to apply FA or AFA must be based on a review of "the record as a whole," and must be supported "by substantial evidence on the record" – meaning "more than a mere scintilla" of evidence and not merely speculation. In this case, substantial evidence on the record does not support any conclusion that the requirements of 19 U.S.C. §§ 1677e and 1677m are satisfied such that the application of AFA would be justified.

36. Prior to applying AFA, Commerce must first find it proper to apply FA. *See Zhejiang Dunan Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011). Section 1677e(a) of the statute defines the conditions under which Commerce may resort to FA in making its determination. Those conditions are: (1) necessary information is not available on the record; or (2) a respondent has either withheld requested information, failed to provide requested information by the established deadlines or in the form and manner requested (subject to 19 U.S.C. §§ 1677m(c)(1) and (e)), significantly impeded the proceeding, or provided unverifiable information.

37. The U.S. Court of Appeals for the Federal Circuit has stated that, "under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record." *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348. In other words, Commerce may not apply FA "in disregard of information of record that is not missing or otherwise deficient." *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348 (quoting *Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270, 1288 (Ct. Int'l Trade 2005)).

38. If the conditions under § 1677e(a) are satisfied, the Department may use FA. But the application of adverse inferences is still not authorized. Before the Department may apply AFA, both the conditions under § 1677e(a) *and* the additional conditions prescribed under § 1677e(b) must be satisfied.

39. Section 1677e(b) of the statute requires an additional finding that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information." In finding a respondent did not act "to the best of its ability," Commerce must determine that a respondent's actions amounted to "either a willful decision not to comply or behavior below the standard for a reasonable respondent." *China Steel Corp v. United States*, 264 F. Supp. 2d 1339, 1360 (Ct. Int'l Trade 2003) (quoting *Nippon Steel Corp. v. United States*, 118 F. Supp. 2d 1366, 1379 (Ct. Int'l Trade 2000)). Moreover, "{a}n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." *Nippon Steel Corp. v. United States*, 337 F.3d at 1373, 1383 (Fed. Cir. 2003).

40. Furthermore, the circumstances that warrant the application of total AFA are reserved for situations "'where none of the reported data is reliable or usable' because, for example, all of the 'submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data.'" *Mukand, Ltd. v. United States*, Court No. 11-00401, 2013 WL 1339399, at *12-13 (Ct. Int'l Trade Mar. 25, 2013), *aff'd* 767 F.3d 1300 (Fed. Cir. 2014) (citations omitted). Circumstances justifying the use of total AFA are not supported by a record where a respondent has responded to all of Commerce's questionnaires with reliable and useful information and such information has been verified, as is the case in this underlying investigation.

41. The statute also establishes the conditions under which Commerce must utilize a respondent's responses instead of applying FA or AFA. Specifically, 19 U.S.C. § 1677m(d) provides that before Commerce may disregard all or part of a respondent's responses that Commerce considers to be deficient, it "shall" inform the respondent of the deficiency and provide the respondent an opportunity to remedy or explain the deficiency. Thus, if Commerce has not identified the deficiency and provided the respondent an opportunity to remedy or explain it, Commerce may not disregard a respondent's responses and apply FA or AFA. Commerce must rely on a respondent's responses in that circumstance.

42. Section 1677m(e) also precludes Commerce from rejecting submitted information if (1) the information was submitted by the established deadlines; (2) the information is verifiable; (3) the information is not so incomplete that it cannot be reliable; (4) the respondent acted to the best of its ability; and (5) it would not be difficult for the Department to use the information. Therefore, if the conditions listed in § 1677m(e) are satisfied, Commerce must still use the respondent's submitted information instead of FA or AFA.

43. Not only did Commerce lack the authority to apply AFA here, it committed legal and factual error in selecting the appropriate AFA rate. In selecting the AFA rate, Commerce found that "there are no facts on this record to suggest that a rate other than the highest rate envisioned" under the statute "should be applied as AFA." Final IDM, at 14. This, of course, ignores the detailed record confirming non-use of <u>all</u> programs at issue, including the indisputable fact that Kazchrome's location prevents it from use of the subsidies available only in the special economic zone. Nevertheless, Commerce calculated a punitive AFA rate that included all such special economic zone programs and all program-specific rates above zero for the other mandatory respondent, YDD. There is no corroboration or factual basis for the application of any such

program-specific rates to Kazchrome, nor did Commerce attempt to identify any. It merely stated that there was an "absence of reliable record evidence concerning Kazchrome {sic} usage of the subsidy programs at issue due to their decision not to provide complete information in the investigation." Final IDM, at 15. But this is not true. The (erroneously) identified evidence that Commerce found lacking was the ownership structure of Kazchrome's non-Kazakhstani ultimate parent, ERG, which is an entity plainly out of scope of the programs.

44. In the final determination, Commerce applied a rate of 265.38 percent – an egregiously high rate under any circumstances, but surely punitive and out of bounds in the context of this investigation.

45. Commerce then went beyond this rate in an amended final determination on April 16, 2025, increasing the rate to 265.52 percent on the basis of changes to the other mandatory respondent's use of certain programs. While essentially irrelevant in terms of actual impact of the rate increase, the amended final determination confirms the legal error in Commerce's selection of the AFA rate, as it even *adjusted* the rate to again account for another company's use of programs at issue, relying, for example, on that other company's location in the special economic zone that formed the primary basis of the subsidy rates that were calculated.

## **CLAIMS**

### COUNT I

46. Paragraphs 1-45 are incorporated by reference.

47. The application of AFA to Kazchrome was unlawful and unsupported by substantial evidence on the record.

### COUNT II

48. Paragraphs 1-45 are incorporated by reference.

49. Commerce's selection of the AFA rate that it applied to Kazchrome was unlawful and unsupported by substantial evidence on the record.

50. Further compounding the unlawful selection of the AFA rate is the fact that Commerce increased that rate subsequent to the final determination, and again did so on the basis of another company's use of the programs at issue. This confirms that Commerce's selection of the rate was deliberate and intentional and not related to Kazchrome's experience in any way.

## COUNT III

51. Paragraphs 1-45 are incorporated by reference.

52. Commerce's decision to countervail against the tax incentive program that related entirely to production of out-of-scope ferrochrome was unlawful and unsupported by substantial evidence on the record.

53. Where the respondent has demonstrated that the benefit is tied to the production of non-subject merchandise, as Kazchrome has done here, Commerce lacks statutory authority to find that a countervailable benefit was conferred "*with respect to the manufacture, production, or export of a class or kind of merchandise*" under 19 U.S.C. § 1671(a)(1).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(A) Enter judgment in favor of Plaintiff;

(B) Declare Commerce's Final Determination unsupported by substantial evidence on the record and otherwise not in accordance with law;

(C) Remand this matter to Commerce to issue a revised final determination in conformity with this Court's decision; and

(D) Grant Plaintiff such additional relief as the Court may deem just and appropriate.

Dated: July 18, 2025

Respectfully submitted,

*/s/ Christine M. Streatfeild*
Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff TNC Kazchrome JSC*