# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

TNC KAZCHROME JSC

                Plaintiff,

    v.

UNITED STATES,

                Defendant.

    and

CC METALS AND ALLOYS, LLC
AND FERROGLOBE USA, INC.

        Defendant-Intervenors.

Court No. 25-00128

**NON-CONFIDENTIAL
VERSION**

**Business Proprietary
Information Contained
in Brackets ("[]") and
Omitted from the
Glossary and Pages 13-
16**

# PLAINTIFF'S RULE 56.2 MEMORANDUM OF LAW IN
## SUPPORT OF
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff TNC Kazchrome
JSC*

December 9, 2025

# TABLE OF CONTENTS

I.   RULE 56.2 STATEMENT ..................................................................1

  A.   Administrative Determination to Be Reviewed ............................1

  B.   Issues Presented and Summary of Argument .................................2

II.  STATEMENT OF FACTS ................................................................6

III. STANDARD OF REVIEW .............................................................27

IV. ARGUMENT ..................................................................................29

  A.   Legal Standard for Applying AFA ...............................................29

    1.   Conditions Under Which Commerce May Use FA.......................30

    2.   Conditions Under Which Commerce Must Use the Information
Submitted by a Respondent ...........................................................32

    3.   Additional Prerequisites for the Application of Adverse
Inferences .......................................................................................34

  B.   Commerce's Application of FA to Kazchrome is Not Supported
by Law or Fact .............................................................................36

    1. The record fails to demonstrate the satisfaction of any statutory
criteria for the application of FA. ..................................................37

    2. Any information that was alleged to be missing was not necessary
for Commerce's subsidy analysis. ...............................................46

    3. Case law that Commerce relies upon fails to support its
application of FA. ..........................................................................47

    4. Commerce did not timely notify Kazchrome of any deficiencies in
its responses and consequently failed to satisfy its statutory
obligations under 19 U.S.C. § 1677m(d). ....................................53

    5. Kazchrome did not deprive Commerce from any opportunity to
determine whether 19 C.F.R. § 351.527(a) was applicable.................57

  C.   Commerce's Application of AFA to Kazchrome is Not Supported
by Law or Fact .............................................................................59

    1.   Commerce went beyond its authority when it applied AFA to
Kazchrome .....................................................................................60

2. The way in which Commerce applied AFA to Kazchrome was also
unlawful. ...........................................................................................62

D.    Commerce Must Address The Issues Raised With Respect to
Alleged Benefits Under a Corporate Income Tax Exemption Program
Tied to Non-Subject Merchandise ...............................................................65

V.    CONCLUSION.............................................................................68

Pursuant to the Court's rules, and consistent with Federal Circuit Rule
25.1(e)(1)(B), this brief contains confidential material identified in
brackets and omitted from the Glossary and pages 13 through 16. The
material identified in brackets and omitted from the Glossary and
pages 13 through 16 includes information regarding certain of
Kazchrome's cross-owned affiliates, for which Kazchrome submitted
complete questionnaire responses in the underlying proceedings. This
information was treated as business proprietary and subject to an
administrative protective order by the U.S. Department of Commerce in
the underlying proceedings.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altx, Inc. v. United States*,
167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ....................................... 28

*Atlantic Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ........................................................ 27

*Chemours Company FC, LLC v. United States*,
443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ..................................... 28

*China Steel Corp. v. United States*,
264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) ..................................... 34

*Clearon Corp. v. United States*,
359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ..................................... 28

*Corinth Pipeworks Pipe Indus. SA v. United States*,
633 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ..................................... 48

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ........................................................ 66

*Hitachi Energy USA Inc. v. United States*,
34 F.4th 1375 (Fed. Cir. 2022) ................................................... 32, 54

*Mukand, Ltd. v. United States*,
37 C.I.T. 443 (Ct. Int'l Trade 2013), *aff'd* 767 F.3d 1300
(Fed. Cir. 2014) ............................................................................. 35

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ................................................... 27, 34

*POSCO v. United States*,
337 F. Supp. 3d 1265 (Ct. Int'l Trade 2018) ..................................... 35

*Saha Thai Steel Pipe Pub. Co. v. United States*,
605 F.Supp.3d 1348 (Ct. Int'l Trade 2022) ................................... 33, 53

*Shandong Huarong Machinery Co., Ltd. v. United States*,
 435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ....................................... 60

*Shelter Forest International Acquisition, Inc. v. United States*,
 2022 WL 2155965 (Fed. Cir. June 15, 2022) ..................................... 54

*Sugiyama Chain Co. v. United States*,
 797 F. Supp. 989 (Ct. Int'l Trade 1992) .............................................. 48

*Universal Camera Corp. v. NLRB*,
 340 U.S. 474 (1951) ................................................................................. 27

*Zhejiang Dunan Hetian Metal Co., Ltd. v. United States*,
 652 F.3d 1333 (Fed. Cir. 2011) ........................................................... 30

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................. 27

19 U.S.C. § 1671(a)(1) .............................................................................. 66

19 U.S.C. § 1677e(a) ..................................................................... 30, 31, 32

19 U.S.C. § 1677e(a)(1) ............................................................................ 46

19 U.S.C. § 1677e(a)(2)(B) ................................................................. 33, 43

19 U.S.C. § 1677e(a) ................................................................................ 28

19 U.S.C. § 1677e(b) .......................................................................... 28, 34, 61

19 U.S.C. § 1677e(b)(1) ...................................................................... 34, 61

19 U.S.C. § 1677m ................................................................................... 32

19 U.S.C. § 1677m(d) ......................................................... 4, 30, 33, 54, 59

19 U.S.C. § 1677m(e) ........................................................................ 33, 43

**Regulations**

19 C.F.R § 351.509(d) .............................................................................. 18

19 C.F.R. § 351.525(b)(5)(1)........................................................66

19 C.F.R. § 351.527(a) ...............................................................47

## Administrative Determinations

*Certain Cold-Rolled Steel Flat Products From the Republic of
Korea: Preliminary Results and Partial Rescission of
Countervailing Duty Administrative Review; 2022*, 89 Fed.
Reg. 82,566 (Dep't of Commerce Oct. 11, 2024) .................................66

*Ferrosilicon from the Republic of Kazakhstan: Final
Affirmative Countervailing Duty Determination*, 90 Fed.
Reg. 14,108 (Dep't of Commerce, Mar. 28, 2025) ...............................1

*Regulations Improving and Strengthening the Enforcement
of Trade Remedies Through the Administration of the
Antidumping and Countervailing Duty Laws,* 89 Fed. Reg.
20,766 (Dep't of Commerce, Mar. 25, 2024) .....................................24

BUSINESS PROPRIETARY / NON-CONFIDENTIAL
INFORMATION          VERSION
HAS BEEN OMITTED

# **GLOSSARY**

| Acronyms and Abbreviations | Item |
|---|---|
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| Affiliation Supplemental Questionnaire | Letter from Lana Nigro, Program Manager, AD/CVD Operations, Office VII to TELF AG, *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Affiliation Supplemental Questionnaire for TELF and Kazchrome*, Case No. C-834-813 (Jun. 7, 2024) |
| Amended Final Determination and Order | *Ferrosilicon from Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce, May 20, 2025) |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Commerce | U.S. Department of Commerce |
| CVD | Countervailing Duty |
| [ *affiliate acronym* | *affiliate name* ] |
| ERG | Eurasian Resources Group S.a.r.l |

| FA | Facts Otherwise Available |
|---|---|
| Ferrochrome Priority Investment Project | A facility that is one specific, ringfenced shop for producing ferrochrome (a fully out-of-scope separate ferroalloy) |
| Final Determination | *Ferrosilicon from the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,108 (Dep't of Commerce, Mar. 28, 2025) and accompanying Issues and Decision Memorandum |
| GOK | Government of Kazakhstan |
| GOK's Minor Corrections | Letter from the Ministry of Trade and Integration of the Republic of Kazakhstan to the Hon. Gina Raimondo, *Ferrosilicon from the Republic of Kazakhstan: GOK's Minor Corrections*, Case No. C-834-813 (Sep. 12, 2024) |
| GOK Section II Questionnaire Response | Letter from the Ministry of Trade and Integration of the Republic of Kazakhstan to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Ministry of Trade and Integration of the Republic of Kazakhstan – Response to Section II*, Case No. C-834-813 (Jun. 25, 2024) |

vii

| | |
|---|---|
| GOK Section II Supplemental Questionnaire Response | Letter from the Ministry of Trade and Integration of the Republic of Kazakhstan to the Hon. Gina Raimondo, *1st Supplemental Questionnaire for the Government of the Republic of Kazakhstan*, Case No. C-834-813 (Aug. 15, 2024) |
| GOK's Verification Exhibits | Letter from the Ministry of Trade and Integration of the Republic of Kazakhstan to the Hon. Gina Raimondo, *Verification of the Government of the Republic of Kazakhstan's Questionnaire Responses*, Case No. C-834-813 (Sep. 13, 2024) |
| GOK Verification Report | Memorandum from Isaiah Kahn and Peter Shaw, International Trade Compliance Analysts, AD/CVD Operations, Office VII to the File, *Verification of Questionnaire Responses of the Government of Kazakhstan*, Case No. C-834-813 (Nov. 19, 2024) |
| Initiation Notice | *Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 31,133 (Dep't of Commerce, Apr. 24, 2024) |
| Initial Questionnaire | Letter from Lana Nigro, Program Manager, AD/CVD Operations, Office VII to the Government of Kazakhstan, *Investigation of Ferrosilicon from Kazakhstan: Countervailing Duty Questionnaire*, Case No. C-834-813 (May 3, 2024) |

| Kazchrome's Affiliated Companies Response | *Ferrosilicon from Kazakhstan: Affiliated Companies Questionnaire Responses* |
|---|---|
| Kazchrome's Affiliation Supplemental Questionnaire Responses | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from the Republic of Kazakhstan: Affiliation Supplemental Questionnaire Responses*, Case No. C-834-813 (Jun. 13, 2024) |
| Kazchrome's June 17, 2024 Questionnaire Response | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Section III Response Part I*, Case No. C-834-813 (Jun. 17, 2024) |
| Kazchrome's June 20, 2024 Questionnaire Response | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from the Republic of Kazakhstan: Section III Response Part II*, Case No. C-834-813 (Jun. 20, 2024) |
| Kazchrome's Response to Petitioner's June 28, 2024 Comments | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Kazchrome's Response to Petitioners' June 28, 2024 Comments*, Case No. C-834-813 (Jun. 28, 2024) |
| Kazchrome's Minor Corrections | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan*: Kazchrome's Minor Corrections, Case No. C-834-813 (Sep. 20, 2024) |
| Kazchrome's Rebuttal Brief | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan:* Kazchrome's Rebuttal Brief, Case No. C-834-813 (Dec. 20, 2024) |

| Kazchrome's Verification Exhibits | Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan*: Kazchrome's Verification Exhibits, Case No. C-834-813 (Sept. 26, 2024) |
|---|---|
| Kazchrome Verification Report | Memorandum from Isaiah Kahn and Peter Shaw, International Trade Compliance Analysts, AD/CVD Operations, Office VII to the File, *Verification of Questionnaire Responses TNC Kazchrome JSC Corporation LLP*, Case No. C-834-813 (Nov. 19, 2024) |
| Ministerial Error Amendment | Memorandum from Peter Shaw to Elizabeth Eastwood, *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Analysis of Ministerial Error Allegations*, Case No. C-834-813 (Apr. 15, 2025) |
| Ministerial Error Memo | Memorandum from Peter Shaw, Senior International Trade Compliance Analyst, AD/CVD Operations, Office V to Elizabeth Eastwood, Acting Deputy Assistant Secretary, AD/CVD Operations, *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Analysis of Ministerial Error Allegations*, Case No. C-834-813 (Apr. 15, 2025) |
| Petitioners | CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively) |

x

BUSINESS PROPRIETARY / NON-CONFIDENTIAL
INFORMATION                           VERSION
HAS BEEN OMITTED

| | |
|---|---|
| Petitioners' Case Brief | Letter from the Bristol Group to the Hon. Gina Raimondo, *Ferrosilicon from the Republic of Kazakhstan: Case Brief*, Case No. C-834-813 (Dec. 6, 2024) |
| POI | Period of Investigation |
| TELF | TELF AG |
| TELF's May 14, 2024 Submission | *Ferrosilicon from Kazakhstan: TELF Comments on Company Address*, Case Nos. A-834-812 and C-834-813 (May 14, 2024) |
| **[** *affiliate acronym* | *affiliate name* **]** |
| YDD | YDD Corporation / YDD Corporation LLP |

## I.   RULE 56.2 STATEMENT

### A. Administrative Determination to Be Reviewed

Plaintiff seeks judicial review of the Final Determination issued by
the U.S. Department of Commerce ("Commerce") in the countervailing
duty ("CVD") investigation of ferrosilicon from the Republic of
Kazakhstan (Case No. C-834-813). *See Ferrosilicon from the Republic of
Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90
Fed. Reg. 14,108 (Dep't of Commerce, Mar. 28, 2025), P.R. 448, Appx___
and accompanying Issues and Decision Memorandum, P.R. 442,
Appx___ (collectively, "Final Determination"). The period of
investigation ("POI") was January 1, 2023, through December 31, 2023.
Notice of the Final Determination was published in the *Federal Register*
on March 28, 2025. *See* Final Determination, P.R. 448, Appx___.

It was through this Final Determination that Commerce first applied
adverse facts available ("AFA") to Kazchrome. Commerce then
published an amended final determination to correct for ministerial
errors related to the other mandatory respondent and <u>increased</u> the
AFA rate for Kazchrome based on errors identified for the other
company. *See Ferrosilicon from Kazakhstan: Amended Final*

1

*Countervailing Duty Determination; Ferrosilicon From Brazil,*

*Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg.

21,446 (Dep't of Commerce, May 20, 2025), P.R. 460, Appx___

("Amended Final Determination and Order"); *see also* Memorandum

from Peter Shaw to Elizabeth Eastwood, *Countervailing Duty*

*Investigation of Ferrosilicon from the Republic of Kazakhstan: Analysis*

*of Ministerial Error Allegations*, Case No. C-834-813 (Apr. 15, 2025),

P.R. 454, Appx___/C.R. 297, Appx ___ ("Ministerial Error Amendment").

## B. Issues Presented and Summary of Argument

### 1. Whether Commerce's findings under 19 U.S.C. § 1677e and decision to apply facts otherwise available were supported by fact and law.

Commerce's decision to apply facts otherwise available ("FA") was

not supported by fact or law. None of the threshold statutory criteria for

the application of FA were met. All information necessary for

Commerce's subsidy analysis was on the record, and Kazchrome did not

(i) withhold requested information, (ii) fail to provide requested

information by established deadlines or in the form and manner

requested, (iii) significantly impede the proceeding, or (iv) provide

unverifiable information. Indeed, any information Commerce alleges in

its Final Determination was missing, withheld, or late, or was not in
the form and manner requested, was either not requested by
Commerce, was on the record since the beginning of the investigation
but was disregarded or overlooked by Commerce, and/or was not
necessary for Commerce's subsidy analysis. As such, Commerce's
decision to apply FA (and as a result, its decision to apply AFA) cannot
stand.

> ### 2. Whether Commerce properly adhered to its statutory obligations under 19 U.S.C. § 1677m(d) to timely notify Kazchrome of any deficiencies in its responses and afford Kazchrome the opportunity to cure those deficiencies.

Commerce did not adhere to its statutory obligations to notify
Kazchrome of any deficiencies in its responses and to afford Kazchrome
an opportunity to cure those deficiencies. To the extent any necessary
information was missing from the record or not submitted in the form
and manner requested, Commerce never alerted Kazchrome of these
issues and consequently never provided Kazchrome the opportunity to
provide any alleged missing information or to correct the information so
that it was in a form and manner Commerce required. Commerce's only
notification of these issues was in its Final Determination. Yet, the
information with which Commerce takes issue in its Final

Determination was on the record since the beginning of the investigation. Commerce never inquired further about this information despite issuing multiple supplemental questionnaires, demonstrating that it could have but chose not to. As a result, Commerce did not adhere to its statutory obligations under 19 U.S.C. § 1677m(d), a fact which precludes Commerce from applying FA and AFA.

> ### 3. Whether Commerce's decision to disregard the applicability of 19 C.F.R. § 351.527(a) to an affiliate incorporated and located outside of Kazakhstan was supported by fact and law.

Commerce had no basis to disregard regulations in effect at the time of the investigation that precluded the attribution of subsidies from an entity incorporated and located outside of Kazakhstan to Kazchrome. Section 351.527(a) of its regulations barred Commerce from finding that a subsidy exists if the alleged subsidy is supplied "{b}y a government of a country other than the country in which the recipient firm is located…". Nothing on the record of this investigation undermines the applicability of this regulation to Kazchrome's ultimate parent, and Commerce failed to cite to any information or reason as to why the regulation would not apply. Commerce was therefore obligated to

adhere to this regulation and could not attribute any subsidies that may have been received by Kazchrome's ultimate parent to Kazchrome.

### 4. Whether Commerce's findings under 19 U.S.C. § 1677e(b) and decision to apply AFA were supported by fact and law.

Commerce's decision to apply AFA was unsupported by fact and law for several reasons. First, a proper finding of FA is needed before AFA can be applied, and because Commerce's application of FA is not supported by fact or law, it automatically renders its application of AFA unlawful. Second, the information that Commerce claimed was late or missing was not necessary for its subsidy analysis. Third, Kazchrome acted to the best of its ability when it provided all necessary information by the required deadlines and explained the basis for its reporting. Fourth, prior to applying FA/AFA, Commerce must notify a respondent of any deficiencies in its responses pursuant to its statutory obligations, and in this investigation Commerce did not.

Furthermore, the way Commerce applied AFA was not proper. In selecting a rate, Commerce disregarded extensive, verified record information. Thus, even if the application of AFA was lawful (which it was not), the rate selected was not.

<u>5. Whether Commerce must reconsider its finding with
respect to particular subsidy programs tied to non-subject
merchandise, if, on remand, Commerce calculates a rate
based on Kazchrome's data.</u>

To the extent Commerce properly considers record information to
calculate Kazchrome's subsidy rate on remand, Commerce cannot apply
a program that is tied to non-subject merchandise. The record supports
a finding that certain programs were tied to non-subject merchandise
and Commerce's regulations preclude a finding that programs tied to
non-subject merchandise confer countervailable benefits. In calculating
a final subsidy rate for Kazchrome, such programs must be disregarded.

## II.   STATEMENT OF FACTS

On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA,
Inc. (collectively "Petitioners") filed a petition for antidumping duty
("AD") and CVD measures on imports of ferrosilicon from Brazil,
Kazakhstan, Malaysia, and Russia. *See Ferrosilicon from Brazil,
Malaysia, the Republic of Kazakhstan, and the Russian Federation:
Petitions for the Imposition of Antidumping and Countervailing Duties
Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended,
on Behalf of CC Metals and Alloys LLC and Ferroglobe USA, Inc.*, Case
Nos. A-351-860, A-834-812, A-557-828, A-821-838, C-351-861, C-834-

6

813, C-557-829, and C-821-839 (Mar. 28, 2024), P.R. 1-9, Appx\_\_\_/C.R.

1-9, Appx\_\_\_.

Commerce initiated CVD investigations with respect to ferrosilicon

from Brazil, Kazakhstan, Malaysia, and Russia on April 17, 2025. *See*

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian*

*Federation: Initiation of Countervailing Duty Investigations*, 89 Fed.

Reg. 31,133 (Dep't of Commerce, Apr. 24, 2024), P.R. 34, Appx\_\_\_

("Initiation Notice"). For Kazakhstan, Commerce initiated an

investigation into 21 different programs that were alleged by

Petitioners. *See* Initiation Notice, at 31,335, P.R. 34, Appx\_\_\_.

Ultimately, by the end of the investigation, Commerce reviewed 26 total

programs. *See generally* Final Determination, P.R. 441-442, Appx\_\_\_.

On May 3, 2024, Commerce issued the CVD questionnaire, in which

it selected TELF AG ("TELF") and YDD Corporation / YDD Corporation

LLP ("YDD") as the mandatory respondents in its CVD investigation.

*See Investigation of Ferrosilicon from Kazakhstan: Countervailing Duty*

*Questionnaire*, Case No. C-834-813 (May 3, 2024), P.R. 40, Appx\_\_\_.

Because the import record appeared unclear on the foreign producer

entity (of no fault of Kazchrome's), Kazchrome formally sought

7

consideration by Commerce that it be selected as a respondent on May

23, 2024. *See* Letter from Baker McKenzie LLP to the Hon. Gina

Raimondo, *Ferrosilicon from Kazakhstan: Respondent Selection*

*Supplemental Questionnaire Response*, Case No. C-834-813 (May 23,

2024), P.R. 69, Appx___/C.R. 22, Appx___. Kazchrome's request followed

a May 14, 2024 submission from its unaffiliated importer, TELF, in

which TELF argued that it should not have been selected as a

mandatory respondent in the AD or CVD investigations as it was

neither the exporter nor producer. In its May 14, 2024 submission,

TELF had also urged Commerce to select Kazchrome as a mandatory

respondent in TELF's stead in both investigations. *See* Letter from

Cassidy Levy Kent (USA) LLP to the Hon. Gina Raimondo, *Ferrosilicon*

*from Kazakhstan: TELF Comments on Company Address*, Case Nos. A-

834-812 and C-834-813 (May 14, 2024), at 1-2, P.R. 50, Appx___/C.R. 20,

Appx___ ("TELF's May 14, 2024 Submission").

   In support of this request, TELF explained that it was not affiliated

with Kazchrome, is a Swiss company that is out of scope of any

Kazakhstan government programs, and that it was a purchaser and

reseller in the United States of Kazchrome-produced ferrosilicon at

issue. *See id.* at 3-4, P.R. 50, Appx___/C.R. 20, Appx___. TELF included in this submission a narrative description of the ownership of Kazchrome's ultimate parent, Eurasian Resources Group S.a.r.l ("ERG") and supporting documentation from ERG's website, which also expressly detailed ERG's complete ownership in the exact form that was later viewed at verification in Kazakhstan. *See id.* at 4 fn. 6 and Exhibit 3, , P.R. 50, Appx___/C.R. 20, Appx___. TELF's submission included the precise interest in ERG held by the Government of Kazakhstan ("GOK"). *See* TELF's May 14, 2024 Submission, at 4 fn. 6 and Exhibit 3, P.R. 50, Appx___/C.R. 20, Appx___. In other words, the core facts with respect to ERG's ownership were on the record before Commerce within three weeks of initiation.

TELF argued that it was unaffiliated with Kazchrome – relying substantively on the ownership chart and other factual representations – and that Kazchrome would be the appropriate entity for Commerce to select as ferrosilicon producer in Kazakhstan. *See id.*, P.R. 50, Appx___/C.R. 20, Appx___. Kazchrome subsequently expressed its support for TELF's request to Commerce. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from*

9

*Kazakhstan: Respondent Selection Supplemental Questionnaire*

*Response*, Case No. C-834-813 (May 23, 2024), at 1, P.R. 69,

Appx___/C.R. 22, Appx___.

Commerce selected Kazchrome following these submissions, and

Kazchrome proceeded to respond to the affiliated companies portion of

the Section III questionnaire (submitted May 31, 2024) and the

remaining portions of the Section III questionnaire (submitted on June

17, 2024 and June 20, 2024 in two parts, per granted extensions). In

addition, Kazchrome submitted four responses to supplemental

questionnaires (submitted on June 13, 2024, August 14, 2024, August

16, 2024, and August 28, 2024).

In the initial affiliated companies response of May 31, 2024,

Kazchrome identified all companies with which it was affiliated in

accordance with Question 1 of the questionnaire. *See* Letter from Baker

McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from*

*Kazakhstan: Affiliated Companies Questionnaire Responses*, P.R. 77,

Appx___/C.R. 26, Appx___ ("Kazchrome's Affiliated Companies

Response"). This included ERG. Kazchrome also identified ERG as a

cross-owned company in accordance with Commerce's instructions, but

went on to explain that ERG is a Luxembourg company and not a Kazakhstani company or located in Kazakhstan, and consequently, was not required to respond to the questionnaire. *See* Kazchrome's Affiliated Companies Response at 4, P.R. 77, Appx___/C.R. 26, Appx___. Kazchrome also highlighted this same point for several other parent companies in this initial affiliated companies response. *See id.*, P.R. 77, Appx___/C.R. 26, Appx___. This affiliated companies portion of the Section III questionnaire did not include any express request by Commerce for the ownership structure of any entity.

Commerce also issued an Affiliation Supplemental Questionnaire on June 7, 2024, in which it requested that Kazchrome provide a "chart…starting with Kazchrome, its ultimate owners (parent holding companies, grandparents, etc.), and companies in which Kazchrome may own a percentage." *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Affiliation Supplemental Questionnaire for TELF and Kazchrome*, Case No. C-834-813 (Jun. 7, 2024), P.R. 88, Appx___/C.R. 28, Appx___. Kazchrome provided this chart identifying all parent entities, including its ultimate parent, ERG, and all companies in which Kazchrome may own a percentage based on

11

its understanding of Commerce's express request for parent companies. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from the Republic of Kazakhstan: Affiliation Supplemental Questionnaire Responses*, Case No. C-834-813 (Jun. 13, 2024), at Exhibit AFFILSUPP-2, P.R. 97-98, Appx___/C.R. 29, Appx___ ("Kazchrome's Affiliation Supplemental Questionnaire Responses"). Because there were no other parent entities above ERG, Kazchrome's organizational chart ended with ERG as the ultimate parent. *See id.*, P.R. 97-98, Appx___/C.R. 29, Appx___.

Financial statements that Kazchrome submitted with its June 17, 2024 response to the remaining portions of the Section III questionnaire also disclosed the GOK's interest in ERG. *See* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Section III Response Part I*, Case No. C-834-813 (Jun. 17, 2024), at Exhibits GEN-2 through GEN-6 and GEN-14, P.R. 107-113, Appx___/C.R. 32-57, Appx___ ("Kazchrome's June 17, 2024 Questionnaire Response").

For the program-specific portion of the initial questionnaire, Kazchrome provided detailed information related to its company

12

BUSINESS PROPRIETARY / NON-CONFIDENTIAL
INFORMATION                    VERSION
HAS BEEN OMITTED

structure and its cross-owned affiliates, as required. Importantly, and

notwithstanding Commerce's initiation of an investigation into 21

separate alleged programs, Kazchrome response centered on how it was

*ineligible* to even apply for the vast majority of the programs as they

were tied to particular geographic region in which *Kazchrome was not

located*. Kazchrome explained that it was responding to the program-

specific portion of the initial questionnaire "on behalf of itself and its

cross-owned affiliates **[** *affiliate names* **]**," which were the only cross-

owned affiliates that met criteria warranting their full responses to

Commerce's questionnaires. *See* Kazchrome's June 17, 2024

Questionnaire Response, at 1, P.R. 107-113, Appx___/C.R. 32-57,

Appx___. In its responses to the program-specific portion of the initial

questionnaire, Kazchrome provided details related to: (1) the provision

of electricity, water, and drainage system services; (2) an investment

contract with the GOK entered into by **[** *affiliate name* **]** related to

property tax and corporate income tax exemptions under the

Entrepreneur Code; and (3) an investment contract with the GOK

entered into by Kazchrome related to the corporate income tax

exemption for priority investment projects to create new production

BUSINESS PROPRIETARY / NON-CONFIDENTIAL
INFORMATION                    VERSION
HAS BEEN OMITTED

facilities under the Entrepreneur Code (the "Priority Investment Projects for the Creation of New Production Facilities" program). *See* Kazchrome's June 17, 2024 Questionnaire Response, P.R. 107-113, Appx___/C.R. 32-57, Appx___; *see also* Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from the Republic of Kazakhstan: Section III Response Part II*, Case No. C-834-813 (Jun. 20, 2024), P.R. 115, Appx___/C.R. 56-57, Appx___ ("Kazchrome's June 20, 2024 Questionnaire Response"). With respect to point (2), Kazchrome demonstrated that **[** *affiliate name* **]** did not benefit from the property tax or corporate income tax exemptions under the Entrepreneur Code, which, similarly to the geographic location-based programs was clear and demonstrable in its tax records. *See* Kazchrome's June 20, 2024 Questionnaire Response, at 4, P.R. 115, Appx___/C.R. 56-57, Appx___.

With respect to point (3), Kazchrome explained that its contract with the GOK specifically involved corporate income tax exemptions connected to the construction of a smelt shop that was unrelated to subject merchandise. This particular facility is one specific, ringfenced shop for producing ferrochrome (a fully out-of-scope separate ferroalloy) ("Ferrochrome Priority Investment Project"). In its June 20, 2024

BUSINESS PROPRIETARY / NON-CONFIDENTIAL
INFORMATION                                    VERSION
HAS BEEN OMITTED

submission, Kazchrome provided: (1) the GOK's inclusion of Kazchrome's ferrochrome smelting shop at Aktobe in its list of priority investment projects; (2) the investment contract between Kazchrome and the GOK specifying the priority investment project as the construction of and activities related to this ferrochrome smelting shop (and all amendments to the contract); (3) examples of Kazchrome's semiannual reports submitted to the GOK providing status updates on the priority investment project; and (4) the GOK's approval letter upon completion of construction and operational start of this ferrochrome smelting shop. *See* Kazchrome's June 20, 2024 Questionnaire Response, at Exhibits SQA PRIORITY-2 through SQA-PRIORITY-6, P.R. 115, Appx___/C.R. 56-57, Appx___. The information demonstrated that the corporate income tax exemptions were specifically tied to income generated by the production of out-of-scope ferrochrome, and were not provided to the overall operations of the company or otherwise tied to the production, sale, or export of subject merchandise.

Kazchrome also demonstrated that it did not apply for, use, or benefit from the 17 other alleged subsidy programs, and that **[** *affiliate name* **]** did not apply for, use, or benefit from 18 alleged subsidy

15

BUSINESS PROPRIETARY NON-CONFIDENTIAL
INFORMATION                    VERSION
HAS BEEN OMITTED

programs. *See* Kazchrome's June 17, 2024 Questionnaire Response, P.R. 107-113, Appx\_\_\_/C.R. 32-57, Appx\_\_\_; Kazchrome's June 20, 2024 Questionnaire Response, P.R. 115, Appx\_\_\_/C.R. 56-57, Appx\_\_\_; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Kazchrome's Response to Petitioners' June 28, 2024 Comments*, Case No. C-834-813 (Jun. 28, 2024), P.R. 259, Appx\_\_\_/C.R. 160, Appx\_\_\_ ("Kazchrome's Response to Petitioner's June 28, 2024 Comments"). Kazchrome further demonstrated that **[** *affiliate name* **]** did not apply for, use, or benefit from 16 programs, and was approved for—but did not benefit from—two other programs (specifically, property and corporate income tax exemptions under the Entrepreneur Code). *See* Kazchrome's June 17, 2024 Questionnaire Response, P.R. 107-113, Appx\_\_\_/C.R. 32-57, Appx\_\_\_; Kazchrome's June 20, 2024 Questionnaire Response, P.R. 115, Appx\_\_\_/C.R. 56-57, Appx\_\_\_; Kazchrome's Response to Petitioner's June 28, 2024 Comments, P.R. 259, Appx\_\_\_/C.R. 160, Appx\_\_\_. The GOK also corroborated Kazchrome's non-use of various alleged programs in its initial response to Section II of the questionnaire. *See generally* Letter from the Ministry of Trade and Integration of the Republic of Kazakhstan to the

Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan: Ministry of Trade and Integration of the Republic of Kazakhstan – Response to Section II*, Case No. C-834-813 (Jun. 25, 2024), P.R. 148-257, Appx___/C.R. 157-159, Appx___ ("GOK Section II Questionnaire Response"). The non-use of these programs was a point of unusual clarity given that many were tied to a particular economic region.

Commerce went on to issue supplemental questionnaires to Kazchrome, within which it asked questions about other affiliates of Kazchrome. Commerce never asked additional questions about ERG, though it was aware of the GOK ownership. This makes sense as ERG is not a Kazakhstan company, nor a producer of ferrosilicon. Commerce also issued a supplemental questionnaire to the GOK. In response to Commerce's requests in this questionnaire, the GOK confirmed Kazchrome's non-use of additional alleged subsidy programs. *See generally* Letter from the Ministry of Trade and Integration of the Republic of Kazakhstan to the Hon. Gina Raimondo, *1st Supplemental Questionnaire for the Government of the Republic of Kazakhstan*, Case No. C-834-813 (Aug. 15, 2024), at 6, P.R. 311-332, Appx___/C.R. 207-

218, Appx___ ("GOK Section II Supplemental Questionnaire
Response").

On September 10, 2024, Commerce published its preliminary
determination and calculated a company-specific rate of 2.37 percent for
Kazchrome. *See Ferrosilicon From the Republic of Kazakhstan:
Preliminary Affirmative Countervailing Duty Determination and
Alignment of Final Determination With Final Antidumping Duty
Determination*, 89 Fed. Reg. 73,369 (Dep't of Commerce Sept. 10, 2024),
P.R. 388, Appx___ and accompanying Preliminary Decision
Memorandum, P.R. 388, Appx___ (collectively, "Preliminary
Determination"). The near de-minimis margin was from alleged
corporate income tax benefits that Kazchrome received through the
"Priority Investment Projects for the Creation of New Production
Facilities" program under the Entrepreneur Code, related to the
Ferrochrome Priority Investment Project. *See* Preliminary
Determination, at 18, P.R. 388, Appx___. Relying on 19 C.F.R §
351.509(d)), Commerce cursorily concluded that these corporate income
tax exemptions applied to the overall operations of Kazchrome, not just

to the production, sale, or export of out-of-scope ferrochrome. *See*
Preliminary Determination, at 18, P.R. 388, Appx___.

In addition, in its preliminary findings, Commerce noted TELF and
Kazchrome's attestations that they had not applied for, used, or
benefitted from other programs preliminarily investigated by
Commerce. *See* Preliminary Determination, at 15-19, P.R. 388,
Appx___. Commerce further noted the GOK's confirmation that TELF
and Kazchrome had not benefitted from additional programs
preliminarily examined by Commerce. *See* Preliminary Determination,
at 15-19, P.R. 388, Appx___.

Commerce then conducted - and Kazchrome fully participated in -
the on-site CVD verification process. *See* Memorandum from Isaiah
Kahn and Peter Shaw, International Trade Compliance Analysts,
AD/CVD Operations, Office VII to the File, *Verification of Questionnaire
Responses TNC Kazchrome JSC Corporation LLP*, Case No. C-834-813
(Nov. 19, 2024), P.R. 412, Appx___/C.R. 283, Appx___ ("Kazchrome
Verification Report"); *see also* Letter from Baker McKenzie LLP to the
Hon. Gina Raimondo, *Ferrosilicon from Kazakhstan*: Kazchrome's
Minor Corrections, Case No. C-834-813 (Sep. 20, 2024), P.R. 396,

Court No. 25-00128

Appx____/C.R. 252, Appx____ ("Kazchrome's Minor Corrections"); Letter

from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon*

*from Kazakhstan*: Kazchrome's Verification Exhibits, Case No. C-834-

813 (Sept. 26, 2024), P.R. 401, Appx____/C.R. 273-275, Appx____

("Kazchrome's Verification Exhibits"). Commerce also conducted a

verification of the GOK's responses to Commerce's questionnaires, in

which the GOK fully participated. *See* Memorandum from Isaiah Kahn

and Peter Shaw, International Trade Compliance Analysts, AD/CVD

Operations, Office VII to the File, *Verification of Questionnaire*

*Responses of the Government of Kazakhstan*, Case No. C-834-813 (Nov.

19, 2024), P.R. 414, Appx___/C.R. 283, Appx___ ("GOK Verification

Report"); Letter from the Ministry of Trade and Integration of the

Republic of Kazakhstan to the Hon. Gina Raimondo, *Ferrosilicon from*

*the Republic of Kazakhstan: GOK's Minor Corrections*, Case No. C-834-

813 (Sep. 12, 2024), P.R. 391, Appx___ ("GOK's Minor Corrections");

Letter from the Ministry of Trade and Integration of the Republic of

Kazakhstan to the Hon. Gina Raimondo, *Verification of the Government*

*of the Republic of Kazakhstan's Questionnaire Responses*, Case No. C-

834-813 (Sep. 13, 2024), P.R. 392-394, Appx___/C.R. 238-240, Appx___

("GOK's Verification Exhibits").

During its verification of Kazchrome, Commerce requested and received additional information corroborating: (1) Kazchrome's use of corporate income tax benefits under the "Priority Investment Projects for the Creation of New Production Facilities" program; and (2) non-use of other alleged programs. *See* Kazchrome Verification Report, at 5-6, P.R. 396, Appx____/C.R. 252, Appx____. Specifically, Commerce examined Kazchrome's (and its cross-owned affiliates') tax returns, general ledger accounts, financials, and "other selected accounts from the chart of accounts," and found "no evidence that the company was receiving other subsidies." Kazchrome Verification Report, at 5-6, P.R. 396, Appx____/C.R. 252, Appx____. Commerce also found "no indication that the company has facilities located in the Saryaka Special Economic Zone {"SEZ"}, the geographic region" to which certain of the alleged subsidy programs were limited. Kazchrome Verification Report, at 6, P.R. 396, Appx____/C.R. 252, Appx____.

During verification of the GOK's responses, Commerce received and reviewed further information demonstrating that, for various alleged

subsidy programs, recipients were either required to maintain special

contracts with the GOK or be located in an SEZ (namely the Saryarkza

SEZ). *See* GOK Verification Report, at 2-5, P.R. 414, Appx____/C.R. 283,

Appx____. Commerce also examined online GOK databases that

contained these special contracts in effect during the POI, and

confirmed contracts applicable to the mandatory respondents. *See* GOK

Verification Report, at 2-4, P.R. 414, Appx____/C.R. 283, Appx____.

Moreover, Commerce verified responses from the GOK that Kazchrome

had not used certain alleged subsidy programs. *See* GOK Verification

Report, at 2-5, P.R. 414, Appx____/C.R. 283, Appx____. In other words,

Commerce could—and did—determine Kazchrome's actual use or non-

use of the alleged subsidy programs in a straightforward and document-

based manner, including confirming that Kazchrome lacked facilities in

the relevant SEZ and confirming the existence of (or lack thereof)

special contracts between Kazchrome (or its cross-owned affiliates) and

the GOK in the GOK's records.

   During verification of Kazchrome, Commerce also reviewed

Kazchrome's corporate background and a copy of the ownership

structure of ERG that was already on the record. *See* Kazchrome

Verification Report, at 2, P.R. 396, Appx____/C.R. 252, Appx____.

Despite the fact that this information was previously on the record,

Commerce claimed in its verification report for Kazchrome that it

learned for the first time at verification that the GOK has an ownership

interest in ERG. *See* Kazchrome Verification Report at 2, 4,  P.R. 396,

Appx____/C.R. 252, Appx____. This was not factually accurate.

Petitioners latched onto this statement in their case brief and pushed

for Commerce to apply total AFA to Kazchrome, though it was

demonstrable that the ownership interest was already record evidence.

*See* Letter from the Bristol Group to the Hon. Gina Raimondo,

*Ferrosilicon from the Republic of Kazakhstan: Case Brief*, Case No. C-

834-813 (Dec. 6, 2024), at 8-11, P.R. 419, Appx___/C.R. 286, Appx___

("Petitioners' Case Brief"). Kazchrome fully rebutted Petitioners' claim

for AFA in its rebuttal brief and during Commerce's hearing. *See* Letter

from Baker McKenzie LLP to the Hon. Gina Raimondo, *Ferrosilicon*

*from Kazakhstan:* Kazchrome's Rebuttal Brief, Case No. C-834-813

(Dec. 20, 2024), at 7-8, P.R. 426, Appx___ ("Kazchrome's Rebuttal

Brief"). Kazchrome further explained that, even if the GOK's interest in

ERG was not on the record prior to Kazchrome's verification (which it

was), it would have been legally insufficient to warrant the imposition

of total AFA to Kazchrome. *See* Kazchrome's Rebuttal Brief, at 8, P.R.

426, Appx___/C.R. ___, Appx___. It was undisputed that ERG is a

Luxembourg company, and 19 C.F.R. § 351.527(a) precluded Commerce

from finding a subsidy to exist if it was supplied "{b}y a government of a

country other than the country in which the recipient firm is located

…"[1] *See* Kazchrome's Rebuttal Brief, at 8-9, P.R. 426, Appx___/C.R. ___,

Appx___. In other words, Commerce would have been precluded from

finding that any theoretical subsidies provided to ERG by the GOK

were countervailable, because ERG was not a Kazakhstani company.

*See* Kazchrome's Rebuttal Brief, at 8-9, P.R. 426, Appx___/C.R. ___,

Appx___. Thus, (i) regardless of the GOK's interest in ERG and (ii) even

if there were subsidies provided by the GOK to ERG, any such subsidies

could not be legally be attributed to Kazchrome. *See* Kazchrome's

---

[1]    Commerce eliminated section 351.527 in its 2024 amendments to its regulations. *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws,* 89 Fed. Reg. 20,766, 20,826 (Dep't of Commerce, Mar. 25, 2024).  However, these amendments apply only to proceedings initiated on or after April 24, 2024.  *See id.* at 20,766.  Because this investigation was initiated on April 17, 2024, these amendments do not apply, and section 351.527 remains applicable.  To the extent that the entire decision contested in this action rests on Commerce's conclusion that transnational subsidies may have been relevant, it is erroneous as a matter of law.

Rebuttal Brief, at 8-9, P.R. 426, Appx___/C.R. ___, Appx___. This
further confirms why it made sense that Commerce never followed up
on ERG's ownership structure or otherwise explored this issue after the
May 14, 2024 submission. As Kazchrome explained, this would have
been true regardless of whether ERG submitted full questionnaire
responses or not. *See* Kazchrome's Rebuttal Brief, at 8-9, P.R. 426,
Appx___/C.R. ___, Appx___.

 In its Final Determination, Commerce failed to account for the
evidence on the record and Kazchrome's explanation with respect to
ERG's ownership (*i.e.*, that the information was on the record before
verification, but nevertheless irrelevant to Commerce's analysis). *See*
Final Determination, at 5-6, P.R. 448, Appx___. Commerce then
asserted that an absence of this information from the record deprived
Commerce of the "opportunity to timely request information from ERG
regarding subsidies, if any, it received from the GOK that would affect
Commerce's subsidy calculation for Kazchrome." Final Determination,
at 5, P.R. 448, Appx___. It then assigned Kazchrome a 265.38 percent
rate based on total AFA. *See* Final Determination, at 6, 15, P.R. 448,
Appx___. Commerce then increased this AFA rate to 265.53 percent in

response to ministerial error allegations in its amended final

determination. *See* Amended Final Determination and Order.

In its Final Determination, Commerce applied as AFA, YDD's higher

rate (11.64 percent) as the subsidy rate for Kazchrome associated with

the "Priority Investment Projects for the Creation of New Production

Facilities" program. *See* Final Determination, P.R. 448, Appx___.[2]

However, applying AFA, Commerce ultimately used YDD's higher rate

(11.64 percent) as the subsidy rate for Kazchrome associated with this

program. *See* Final Determination, at 14, P.R. 448, Appx___. Because it

assigned an AFA rate to Kazchrome, Commerce did not further engage

with the record evidence demonstrating that, in Kazchrome's case,

these tax exemptions were tied to the production of non-subject

merchandise (specifically, ferrochrome). *See* Final Determination, at 45,

P.R. 448, Appx___.

Kazchrome now appeals Commerce's findings in its Final

Determination.

---

[2]    Kazchrome notes that in Commerce's Final Determination, Commerce stated
that it calculated a 2.37 percent *ad valorem* subsidy rate for Kazchrome under this
program. *See* Final Determination at 16, P.R. 448, Appx___.  However, the final
calculations show that Commerce applied the 11.64 percent subsidy rate.

## III.   STANDARD OF REVIEW

This Court must "hold unlawful any determination, finding, or
conclusion found . . . to be unsupported by substantial evidence on the
record, or otherwise not in accordance with law."  19 U.S.C.
§ 1516a(b)(1)(B)(i).

To satisfy the "substantial evidence" standard, Commerce must take
into account "the entire record, including whatever fairly detracts from
the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United
States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also Nippon Steel Corp.
v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). And the Court
may not sustain Commerce's determination "without taking into
account contradictory evidence or evidence from which conflicting
inferences could be drawn."  *Universal Camera Corp. v. NLRB*, 340 U.S.
474, 487 (1951).

In order to satisfy the "substantial evidence" standard, Commerce
must also provide a reasoned explanation for its determination. To do
so, it must "make the necessary findings and have an adequate
evidentiary basis for its findings," which requires "examin{ing} the
relevant data and articulat{ing} a satisfactory explanation for its action

27

including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (*citing In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)). Commerce "must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

To be "in accordance with law," Commerce's determination must comply with the countervailing duty statute and its implementing regulations. Compliance includes adherence to the statutory criteria that must be satisfied before Commerce may disregard information on the record and apply facts otherwise available ("FA"), and thereafter AFA. *See, e.g.*, *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1357-1360 (Ct. Int'l Trade 2019) (remanding in part Commerce's final results in the first administrative review of the CVD order on chlorinated isocyanurates from China, because Commerce improperly applied FA—and subsequently, AFA—in violation of 19 U.S.C. § 1677e(a)-(b)). Failure to adhere to these requirements is fatal to Commerce's decision. *See, e.g.*, *id.*

28

## IV.   ARGUMENT

Commerce's decision to apply AFA to a fully cooperative

respondent—who participated in the underlying investigation through

the submission of thousands of pages of evidence and data and four full

on-site days of verification in Aktobe, Kazakhstan—is unsupported by

substantial evidence on the record and not in accordance with law.

Commerce inaccurately stated that information was missing from the

record in its Final Determination, but all necessary information was on

the record and was timely submitted in the form and manner requested.

Even if Commerce's claims were accurate (which they are not), the

information with which Commerce raised concerns is not relevant for

Commerce's subsidy calculations. Furthermore, to the extent that

information was missing, Commerce was obligated to, but did not,

notify Kazchrome of any alleged deficiencies and afford it the

opportunity to remedy the deficiency. This is tantamount to punitive

treatment for a fully cooperative respondent, and it is unlawful.

### A. Legal Standard for Applying AFA

Kazchrome first provides an overview of the applicable law regarding

the use of FA and AFA. Kazchrome organizes its discussion into the

following three categories: (i) the conditions under which Commerce

29

may use FA on the record; (ii) the conditions under which Commerce

must use the information submitted by a respondent even if its

submissions do not completely satisfy Commerce's requirements; and

(iii) the additional conditions under which Commerce may not only use

FA but also apply adverse inferences (*i.e.*, AFA).

### 1. Conditions Under Which Commerce May Use FA

Section 1677e(a) of the statute defines the conditions (subject to 19

U.S.C. § 1677m(d)) under which Commerce may resort to FA in making

its determination. Those conditions are: (1) necessary information is not

available on the record; or (2) a respondent has (i) withheld requested

information, (ii) failed to provide requested information by the

established deadlines or in the form and manner requested (subject to

19 U.S.C. §§ 1677m(c)(1) and (e)), (iii) significantly impeded the

proceeding, or (iv) provided unverifiable information. *See* 19 U.S.C.

§ 1677e(a).

Importantly, the U.S. Court of Appeals for the Federal Circuit

("CAFC") has stated that, "under the plain language of § 1677e(a), it is

clear that Commerce can only use facts otherwise available to fill a gap

in the record." *Zhejiang Dunan Hetian Metal Co., Ltd. v. United States*,

30

652 F.3d 1333, 1348 (Fed. Cir. 2011). In other words, Commerce may not apply FA "in disregard of information of record that is not missing or otherwise deficient." *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348 (*quoting Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270, 1288 (Ct. Int'l Trade 2005)).

Moreover, if the conditions under 19 U.S.C. § 1677e(a) are satisfied, Commerce is permitted to use FA, but not necessarily permitted to draw adverse inferences (*i.e.*, apply AFA). Before Commerce may apply AFA, both the conditions under 19 U.S.C. § 1677e(a) and the additional conditions prescribed by 19 U.S.C. § 1677e(b) must be satisfied. The conditions prescribed by 19 U.S.C. § 1677e(a) therefore are necessary, but not sufficient, for Commerce to apply AFA. "As these two subsections make clear, Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference." *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1346.

If the statutory prerequisites are not met, Commerce cannot disregard the submitted information and apply FA or AFA. That is the circumstance present in this case; Commerce failed to demonstrate satisfaction of both of the statutory prerequisites.

### 2. Conditions Under Which Commerce Must Use the Information Submitted by a Respondent

The statute also establishes conditions under which Commerce must utilize a respondent's responses instead of FA (or AFA). Those conditions follow from the cross references to 19 U.S.C. § 1677m contained in 19 U.S.C. § 1677e(a). If the conditions in the cross references to 19 U.S.C. § 1677m are satisfied, then Commerce must utilize a respondent's responses even if they do not completely satisfy Commerce's requirements. Stated differently, when these conditions are satisfied, Commerce cannot disregard the respondent's responses and apply FA.

Section 1677m(d) provides that before Commerce may disregard all or part of a respondent's responses that Commerce considers to be deficient, Commerce "shall" promptly inform the respondent of the deficiency and, to the extent practicable, provide the respondent an opportunity to remedy or explain the deficiency. The notice of any deficiency must also be timely such that the respondent has sufficient time to correct it. *See Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022); *see also Saha Thai Steel Pipe Pub. Co. v. United States*, 605 F.Supp.3d 1348, 1362 (Ct. Int'l Trade 2022)

32

("Commerce next must demonstrate it provided notice of and an opportunity to remedy any deficiencies in a respondent's submissions"). Thus, if Commerce has not timely identified the deficiency and provided the respondent an opportunity to remedy or explain it, Commerce may not disregard a respondent's responses and apply FA—let alone AFA. Commerce must rely on a respondent's responses in that circumstance.

Moreover, both 19 U.S.C. § 1677e(a)(2)(B) and 19 U.S.C. § 1677m(d) refer to 19 U.S.C. § 1677m(e). Section 1677m(e) states that Commerce "shall not" decline to use submitted information that does not meet all applicable requirements if: (1) the information was submitted by the established deadlines; (2) the information is verifiable; (3) the information is not so incomplete that it cannot be reliable; (4) the respondent acted to the best of its ability; and (5) it would not be unduly difficult for Commerce to use the information. Thus, again, even if the information submitted by a respondent does not meet all applicable requirements, if the conditions listed in 19 U.S.C. § 1677m(e) are satisfied, Commerce must still use the respondent's submitted information instead of FA (or AFA).

### 3. Additional Prerequisites for the Application of Adverse Inferences

Section 1677e(b) of the statute imposes further restrictions on Commerce's application of AFA. Specifically, that provision states that Commerce may apply AFA (as opposed to simply using FA) only if Commerce makes an additional finding that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1).

The CAFC has made clear that, pursuant to 19 U.S.C. § 1677e(b), the application of AFA requires the separate and additional finding that the respondent failed to act "to the best of its ability." *Zhejiang Dunan Hetian Metal Co.*, 652 F. 3d at 1346 (*quoting Nippon Steel Corp.*, 337 F.3d at 1381). In finding that a respondent did not act "to the best of its ability," Commerce must determine that a respondent's actions amounted to "either a willful decision not to comply or behavior below the standard for a reasonable respondent." *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1360 (Ct. Int'l Trade 2003) (*quoting Nippon Steel Corp. v. United States*, 118 F. Supp. 2d 1366, 1379 (Ct. Int'l Trade 2000)); *see also POSCO v. United States*, 337 F. Supp. 3d 1265, 1273 (Ct. Int'l Trade 2018) ("The U.S. Court of Appeals for the

34

Federal Circuit has interpreted these two subsections to have different purposes. Subsection (a) applies 'whether or not any party has failed to cooperate fully with the agency in its inquiry.' On the other hand, subsection (b) applies only when the Department makes a separate determination that the respondent failed to cooperate 'by not acting to the best of its ability.'") (internal citations omitted). Moreover, "{a}n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." *Nippon Steel Corp.*, 337 F.3d at 1383.

The circumstances that warrant the application of total AFA are reserved for situations "'where none of the reported data is reliable or usable' because, for example, all of the 'submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data.'" *Mukand, Ltd. v. United States*, 37 C.I.T. 443, 452 (Ct. Int'l Trade 2013), *aff'd* 767 F.3d 1300 (Fed. Cir. 2014) (emphasis added, citations omitted); *see also Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348 (*citing Steel Authority of India, Ltd. v. United States*, 149 F. Supp. 2d 921, 928-929 (Ct. Int'l Trade 2001)). The use of total AFA is

35

not supported by a record where a respondent has responded to all of

Commerce's questionnaires with reliable and usable information, the

respondent did so within the established deadlines, and Commerce

verified the accuracy of the information, as is the case here.

### B. Commerce's Application of FA to Kazchrome is Not Supported by Law or Fact

The ability to apply FA is a prerequisite for AFA. *See Zhejiang*

*Dunan Hetian Metal Co.*, 652 F.3d at 1346. Because Commerce's

application of FA was improper in this investigation, it could not

lawfully apply AFA either.

Commerce's decision to apply FA (and AFA) to Kazchrome revolves

entirely around one piece of information—the ownership of Kazchrome's

ultimate parent, ERG. Commerce disregarded the fact that this

information was on the record since the beginning of the investigation

(as early as May 14, 2024), and that this information was not necessary

for Commerce's subsidy calculations due to regulatory bars in effect

during the investigation. In disregarding the record evidence and

misapplying the law in effect during the investigation, Commerce

constructed unsupported bases to apply FA (and AFA). Because these

bases were unsubstantiated and unlawful, Commerce failed to satisfy

the statutory criteria for FA (and AFA).

### 1. The record fails to demonstrate the satisfaction of any statutory criteria for the application of FA.

The record does not support the application of FA. In the Final

Determination, Commerce based its decision to apply FA on the

following allegations: (1) "necessary information is missing from the

record"; (2) "Kazchrome failed to provide information within the

deadlines established"; (3) the information was not "in the form and

manner requested"; and (4) "Kazchrome significantly impeded the

investigation." Final Determination, at 30-31, P.R. 448, Appx___ (*citing*

19 U.S.C. § 1677e(a)(2)(A) – (C)).[3]  These allegations focused solely on

---

[3]     As a technical note, Commerce's discussion in its Final Determination seemingly conflates the statutory standards for the application of FA under subsections (a)(1) and (a)(2)(A).  Section 1677e(a)(1) authorizes Commerce to apply FA if "necessary information is not available on the record."  Section 1677e(a)(2)(A) authorizes Commerce to apply FA if "an interested party or any other person withholds information that has been requested by {Commerce}…".  Commerce does not cite to section 1677e(a)(1) in its Final Determination but does state that necessary information is not on the record.  Conversely, Commerce cites to section 1677e(a)(2)(A) but does not state that Kazchrome withheld information that was requested.  Despite Commerce's technical errors, Kazchrome addresses both subsections of the statute and explains why the record does not support a finding that either statutory criterion is satisfied.  As explained in this brief, all necessary information was available on the record and Kazchrome did not withhold any requested information.

information related to the ownership of ERG. The record, however, does not support these allegations.

As an initial point, Commerce anchored its entire FA finding upon the claim that Kazchrome did not submit the information at issue in the "form and manner" requested. Commerce then tethered the satisfaction of the other FA criteria on this "form and manner" finding. In the Final Determination, Commerce acknowledged that while ERG's ownership information may be on the record, the way it was provided "does not constitute an adequate or beneficial response to Commerce's initial affiliation inquiries." Final Determination, at 28-29, P.R. 448, Appx___. Commerce then noted that "{r}ather than provide the information in the form and manner requested…Kazchrome provided an incomplete response" regarding ERG. Final Determination, at 29, P.R. 448, Appx___. Commerce alleged that it lacked "the opportunity to request more information on ERG and potential subsidies that ERG received, which could have a direct impact on Commerce's calculation of the subsidy rate assigned to Kazchrome." Final Determination, at 29, P.R. 448, Appx___. Commerce thereby concluded that "necessary" information (*i.e.*, additional information about ERG, including

theoretical subsidies provided by GOK to ERG) was missing from the record.

Under the pretense that Commerce requested full ownership information for ERG in its questionnaires, Commerce concluded that Kazchrome had not submitted such "requested" information within the established deadlines. *See* Final Determination, at 30, P.R. 448, Appx___. Rather, Commerce concluded that Kazchrome first provided the information during verification. *See* Final Determination, at 30, P.R. 448, Appx___. Commerce further found that because verification is not an opportunity to present new information, the alleged delay in disclosure of this information significantly impeded the investigation. *See* Final Determination, at 30, P.R. 448, Appx___. In total, Commerce found that because it believed the ERG ownership information was not submitted in the form and manner requested, it was not provided by allegedly applicable deadlines to submit that information, resulting in Kazchrome impeding the investigation.

Contrary to Commerce's description of the record, however, Kazchrome supplied all information requested by Commerce in the form and manner requested. Commerce's incorrect view relies entirely on

mischaracterization of its questionnaires. Commerce contends that in its initial questionnaire it requested information regarding Kazchrome and all of its affiliates, "including its complete ownership structure." Final Determination, at 29, P.R. 448, Appx___/ (*citing* Letter from Lana Nigro, Program Manager, AD/CVD Operations, Office VII to the Government of Kazakhstan, *Investigation of Ferrosilicon from Kazakhstan: Countervailing Duty Questionnaire*, Case No. C-834-813 (May 3, 2024), at 48-49, P.R. 40, Appx___ ("Initial Questionnaire")). The initial questionnaire did request certain information about Kazchrome's affiliates, *but it never requested a complete ownership structure of Kazchrome or its affiliates. See* Initial Questionnaire, at 48-49, P.R. 40, Appx___. Commerce's statements that it requested this information in the Initial Questionnaire are false.

Commerce did include the following question in its Affiliation Supplemental Questionnaire:

> Please provide a chart, similar to the one below, starting with Kazchrome, its ultimate owners (parent holding companies, grandparents, etc.), and companies in which Kazchrome may own a percentage.

Letter from Lana Nigro, Program Manager, AD/CVD Operations, Office VII to TELF AG, *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Affiliation Supplemental Questionnaire for TELF and Kazchrome*, Case No. C-834-813 (Jun. 7, 2024), at 4, P.R. 88, Appx___/C.R. 28, Appx___ ("Affiliation Supplemental Questionnaire"). This was the first and only instance when Commerce requested information about Kazchrome's ownership structure. The question specifically asked for the identification of Kazchrome's "ultimate owners," and defined this term in the parenthetical as parent/grandparent companies. The question also requested identification of companies in which Kazchrome may have held an ownership interest. Kazchrome followed Commerce's instructions and reported all of Kazchrome's parent companies up to the ultimate parent—ERG—and included any entities in which Kazchrome held an ownership interest. *See* Kazchrome's Affiliation Supplemental Questionnaire Responses, at Exhibit AFFILSUP-2, P.R. 97-98, Appx___/C.R. 29, Appx___. This cannot lawfully be considered non-responsive or incomplete.

41

The contention that Kazchrome failed to submit information concerning ERG that was <u>actually requested</u> by Commerce, in the form and manner requested by Commerce, is therefore wrong. Commerce never requested this information. Because Commerce never requested it, Commerce cannot claim that Kazchrome failed to provide it in the form and manner requested. And because Commerce relies on its unsupported finding that Kazchrome failed to provide this information in the form and manner requested to find that the other FA criteria were also met (*i.e.*, necessary information was missing from the record, allegedly "requested" information was not timely submitted, and Kazchrome impeded the proceeding), Commerce's entire rationale for the application of FA fails.[4]

---

[4]     Commerce's application of FA also fails when the other statutory criteria are considered independently from whether requested information regarding ERG was submitted in the form and manner requested.  *First*, necessary information was not missing from the record.  As explained throughout this brief and in Commerce's Final Determination, information regarding the GOK's ownership interest in ERG <u>was</u> on the record since May 14, 2024.  In any event, as explained in this brief, neither this information—nor further information regarding ERG that Commerce might have requested—was **necessary** to Commerce's investigation.  Rather, all of this information was legally and practically unnecessary because it could not have affected Commerce's calculation of Kazchrome's CVD rate.  *Second*, requested information was, by definition, not withheld, because Commerce never requested complete ownership information for ERG.  *Third*, the fact that Commerce never requested this information also bars a finding that "requested" information was not

Nevertheless, assuming *arguendo* that Commerce did request the
information in its questionnaires, in accordance with 19 U.S.C.
§ 1677e(a)(2)(B), a finding as to whether a party fails to provide
information in the form and manner requested is conditioned upon 19
U.S.C. § 1677m(e). Section 1677m(e) states that Commerce "shall not
decline to consider information" if:

> (1) the information is submitted by the deadline
> established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it
> cannot serve as a reliable basis for reaching the
> applicable determination,
> (4) the interested party has demonstrated that it
> acted to the best of its ability in providing the
> information and meeting the requirements
> established by {Commerce} . . .with respect to the
> information, and
> (5) the information can be used without undue
> difficulties.

Commerce failed to explain why these provisions do not apply.
Notwithstanding this gap in Commerce's analysis, the record
demonstrates that these conditions <u>were</u> satisfied. ERG's ownership

---

provided within established deadlines. *Fourth*, because Kazchrome timely provided
all information that was actually requested by Commerce, there is no basis to claim
that Kazchrome significantly impeded the proceeding.

information was provided well before any questionnaire response deadlines—as early as May 14, 2024. *See* TELF's May 14, 2024 Submission, at 4 fn. 6 and Exhibit 3, P.R. 50, Appx___/C.R. 20, Appx___. The information could be, and was, verified. *See* Kazchrome Verification Report, at 2, P.R. 396, Appx___/C.R. 252, Appx___. It was not incomplete at all, let alone so incomplete that Commerce could not rely on it in making its Final Determination. Indeed, TELF's May 14, 2024 Submission included the precise ownership interest that the GOK held in ERG (as well as the precise ownership interests held by certain individuals). *See* TELF's May 14, 2024 Submission, at 4 fn. 6 and Exhibit 3, P.R. 50, Appx___/C.R. 20, Appx___. This information was further supported by statements included in Kazchrome's financial statements. *See* Kazchrome's June 17, 2024 Questionnaire Response, at Exhibits GEN-2 through GEN-6 and GEN-14, P.R. 107-113, Appx___/C.R. 32-57, Appx___.

Further, Kazchrome acted to the best of its ability to provide the information requested by Commerce and to meet Commerce's requirements. Kazchrome relied upon Commerce's longstanding regulation (19 C.F.R. § 351.527(a)) that barred attribution of any

subsidies received by ERG to Kazchrome.. Commerce would not have requested an upstream structure for a Luxembourg company like ERG. This information could not have changed the fact that any subsidies received by ERG would be irrelevant to Commerce's calculation of Kazchrome's rate. Such information would not have been necessary for Commerce to render a determination in this investigation.

After Kazchrome submitted its structure chart ending with its ultimate parent (ERG), Commerce did not request further ownership information from Kazchrome or notify Kazchrome of any deficiencies in its submission. Therefore, Kazchrome had reason to believe that it had fully complied with Commerce's requests and adhered to Commerce's requirements..

Finally, given that ERG's ownership information was on the record even prior to the deadline for the initial questionnaire responses—and additional information and explanation with respect to ERG was provided throughout the investigation—record information related to ERG could have been used without undue difficulties. The statute thus precludes Commerce from declining to consider the ERG ownership information on the record and applying FA.

45

### 2. Any information that was alleged to be missing was not necessary for Commerce's subsidy analysis.

Even if information about ERG's ownership was "missing" from the record, such information was not "necessary" for Commerce's subsidy analysis. In instances in which information is missing from the record, Commerce must find this information to be necessary for its analysis before resorting to FA. *See* 19 U.S.C. § 1677e(a)(1) ("if *necessary* information is not available on the record…{Commerce} shall, subject to section 1677m(d) of this title, use the facts otherwise available…") (emphasis added); *see also Clearon Corp*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019) ("Therefore, Commerce's use of facts available cannot be sustained because the Department has failed to show that the information it seeks is necessary to its determination."). If the information is not necessary, then FA is not warranted. As noted, neither information concerning ERG's ownership—nor information regarding theoretical subsidies provided by the GOK to ERG—is necessary, in light of Commerce's regulations that precluded Commerce from attributing any subsidies received by ERG to Kazchrome.

Specifically, section 351.527(a) of the regulations barred Commerce from finding that a subsidy exists if the alleged subsidy is supplied "{b}y

46

a government of a country other than the country in which the recipient firm is located…". It is undisputed that ERG is a Luxembourg company. Commerce did not take issue with this fact and nothing on the record demonstrates otherwise. Without information that would demonstrate otherwise, under 19 C.F.R. § 351.527(a), Commerce was precluded from attributing any alleged support from the GOK received by ERG to Kazchrome. This regulatory bar rendered ERG's ownership details— and any further information that Commerce might have requested about ERG—immaterial to Commerce's analysis and calculation of Kazchrome's rate. Thus, even if certain information about ERG was missing from the record, none of that information was necessary for Commerce's analysis. This fact destroys Commerce's rationale for the application of FA. *See, e.g.*, *Clearon Corp*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019).

> *3. Case law that Commerce relies upon fails to support its application of FA.*

The Final Determination relied upon case law that does not apply. Specifically, Commerce cited two cases: (i) *Sugiyama Chain Co. v. United States*, 797 F. Supp. 989 (Ct. Int'l Trade 1992); and (ii) *Corinth Pipeworks Pipe Indus. SA v. United States*, 633 F. Supp. 3d 1314 (Ct.

47

Int'l Trade 2023). Commerce quoted *Sugiyama Chain* for the proposition that courts recognize "Commerce often receives 'numerous and voluminous submissions' that may be 'entirely impracticable for Commerce to sort out.'" Final Determination, at 28, P.R. 448, Appx___ (*quoting Sugiyama Chain*, 797 F. Supp. at 994). These selective quotes from *Sugiyama Chain*, however, are applied out of context and misconstrue the Court's discussion in the case.

The actual language from the Court's decision is: "Commerce receives numerous and voluminous submissions of such data during an administrative proceeding. Not uncommonly, submissions contain various discrepancies which would be entirely impracticable for Commerce to sort out." *Sugiyama Chain*, 797 F. Supp. at 994. The Court did *not* state that Commerce has no obligation to review numerous and voluminous submissions of data  The Court instead stated that requiring Commerce to sort out *various discrepancies in multiple submissions* would be impracticable.

Crucially, the Court in *Sugiyama Chain* considered multiple iterations of a sales database with a large number of entries, which contained errors that Commerce failed to detect and thus included

48

when calculating the respondent's dumping margin. *See generally
Sugiyama Chain*, 797 F. Supp. 989. The Court was unwilling to obligate
Commerce to parse through data entry discrepancies across multiple
submissions (which, collectively, contained "thousands of data entries").
*See id*. at 994-995. The Court never stated or even alluded to a position
that Commerce can ignore clear statements of fact in any type of
submission simply because there were other submissions and other data
on the record. The citations to *Sugiyama Chain* are therefore
disingenuous, and the actual decision and discussion in *Sugiyama
Chain* is irrelevant to the issues and facts in this case.

Commerce applied the same tactic when it quoted *Corinth
Pipeworks*—a case with facts entirely dissimilar to the one at issue—
using out-of-context language from the decision to support its position
in the Final Determination. *Corinth Pipeworks* involves an antidumping
duty administrative review in which the respondent submitted a multi-
step reconciliation that deviated from "Commerce's 'preferred
reconciliation structure'" and included "over-inclusive data" in response
to Commerce's second Section D supplemental questionnaire. *Corinth
Pipeworks*, 633 F. Supp. 3d at 1324-1326. Commerce disregarded the

data and the reconciliation when it could not reconstruct the submitted reconciliation and ultimately applied AFA. *See Corinth Pipeworks*, 633 F. Supp. 3d at 1319. The Court upheld Commerce's decision to disregard the data, noting that the plaintiff's arguments in the appeal demonstrated that there were multiple ways to analyze the data, and that the plaintiff's preferred reconciliation was confusing and required "Commerce to sift through unrequested and irrelevant information." *Corinth Pipeworks*, 633 F. Supp. 3d at 1326.

In the Final Determination in this investigation, quoting *Corinth Pipeworks*, Commerce stated that "providing a 'bulk of information does not constitute a response to inquiries,' especially where Commerce explicitly requested that Kazchrome provide a complete description of its affiliates and ownership structure." Final Determination at 28, P.R. 448, Appx___ (*quoting Corinth Pipeworks*, 633 F. Supp. 3d at 1324 (internal citations omitted)).[5]

―――――――――――

[5]    Kazchrome highlighted that with respect to the quoted language, these were Commerce's—not the Court's—words.  The language that Commerce highlighted in the Final Determination was included in a parenthetical from the *Corinth Pipeworks* Court in which it cited Commerce's underlying Issues and Decision Memorandum in that case.  The quote that a "bulk of information does not constitute a response to inquiries" comes from Commerce itself, not the Court.

The entire quote is: "Merely providing a bulk of information does not constitute a response to inquiries requesting that a party clearly explain how its submitted cost data reconcile to their audited financial statement COM." *Corinth Pipeworks*, 633 F. Supp. 3d at 1324. The concerns related to the provision of bulk information were therefore specific to the facts at issue in that case—*i.e.*, the submission of detailed cost data and cost reconciliations. The Court was not outlining a broadly applicable principle for all submissions of information, especially not short narrative submissions or easily-navigable exhibits such as annual reports and financial statements.

In total, Commerce's reliance on these two inapposite cases—and the tactics it used as part of its reliance—were inappropriate. Here, the information was not hidden in a voluminous or convoluted data dump— it appeared in early, targeted submissions and in Kazchrome's core financial exhibits. As explained above, the disclosure was first made in the beginning of the proceeding on page 4 of a five-page narrative submission, and again in Exhibit 3 of that same submission. *See generally* TELF's May 14, 2024 Submission, P.R. 50, Appx___/C.R. 20, Appx___. The relevant exhibit was one of only three exhibits in the

entire submission, and it consisted of just two pages. *See generally id.*, P.R. 50, Appx___/C.R. 20, Appx___. This information was then further supported by statements included in all of Kazchrome's financial statements. *See* Kazchrome's June 17, 2024 Questionnaire Response, at Exhibits GEN-2 through GEN-6 and GEN-14, P.R. 107-113, Appx___/C.R. 32-57, Appx___. It cannot be said, then, that the disclosure of ERG's ownership was buried within significant datasets that contained many different data points. The ownership information was provided as a standalone disclosure in short and/or easily digestible submissions. Moreover, the information provided was clear, unambiguous, and consistent. There were no discrepancies between the May 14, 2024 disclosure and Kazchrome's financial statements for Commerce to parse through.

Finally, Kazchrome reiterates again that Commerce never requested complete ownership information for ERG. This contrasts with the sales database and cost data at issue in *Sugiyama Chain* and *Corinth Pipeworks*, which were requested by Commerce. *See generally Sugiyama Chain*, 797 F. Supp. 989; *see also Corinth Pipeworks*, 633 F. Supp. 3d at 1317-1319. In short, neither of the cases cited by Commerce

52

supports a view that Kazchrome failed to provide requested information in the form and manner requested. Consequently, neither case supports Commerce's decision to apply FA to Kazchrome.

> ### 4. Commerce did not timely notify Kazchrome of any deficiencies in its responses and consequently failed to satisfy its statutory obligations under 19 U.S.C. § 1677m(d).

Commerce never notified Kazchrome of any deficiencies with respect to ERG's ownership information (and never requested it either). Because Commerce never provided any such notification, it failed to adhere to the statutory prerequisites for the application of FA. "{F}ederal statute and Federal Circuit precedent require Commerce to have provided notice and an opportunity to cure" a deficiency before it can apply FA (and therefore AFA). *Saha Thai Steel Pipe Pub. Co. v. United States*, 605 F. Supp. 3d 1348, 1369 (Ct. Int'l Trade 2022) (*citing* 19 U.S.C. § 1677m(d) ); *see also Shelter Forest International Acquisition, Inc. v. United States*, 2022 WL 2155965 (Fed. Cir. June 15, 2022). "Commerce's failure to timely notify a party of deficiency 'is itself a violation of § 1677m(d).'" *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022) (*quoting Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1349 (Ct. Int'l Trade 2018). The courts

have also noted that "{a} mistake or misunderstanding still requires notice of the deficiency and an opportunity to cure," *Saha Thai*, 605 F. Supp. 3d at 1369 (*citing Shelter Forest*, 2022 WL 2155965, at \*5, and that it is Commerce's responsibility to "clearly and definitively ask for what it wants." *Saha Thai*, 605 F. Supp. 3d at 1363.

Commerce alleged in its Final Determination that it explicitly requested the ownership structure of ERG in its questionnaires. *See* Final Determination, at 28, 29, P.R. 448, Appx___. As explained above, it did not. And even if it did, Commerce never notified Kazchrome of any deficiencies with respect to any responses related to ERG, as required by law. Commerce cited only to the affiliated companies portion of the Initial Questionnaire when declaring that it requested the ownership structure of ERG. *See* Final Determination, at 29, P.R. 448, Appx___ (stating "In our initial questionnaire, we requested that Kazchrome provide complete information regarding all of its affiliates, including its complete ownership structure" and citing to "Initial Questionnaire at 48-49" for this proposition); *see also* Final Determination, at 30, P.R. 448, Appx___ (contending that "…Kazchrome was required to report its full affiliation and ownership structure

information by May 31, 2024…", citing to Commerce's extension letter for Kazchrome's Affiliated Companies Response).

In the affiliated companies portion of the Initial Questionnaire, Commerce did request identification of all affiliated entities and the nature of the affiliation, and in its response, Kazchrome followed these instructions and identified ERG and the nature of ERG's affiliation to Kazchrome. *See* Kazchrome's Affiliated Companies Response, at 2, 4 and Exhibit AFFIL-1, P.R. 77, Appx___/C.R. 26, Appx___. But Commerce did not request any additional information about ERG, including its ownership, in the Initial Questionnaire. This fact is supported by Commerce's lack of citation in the Final Determination to any specific question within the Initial Questionnaire that requested all ownership information for affiliates. Commerce also did not notify Kazchrome of any deficiencies with respect to its reporting of ERG in the Initial Questionnaire. Again, this is bolstered by Commerce's silence on the issue in the Final Determination. The lack of any reference to deficiency notifications is a tacit concession that Commerce failed to adhere to its statutory obligations.

Moreover, after Kazchrome provided its structure chart in response to Commerce's Affiliation Supplemental Questionnaire, Commerce gave Kazchrome no indication that any aspect of this chart was deficient. Indeed, Commerce requested nothing further from Kazchrome with respect to ERG, even though other record information (*e.g.*, TELF's May 14, 2024 Submission) alerted Commerce to the GOK's interest in ERG. This can only lead to one of two conclusions: either Kazchrome's submission was fully compliant with Commerce's requests, or if it was not, Commerce violated its statutory obligation to inform Kazchrome and provide an opportunity for cure.

Commerce cannot penalize Kazchrome for its own missteps in this investigation. Kazchrome identified ERG in its initial response as an affiliate and explained the basis for affiliation. *See* Kazchrome's Affiliated Companies Response, at 2, 4 and Exhibit AFFIL-1, P.R. 77, Appx___/C.R. 26, Appx___. Kazchrome also understood that information about ERG's ownership, including the GOK's ownership interest, was already on the record. Kazchrome could not have known that Commerce overlooked or was unaware of this information. "The law requires respondents to be diligent, not clairvoyant." *Saha Thai*, 605 F. Supp.

3d at 1365 (*citing Sigma Corp. V. United States*, 841 F. Supp. 1255,

1267 (Ct. Int'l Trade 1993) ("Commerce cannot expect a respondent to

be a mind-reader."). Commerce had a legal obligation to inform

Kazchrome of any deficiency with respect to information about ERG,

and it failed to do so. Having failed to do so, its decision to apply FA

(and AFA) cannot stand. *See Saha Thai*, 605 F. Supp. 3d at 1371

("Having failed at both prerequisites, its current decision is not

supported by substantial evidence nor in accordance with the law.").

> *5. Kazchrome did not deprive Commerce from any opportunity to determine whether 19 C.F.R. § 351.527(a) was applicable.*

Commerce attempts to downplay the effect of applicable law on its

subsidy analysis in the Final Determination by asserting that

Kazchrome "deprived" Commerce of an opportunity to determine

whether 19 C.F.R. § 351.527(a) applied with respect to ERG. *See* Final

Determination, at 30, P.R. 448, Appx___. Specifically, Commerce claims

that it did not have the affiliation information necessary to determine

the applicability of this regulation. *See* Final Determination, at 30, P.R.

448, Appx___. Fact and law fail to support this position.

57

Throughout this brief (and in the underlying administrative record), Kazchrome has demonstrated that the relevant affiliation information was on the record. ERG's ownership information was on the record even before the deadline for Kazchrome's Affiliated Companies Response. Furthermore, Kazchrome presented its understanding of the regulations and how it may apply to ERG in its Affiliated Companies Response submitted on May 31, 2024. *See* Kazchrome's Affiliated Companies Response, at 4, P.R. 77, Appx___/C.R. 26, Appx___. Kazchrome explained that it did not intend to submit a full questionnaire response for ERG because it was a Luxembourg company.

Commerce went on to issue three supplemental questionnaires to Kazchrome between May 2024 and August 2024, and never once inquired further about ERG or the potential applicability of 19 C.F.R. § 351.527(a). If Commerce believed that information necessary to determine the applicability of 19 C.F.R. § 351.527(a) was missing, it had every opportunity to request such information from Kazchrome. But Commerce never made any such requests. Nor did Commerce explain why it could not have made such requests. This is because Commerce has no basis to make such declarations. Since the very beginning stages

of the investigation, Kazchrome was transparent as to its position with

respect to ERG and clearly articulated that ERG was a Luxembourg

company. Therefore, Commerce had all of the information that it

needed to determine the applicability of 19 C.F.R. § 351.527(a). Any

attempts by Commerce to claim otherwise must fail.

As discussed above, to the extent that there were deficiencies on the

record, Commerce was obligated to notify Kazchrome of those

deficiencies and offer it an opportunity to cure them. *See* 19 U.S.C.

§ 1677m(d). Commerce did not do this. Commerce's failure to adhere to

its statutory obligations undermines its ability to disregard the effect of

other law—namely, the regulation precluding the attribution of any

subsidies received by ERG to Kazchrome. As a result, Commerce's

support for its application of FA and AFA is meritless.

## C. Commerce's Application of AFA to Kazchrome is Not Supported by Law or Fact

Commerce could not apply FA to Kazchrome in this investigation for

numerous reasons detailed in the above sections. As a result, Commerce

was automatically precluded from applying AFA to Kazchrome.

Nevertheless, assuming *arguendo* that Commerce was authorized to apply FA, it still had no basis to apply AFA.

> 1. *Commerce went beyond its authority when it applied*
>    *AFA to Kazchrome*

Commerce cannot apply AFA based on an alleged failure by Kazchrome to supply information that is entirely unnecessary for Commerce's subsidy analysis. *See Shandong Huarong Machinery Co., Ltd. v. United States*, 435 F. Supp. 2d 1261, 1298 (Ct. Int'l Trade 2006) (affirming Commerce's decision that AFA is not appropriate based on a respondent not submitting "unneeded data") (*citing Timken Co. v. United States*, 852 F. Supp. 1122, 1126 (Ct. Int'l Trade 1994)). Information about ERG's ownership was not needed because it was irrelevant. Regardless of ERG's ownership or any theoretical subsidies received by ERG from the GOK, section 351.527(a) of Commerce's regulations precluded it from attributing subsidies received by ERG to Kazchrome. Commerce therefore would have no need for this information to complete its subsidy analysis for Kazchrome.

Moreover, Commerce may apply AFA only upon making a separate finding that Kazchrome "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. §

60

1677e(b)(1). As the Federal Circuit has explained: "An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." *Nippon Steel Corp.*, 337 F.3d at 1383.

Here, there is no basis for Commerce to find that Kazchrome failed to cooperate to the best of its ability. In its Affiliated Companies Response, Kazchrome provided all of the information regarding ERG that Commerce actually requested, and explained why it was not providing a complete questionnaire response on behalf of ERG. It did so in accordance with Commerce's regulations and longstanding practice. Further, as discussed in detail above, Kazchrome also provided all of the information that Commerce actually requested through its Affiliation Supplemental Questionnaire. Commerce did not ask Kazchrome to resubmit any information pertaining to ERG from these responses or provide any additional information with respect to ERG, despite having full knowledge of ERG's country of incorporation and the ownership interests in ERG. Because of these facts, there is nothing more Commerce could have reasonably expected from Kazchrome on

61

this issue. Kazchrome cannot have divined Commerce's oversight of

record information or belief that Kazchrome's initial responses were

deficient.

In short, this is not remotely a situation where Commerce could have

expected more from Kazchrome, and thus not a situation where

Kazchrome has failed to cooperate in a manner that would justify the

application of AFA.

### 2. The way in which Commerce applied AFA to Kazchrome was also unlawful.

Not only did Commerce lack the authority to apply AFA here, it

committed legal and factual error in selecting the appropriate AFA rate.

In selecting the AFA rate, Commerce found that "there are no facts on

this record to suggest that a rate other than the highest rate

envisioned" under the statute "should be applied as AFA."  Final

Determination, at 14, P.R. 448, Appx___. This, of course, ignores the

detailed record confirming Kazchrome and its cross-owned affiliates'

non-use of all programs at issue (with one exception for "the "Priority

Investment Projects for the Creation of New Production Facilities"

program, as discussed below). In particular, this extensive record

evidence included: (1) the verified and indisputable fact that

Kazchrome's location prevents it from using subsidies available only in the Saryarkza SEZ; (2) the verified fact that Kazchrome and its cross-owned affiliates did not maintain agreements with the GOK required for receipt of various alleged subsidies; and (3) Commerce's conclusions of non-use based on a comprehensive review of Kazchrome's business records. *See* Kazchrome Verification Report, at 5-6, P.R. 396, Appx___/C.R. 252, Appx___; *see also* GOK Verification Report, at 2-5, P.R. 414, Appx___/C.R. 283, Appx___. Nevertheless, Commerce calculated a punitive AFA rate that included all SEZ programs and all program-specific rates above zero for the other mandatory respondent, YDD. There is no corroboration or factual basis for the application of any such program-specific rates to Kazchrome, nor did Commerce attempt to identify any. It merely stated that there was an "absence of reliable record evidence concerning Kazchrome {sic} usage of the subsidy programs at issue due to their decision not to provide complete information in the investigation." Final Determination, at 15, P.R. 448, Appx___. But this is not true. The (erroneously) identified evidence that Commerce found lacking related to Kazchrome's non-Kazakhstani

63

ultimate parent, ERG, which is an entity plainly out of scope of the investigated programs.

In the Final Determination, Commerce applied a rate of 265.38 percent—an egregiously high rate under any circumstances, but surely punitive and out of bounds in the context of this investigation. *See* Final Determination, at 14,109, P.R. 448, Appx___. Commerce then went beyond this rate in an Amended Final Determination on April 16, 2025, increasing the rate to 265.52 percent on the basis of changes to the other mandatory respondent's use of certain programs. *See* Amended Final Determination and Order, at 21,448, P.R. 460, Appx___. While numerically insignificant, the Amended Final Determination confirms the legal error in Commerce's selection of the AFA rate, as Commerce even *adjusted* this rate to again account for another company's use of a program for which Commerce itself had verified Kazchrome's non-use. *See* Memorandum from Peter Shaw, Senior International Trade Compliance Analyst, AD/CVD Operations, Office V to Elizabeth Eastwood, Acting Deputy Assistant Secretary, AD/CVD Operations, *Countervailing Duty Investigation of Ferrosilicon from the Republic of Kazakhstan: Analysis of Ministerial Error Allegations*, Case No. C-834-

64

813 (Apr. 15, 2025), at 2-3, P.R. 454, Appx___/C.R. 297, Appx___

("Ministerial Error Memo").

### D. Commerce Must Address The Issues Raised With Respect to Alleged Benefits Under a Corporate Income Tax Exemption Program Tied to Non-Subject Merchandise

To the extent Commerce revisits its decision to apply AFA to

Kazchrome on remand and properly calculates a rate using data on the

record, Commerce must reverse its position from the Preliminary

Determination and find that the corporate income tax exemption for the

Ferrochrome Priority Investment Project was tied to the production,

sale, and export of ferrochrome (*i.e.*, non-subject merchandise), and did

not benefit the overall operations of the company. As a result,

Commerce must find that this program did not provide a

countervailable benefit to Kazchrome in this investigation.

The statute requires that a foreign producer's CVD rate be equal to

the amount of subsidies it received that are attributable to the

merchandise under investigation. *See* 19 U.S.C. § 1671(a)(1) ("the

administering authority determines that the government of a country or

any public entity within the territory of a country is providing, directly

or indirectly, a countervailable subsidy *with respect to the manufacture,*

65

*production, or export of a class or kind of merchandise…*") (emphasis added). Commerce will not include any subsidies in the CVD rate that are attributable to products that are not subject to the investigation. *See, e.g., Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 82,566 (Dep't of Commerce Oct. 11, 2024) and accompanying Preliminary Decision Memorandum, at 49-50 (finding that a grant program was tied to the production of non-subject merchandise and therefore did not confer a countervailable benefit). A subsidy is attributable to a specific product if evidence demonstrates that the subsidy is tied to the production or sale of that particular product. *See* 19 C.F.R. § 351.525(b)(5)(1); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1274 (Fed. Cir. 2012) ("Commerce's regulations state that '{i}f a subsidy is tied to the production or sale of a particular product, the Secretary will attribute the subsidy only to that product'").

In this case, the record shows that the GOK earmarked the Ferrochrome Priority Investment Project for ferrochrome—and only for ferrochrome. This fact was apparent from Kazchrome's submissions,

which included: (1) evidence that the GOK selected Kazchrome's

ferrochrome smelting shop at Aktobe as a priority investment project;

(2) the investment contract between Kazchrome and the GOK

specifying the priority investment project as the construction of and

activities related to this smelting shop; (3) status updates from

Kazchrome to the GOK on the priority investment project; and (4) the

GOK's approval letter upon completion of construction and operational

start of this smelting shop. *See* Kazchrome's June 20, 2024

Questionnaire Response, at Exhibits SQA PRIORITY-2 through SQA-

PRIORITY-6, P.R. 115, Appx___/C.R. 56-57, Appx___. The record

evidence also included confirmations by Kazchrome that none of the

facilities at the plant housing this new smelting shop, including the

smelting shop itself, "are designed to or can produce" ferrosilicon. *Id*. at

5, P.R. 115, Appx___/C.R. 56-57, Appx___. In light of this extensive

evidence that the program was tied to the production of ferrochrome,

the program could not be found countervailable by Commerce.

Kazchrome raised this issue in its case brief but Commerce did not

address it in its Final Determination. It instead found the argument to

be moot given that it was applying total AFA to Kazchrome. *See* Final

67

Determination, at 45, P.R. 448, Appx___. Should Commerce be required to reconsider its AFA decision and to use Kazchrome's responses on the record, it must address this issue. Kazchrome therefore includes this issue in this brief to preserve any argument for future briefing should it become relevant.

## V.    CONCLUSION

For the reasons explained above, Plaintiff respectfully requests that this Court enter judgment on the agency record in its favor.

Dated: December 9, 2025          Respectfully submitted,

                                 */s/ Christine M. Streatfeild*
                                 Christine M. Streatfeild
                                 Justin R. Becker
                                 Lauren Shapiro
                                 Baker & McKenzie LLP
                                 815 Connecticut Avenue, N.W.
                                 Washington, DC 20006-4078
                                 Tel.: (202) 835-6111
                                 christine.streatfeild@bakermckenzie.com

                                 *Counsel to Plaintiff TNC Kazchrome JSC*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Memorandum of Law in Support of Plaintiff TNC Kazchrome JSC's Rule 56.2 Motion for Judgment on the Agency Record, filed December 9, 2025, contains 12,663 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order issued by the Court on October 1, 2025 (ECF No. 31).

Dated: December 9, 2025      Respectfully submitted,

                                                        */s/ Christine M. Streatfeild*
                                                        Christine M. Streatfeild
                                                        Justin R. Becker
                                                        Lauren Shapiro
                                                        Baker & McKenzie LLP
                                                        815 Connecticut Avenue, N.W.
                                                        Washington, DC 20006-4078
                                                        Tel.: (202) 835-6111
                                                        christine.streatfeild@bakermckenzie.com

                                                        *Counsel to Plaintiff TNC Kazchrome*
                                                        *JSC*

## <u>CERTIFICATE OF COMPLIANCE REGARDING NON-USE OF</u>
## <u>GENERATIVE ARTIFICIAL INTELLIGENCE</u>

Pursuant to this Court's instructions for *Document Formatting and ECF Filing* (Sept. 19, 2025), counsel for Plaintiff TNC Kazchrome JSC certifies that this Rule 56.2 Motion for Judgment on the Agency Record and accompanying Memorandum of Law was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts – such as, but not limited to, ChatGPT or Google Bard.

Dated: December 9, 2025        Respectfully submitted,

<u>/s/ Christine M. Streatfeild</u>
Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff TNC Kazchrome JSC*