# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| TNC KAZCHROME JSC,                        ) | |
|                                          ) | |
|            Plaintiff,                     ) | |
|                                          ) | |
|      v.                                  )   Court No. 25-00128 |
|                                          ) | |
| UNITED STATES,                           ) | |
|                                          ) | |
|                                          ) | |
|            Defendant,                     ) | |
|                                          ) | |
|      and                                 ) | |
|                                          ) | |
| CC METALS AND ALLOYS, LLC                ) | |
| AND FERROGLOBE USA, INC.                 ) | |
|                                          ) | |
|            Defendant-Intervenor.         ) | |
| _____ ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

# TABLE OF CONTENTS

**PAGE**

DEFENDANT'S RESPONSE TO PLAINTIFF'S Rule 56.2 MOTION
FOR JUDGMENT UPON AGENCY RECORD ........................................1

STATEMENT PURSUANT TO RULE 56.2.............................................2

    I.    The Administrative Determination Under Review ...............2

    II.   Issues Presented For Review....................................................3

STATEMENT OF FACTS ....................................................................3

    I.    Statutory Background................................................................3

    II.   Commerce Initiates the Investigation and Selects TELF AG
        and YDD Corporation LLP As Mandatory Respondents .......5

    III.  Commerce Receives Kazchrome's Affiliated Companies
        Response and Kazchrome's Initial Questionnaire Response .9

    IV.  Commerce Publishes the Preliminary Determination .........12

    V.   Commerce Conducts Verification .........................................13

    VI.  Parties Submit Case and Rebuttal Case Briefs in Advance of
        the Final Determination .........................................................14

    VII. Commerce Publishes the Final Determination and Applies
        Total AFA to Kazchrome .......................................................15

    VIII. Commerce Amends the Final Determination and
        Kazchrome's Subsidy Rate......................................................18

SUMMARY OF THE ARGUMENT .......................................................19

i

ARGUMENT ....................................................................21

I.    Standard of Review .............................................21

II.   Commerce Properly Applied Facts Available to Kazchrome
      in Calculating Kazchrome's Subsidy Rate ............................22

      A. Legal Standard ..................................................23

      B. Kazchrome's Failure To Report ERG's Ownership
         Structure Warranted The Use of Total Facts Available..25

         i.    ERG's Ownership Information Was Necessary
               Information and Kazchrome Deprived Commerce of
               the Opportunity To Request Further Information . 31

         ii.   Kazchrome Was Required To Report ERG's
               Ownership Information ............................................35

         iii.  Commerce's Determination that ERG's Ownership
               Information Was Missing From The Record Is
               Supported by Substantial Evidence .......................39

         iv.   19 U.S.C. § 1677m(d) Does Not Apply ....................47

         v.    19 U.S.C. § 1677m(e) Does Not Apply ....................53

III.  Commerce Properly Applied AFA to Kazchrome In
      Calculating Kazchrome's Subsidy Rate ................................56

      A. Legal Standard ..................................................56

      B. Commerce Properly Determined That Kazchrome's
         Failure To Report ERG's Ownership Structure Warranted
         An Adverse Inference ..........................................57

      C. Commerce Properly Determined As AFA That Kazchrome
         Used All Programs Initiated On In This Investigation ...63

IV.   Commerce Properly Found That Kazchrome Benefited
      Under The Corporate Income Tax Exemption Program ......66

CONCLUSION .................................................................67

# TABLE OF AUTHORITIES

PAGES

<u>Cases</u>

*ABB Inc. v. United States*,
355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) .................... 24, 26, 50, 52

*Bebitz Flanges Works Pvt. Ltd. v. United States*,
433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ............................ Passim

*BlueScope Steel Ltd. v. United States*,
548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ............................... 24, 48

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) ........................................... 22

*Corinth Pipeworks Pipe Indus, SA v. United States*,
633 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ................... 40, 41, 45, 47

*Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO*,
6 F.3d 1511 (Fed. Cir. 1993) ............................................... 29

*Dalian Meisen Woodworking Co., Ltd. v. United States*,
571 F. Supp. 3d 1364 (Ct. Int'l Trade 2021) ...................................... 23

*Giorgio Foods, Inc. v. United States*,
2024 WL 3534491 (Ct. Int'l Trade 2024) .......................................... 34

*Goodluck India Ltd. v. United States*,
11 F.4th 1335 (Fed. Cir. 2021) .................................................. 27, 30

*Mukan Ltd. v. United States*,
767 F.3d 1300 (Fed. Cir. 2014) ........................................... 24

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ....................................... 22, 57, 58, 60

*NSK Ltd. v. United States,*
  481 F.3d 1355 (Fed. Cir. 2007) .......................................................... 52

*Papierfabrik August Koehler SE v. United States,*
  843 F.3d 1373 (Fed. Cir. 2016) .......................................................... 57

*Saha Thai Steel Pipe Public Company Ltd. v. United States,*
  663 F. Supp. 3d 1356 (Ct. Int'l Trade 2023) ................................. 35, 54

*Saha Thai Steel Pipe Public Company Ltd. v. United States,*
  605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) .......................... 49, 50, 51

*SeAH Steel Corporation v. United States,*
  659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) ................................. 25, 38

*Shandong Huarong Machinery Co., Ltd. v. United States,*
  435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ......................... 58, 59, 60

*Sugiyama Chain Co. v. United States,*
  797 F. Supp. 989 (1992)................................................................. 43, 44

*Zenith Electronics Corp. v. United States,*
  988 F.2d 1573 (Fed. Cir. 1993) .......................................................... 23

## **Statutes**

19 U.S.C § 1671 ...................................................................................... 3, 4

19 U.S.C § 1671a ........................................................................................ 4

19 U.S.C. § 1516a ...................................................................................... 21

19 U.S.C. § 1671 ....................................................................................... 33

19 U.S.C. § 1677-1 ................................................................................... 33

19 U.S.C. § 1677e ................................................................... 23, 27, 28, 56

19 U.S.C. § 1677m  ..................................................... 24, 47, 52, 53, 54, 55

**Regulations**

19 C.F.R. § 351.525 ...................................................................... 5

19 C.F.R. § 351.527 ................................................... 31, 33, 34, 35, 36, 37

# <u>GLOSSARY OF ACRONYMS AND ABBREVIATIONS</u>

| | |
|---|---|
| AFA | Adverse Facts Available |
| CBP | Customs and Border Protection |
| C.R. | Confidential Record |
| Commerce | Department of Commerce |
| CVD | Countervailing Duty |
| GOK | Government of Kazakhstan |
| ERG | Eurasian Resources Group S.a.r.l |
| FA | Facts Available |
| IDM | Issues and Decision Memorandum |
| Kazchrome | TNC Kazchrome JSC |
| PDM | Preliminary Decision Memorandum |
| P.R. | Public Record |
| Affiliation SQR | Affiliation Supplemental Questionnaire Response |
| TELF | TELF AG |
| YDD | YDD Corporation LLP |

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| _____ | ) | |
| TNC KAZCHROME JSC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 25-00128 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CC METALS AND ALLOYS, LLC | ) | |
| AND FERROGLOBE USA, INC. | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiff, TNC Kazchrome JSC (Kazchrome).  Kazchrome challenges the final determination of the U.S. Department of Commerce (Commerce) in the countervailing duty investigation of ferrosilicon from the Republic of

1

Kazakhstan (Kazakhstan). Specifically, Kazchrome disputes Commerce's determination to apply facts otherwise available (FA) with an adverse inference (AFA) to Kazchrome, finding that Kazchrome used and benefited from all programs initiated on in the investigation. Kazchrome also disputes Commerce's finding that Kazchrome benefited from the Corporate Income Tax Exemption program. We respectfully request that the Court deny Kazchrome's motion for judgment on the agency record and sustain Commerce's determination.

## STATEMENT PURSUANT TO RULE 56.2

## I.     The Administrative Determination Under Review

The administrative decision under review is *Ferrosilicon From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,108 (Dep't of Commerce March 28, 2025) (final determination) (P.R. 448), Appx___, and accompanying Issues and Decision Memorandum (May 17, 2024) (IDM) (P.R. 442), Appx___, as amended by *Ferrosilicon From Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce May 20, 2025) (P.R. 460), Appx___, and

2

accompanying Amended IDM at 2-3 (P.R. 454, C.R. 297), Appx___,

Appx___.  The period of investigation is January 1, 2023, through

December 31, 2023.

## II.    Issues Presented For Review

1. Whether Commerce properly used total facts otherwise available

   in calculating Kazchrome's subsidy rate when Kazchrome had

   failed to report its complete ownership and affiliation structure as

   required by Commerce's questionnaires until attempting to correct

   at verification.

2. Whether Commerce properly applied an adverse inference in

   calculating Kazchrome's subsidy rate when Kazchrome admits

   that it had the information but failed to disclose it to Commerce.

3. Whether Kazchrome's arguments about the Corporate Income Tax

   Exemption Program are moot.

<u>**STATEMENT OF FACTS**</u>

## I.    Statutory Background

The countervailing duty statute authorizes Commerce to impose

duties on imports that benefited from subsidies provided by a foreign

government.  19 U.S.C § 1671(a).  The goal is to provide a

countervailing duty "equal to the amount of the net countervailable subsidy" given by "the government of a country" with respect to the production or exportation of a specific good. *Id.* Commerce initiates a countervailing duty investigation of subsidy programs alleged in the petition whenever Commerce determines "that a formal investigation is warranted into the question of whether the elements necessary for the imposition of a duty . . . exist." *Id.* § 1671a(a). This means that when an investigation petition sufficiently alleges a government subsidy into an industry, Commerce will "initiate on" that investigation.

In conducting its investigation, Commerce determines whether "the government of a country . . . is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," and if so, "impose{s} upon such merchandise a countervailing duty{.}" *Id.* § 1671(a)(1). In examining whether a government has directly or indirectly provided a countervailable subsidy, it is essential for companies to fully identify "affiliates and ownership structure" in order to "chose which companies Commerce should examine" and "to determine the level of

4

subsidization."  IDM at 5; *see also* 19 C.F.R. § 351.525(b)(6) (detailing

attribution of subsidies across affiliated companies).

## II.    Commerce Initiates the Investigation and Selects TELF AG and YDD Corporation LLP As Mandatory Respondents

In April 2024, Commerce initiated a countervailing duty

investigation on ferrosilicon from Kazakhstan to determine whether the

Government of Kazakhstan (GOK) was providing countervailable

subsidies injuring domestic producers.  *See Ferrosilicon from Brazil,*

*Kazakhstan, Malaysia, and the Russian Federation: Initiation of*

*Countervailing Duty Investigations,* 89 Fed. Reg. 31,133 (Dep't of

Commerce April 24, 2024) (*Initiation Notice*) (P.R. 34), Appx___.

Commerce initiated an investigation on 21 alleged subsidy programs.

*Id.* at 31,135, Appx____.  Commerce normally selects mandatory

respondents for individual examination in countervailing duty

investigations using U.S. Customs and Border Protection (CBP) entry

data for the Harmonized Tariff Schedule of the United States

subheadings listed in the scope of the investigation.  *See e.g.*, *Initiation*

*Notice*, 89 Fed. Reg. at 31,135-36, Appx___.

The CBP entry data in this investigation yielded only two

exporters of ferrosilicon from Kazakhstan, YDD Corporation LLP (YDD)

and TELF AG (TELF).  Commerce's Mem. "Release of Data from U.S.
Customs and Border Protection" (CBP Data Memorandum), April 12,
2024, at Attachment (P.R. 24., C.R. 12), Appx___.  Commerce selected
YDD and TELF as mandatory respondents and issued the initial
questionnaire to GOK, with instructions to forward the initial
questionnaire to YDD and TELF.  *See* Initial Questionnaire, May 3,
2024, (P.R. 40), Appx___.

In May 2024, TELF filed comments arguing that it should not be
selected as a mandatory respondent because it only "purchased subject
merchandise" and that Kazchrome, an "unaffiliated Kazakh ferrosilicon
producer and exporter," should be selected instead because they were
TELF's supplier.  TELF Comments on Company Address, May 14, 2024
(P.R. 50, C.R. 20), Appx___.  In a footnote to its submission, TELF
disclosed that the GOK held an ownership interest in the Eurasian
Resources Group S.a.r.l (ERG), Kazchrome's ultimate parent company.
*Id.* at n. 6, Appx___.

Following TELF's comments, Commerce issued respondent
selection questionnaires to both TELF and Kazchrome, seeking to
clarify whether TELF acted as an exporter.  Kazchrome Respondent

Selection Supplemental Questionnaire, May 21, 2024 (P.R. 61),

Appx___; TELF AG Respondent Selection Supplemental Questionnaire,

May 21, 2024 (P.R. 62), Appx___.  In response, TELF and Kazchrome

submitted export documentation alleging that TELF did not export the

ferrosilicon that it bought from Kazchrome, and that Kazchrome was

the exporter of record.  Kazchrome Respondent Selection Supplemental

Questionnaire Response, May 23, 2024, at 2-5 and Attachments A-E

(P.R. 69, C.R. 22), Appx___, Appx___.

Despite an additional request for reconsideration from TELF,

Commerce did not change its initial decision to select TELF as a

mandatory respondent.  *See* Commerce's Letter "Second Extension

Grant for TELF AG to File Section III Identifying Affiliated Companies

Questionnaire Response," May 31, 2024 ("TELF remains selected as a

mandatory respondent in this investigation.") (P.R. 76), Appx___;

*Ferrosilicon From the Republic of Kazakhstan: Preliminary Affirmative*

*Countervailing Duty Determination and Alignment of Final*

*Determination With Final Antidumping Duty Determination*, 89 Fed.

Reg. 73,369 (preliminary determination) (P.R. 388), Appx___, and

accompanying Preliminary Decision Memorandum (PDM) at 6 ("TELF

7

purchased subject merchandise produced by Kazchrome, an unaffiliated

producer in Kazakhstan.") (P.R. 378), Appx___; *see also* IDM at 1,

Appx___ ("The mandatory respondents subject to this investigation are

{TELF} and {YDD}.").  Commerce did not select Kazchrome as a

mandatory respondent.[1]  *See* PDM at 6, Appx___; IDM at 1, Appx___.

Rather, Kazchrome was required to answer Commerce's questionnaires

because TELF had identified Kazchrome as an unaffiliated supplier.

*See* TELF's Affiliated Companies Questionnaire Response, June 4, 2024

at 2-3 (P.R. 82, C.R. 27), Appx___; Kazchrome's Affiliated Companies

Questionnaire Responses, May 31, 2024 (Kazchrome Affiliated

Companies Response), at 1-2 (P.R. 77, C.R. 26), Appx___, Appx___; *see*

*also* Initial Questionnaire at 49, Appx___ ("If your company sells the

subject merchandise to an export trading company which then exports

the subject merchandise to the United States, then you must submit

complete questionnaire responses for all such trading companies.").

---

[1]  Kazchrome insinuates that Commerce selected Kazchrome as a respondent in this investigation.  *See* Kazchrome Br. at 10 ("Commerce selected Kazchrome following these submissions.").  This statement is factually incorrect.  As Commerce consistently explained during the course of this investigation, Kazchrome was never selected as a respondent.

### III.  Commerce Receives Kazchrome's Affiliated Companies Response and Kazchrome's Initial Questionnaire Response

Commerce's Affiliation Questionnaire instructed companies to "identify all companies with which {a} company is affiliated," including cross-owned companies, and to "describe in detail the nature of the relationship between {the} company and those companies listed" as affiliated.  Initial Questionnaire at 49, Appx___.  Further, Commerce required a "complete questionnaire response for those affiliates where 'cross-ownership' exists, and . . . the cross-owned company is a holding company or a parent company."  Initial Questionnaire at 50, Appx___.  As Commerce instructed, a response "must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling interest in your company."  *Id.* at 50, n. 9, Appx___.  Commerce also informed responding companies that if they "have questions during the course of this investigation" they should "consult with the officials in charge."  *Id.* at 4, Appx___.

Kazchrome responded to the affiliation questionnaire, indicating that it had eight parent companies and that ERG was its ultimate parent company.  Kazchrome Affiliated Companies Response at 4, Appx___.  Kazchrome did not provide responses for ERG because ERG

is not a "Kazakhstani compan{y} or located in Kazakhstan" and, thus, Kazchrome "underst{ood} that {ERG was} not required to respond to the questionnaire." *Id.*

Later, in an affiliation supplemental questionnaire, Commerce requested Kazchrome to provide an affiliation chart "starting with Kazchrome, its ultimate owners (parent holding companies, grandparents, *etc.*), and companies in which Kazchrome may own a percentage." Affiliation Supplemental Questionnaire for TELF and Kazchrome, June 7, 2024 at 4-5 (emphasis added) (Affiliation Supp. Questionnaire) (P.R. 88, C.R. 28), Appx___, Appx___. As part of the questionnaire, Commerce provided an example affiliation chart. *Id.* at 5, Appx___. In addition to the narrative of the questionnaire, the example chart illustrated that Commerce was requesting the complete ownership structure of Kazchrome and consequently of ERG. *See id.* Kazchrome responded. Kazchrome's Affiliation Supplemental Questionnaire Responses, June 13, 2024 at 2, Exhibit AFFILSUPP-2 (Affiliation SQR) (P.R. 97-98, C.R. 29), Appx___, Appx___.

Kazchrome provided its full response to the Initial Questionnaire's general questions. Therein, Kazchrome submitted hundreds of pages of

10

various financial documents including three years of financial statements for itself and its cross-owned companies. Kazchrome's Initial Questionnaire Response, June 17, 2024, at 2-7, Exhibits GEN-1 – GEN-16 (P.R. 107-113, C.R. 32-41), Appx___, Appx___. One of the attached financial statements included a note stating, "{t}he Republic of Kazakhstan is the Company's related party based on significant influence on ERG." Kazchrome's Initial Questionnaire Response at Exhibit GEN-2 (note 4), Appx___. The financial statements did not elaborate on any ownership by the GOK. *See id.*

Also, Kazchrome provided its responses to the Initial Questionnaire's program-specific questions. Kazchrome's Initial Questionnaire Response Part II, June 17, 2024 (P.R. 115, C.R. 56-57), Appx___, Appx___. There, Kazchrome reported that Kazchrome and its two reported cross-owned affiliates were either ineligible or did not apply for various subsidy programs. *See* Kazchrome's Initial Questionnaire Response Part II at 2-8, Exhibits SQA PRIORITY-2 – SQA-PRIORITY-6 (P.R. 115, C.R. 56-57), Appx___, Appx___.

## IV.    Commerce Publishes the Preliminary Determination

In September 2024, Commerce published the preliminary determination, calculating a company-specific subsidy rate of 2.37 percent for Kazchrome.  *See Preliminary Determination*, 89 Fed. Reg. at 73,369, Appx___.  In the preliminary determination, Commerce found that Kazchrome had used and benefited from the Corporate Tax Exemption program, which provided "companies with investment priority projects" up to a "100 percent reduction in their calculated corporate income tax on income received from the implementation of the activities specified in the investment contract."  PDM at 17, Appx___; *see* Preliminary Countervailable Subsidy Rate Calculation for TELF AG, September 3, 2024 at 2 (P.R. 381, C.R. 235-236), Appx___, Appx___. Although the tax exemption was related to a new facility not connected to the production of ferrosilicon, Commerce determined income-tax subsidies benefit the entire firm, which made it attributable to Kazchrome's production of ferrosilicon.  *See* PDM at 17, Appx___.

12

## V.   Commerce Conducts Verification

After it issued the preliminary determination, Commerce conducted an in-person verification of Kazchrome's reporting.  *See* Verification Outline, September 11, 2024 (P.R. 390), Appx___.

At the outset of verification, based on Kazchrome's questionnaire and supplemental questionnaire responses, Commerce believed that Kazchrome "had eight parent companies, including its ultimate parent ERG."  Verification of Questionnaire Responses TNC Kazchrome JSC Corporation LLP, November 19, 2024 (Verification Report) at 3-4 (P.R. 412, C.R. 283), Appx___, Appx___. (citing Kazchrome Affiliated Companies Response at 2-4, Appx___).  During verification, however, Kazchrome officials "provided an overview of the ownership structure for Kazchrome."  *Id.* at 4, Appx___.  In doing so, Kazchrome officials, for the first time, "explained that there were additional parent companies and individual owners above ERG that {were} previously unreported."  *Id.*  In response, Commerce "requested additional ownership information of ERG."  *Id.* at 2, Appx___.

At that point, for the first time, Kazchrome officials provided a new ownership structure chart, which differed from the chart

13

Kazchrome previously provided in response to Commerce's supplemental questionnaire. *Compare id.* at 2, Exhibit VE-3, Appx___ *with* Affiliation SQR, at 2, Exhibit AFFILSUPP-2 (P.R. 97-98, C.R. 29), Appx___, Appx___. That new ownership structure chart indicated that there were additional parent companies above ERG and that the GOK had "a 40 percent ownership of ERG." *Id.* at 4, Exhibit VE-3, Appx___.

At verification, Commerce also examined Kazchrome's reporting with respect to the Corporate Income Tax Exemption program and non-use of other subsidy programs. *Id.* at 5-6, Appx___. Commerce verified that Kazchrome's reporting for itself and the two cross-owned affiliates it did report, was not inconsistent. *Id.*

## VI. Parties Submit Case and Rebuttal Case Briefs in Advance of the Final Determination

In their case brief, the petitioners argued that Commerce should apply total AFA to Kazchrome for its failure to provide complete information about ownership and affiliation before verification. Petitioner's Case Brief, December 6, 2024, at 8-11, 18-21 (P.R. 422, C.R. 289), Appx___. Kazchrome responded that the GOK's ownership in ERG had been on the record since TELF's respondent selection comments, and that Kazchrome had disclosed the GOK's ownership in

ERG when it submitted its financial statements.  Kazchrome's Rebuttal Brief, December 20, 2024, at 7-8 (P.R. 426), Appx___.  Kazchrome continued, contending that even if Commerce found that the information had not been disclosed until verification, AFA would be inappropriate because ERG is a Luxembourg company and, therefore, any provision of subsidies to ERG by the GOK would be transnational subsidies.  *Id.* at 8, Appx___.  Kazchrome argued that Commerce should be precluded from finding transnational subsidies to be countervailable under its regulations at the time.  *Id.* at 9, Appx___.

Additionally, Kazchrome argued in its case brief that the Corporate Income Tax Exemption program was tied to the production of non-subject merchandise and, therefore, that Commerce could not find the program countervailable.  *See* Kazchrome's Case Brief, December 6, 2024, at 5-11 (P.R. 419, C.R. 286), Appx___.

## VII.  Commerce Publishes the Final Determination and Applies Total AFA to Kazchrome

In March 2025, Commerce published the final determination. Commerce determined that application of total AFA to Kazchrome for its failure to provide complete information was warranted.  *See* Final

Determination, Appx___. Applying its CVD AFA Hierarchy,[2] Commerce calculated a company-specific subsidy rate of 265.38 percent for Kazchrome as an unaffiliated producer. *Id.* at 14,109 n.9, Appx___. As AFA, Commerce found that Kazchrome had used all 21 of the programs initiated "in the absence of reliable record evidence concerning Kazchrome{'s} usage of the subsidy programs at issue." IDM at 15, Appx___. This determination was made because of Kazchrome's "decision not to provide complete information in the investigation." *Id.* Following its CVD AFA Hierarchy, Commerce applied the "highest calculated program-specific rates determined for a cooperating respondent", YDD. *Id.* at 12, Appx___. For programs not used by YDD,

---

[2] It is Commerce's practice in CVD proceedings to normally compute an AFA rate for non-cooperating companies using the highest calculated program-specific rates determined for a cooperating respondent in the same investigation, or, if not available, rates calculated in prior CVD cases involving the same country. IDM at 12, Appx___ (citing *e.g., Certain Tow-Behind Lawn Groomers and Certain Parts Thereof from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 73 Fed. Reg. 70,971, 70,975 (Dep't of Commerce Nov. 24, 2008), unchanged in *Certain Tow-Behind Lawn Groomers and Certain Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 29,180 (Dep't of Commerce June 19, 2009), and accompanying IDM at "Application of Facts Available, Including the Application of Adverse Inferences").

16

Commerce applied, where available, "the highest above *de minimis* rate calculated for the same or comparable programs in a CVD investigation or administrative review involving Kazakhstan." IDM at 14, Appx___.

Commerce found that Kazchrome cited only two places where ERG's allegedly included additional ownership information: TELF's submission on whether it should be a mandatory respondent, and Kazchrome's questionnaire responses. Commerce found Kazchrome's reference to TELF's comments unavailing because (1) ERG's (incomplete) additional ownership appeared *in a footnote of an unaffiliated party's submission* (TELF), and (2) Kazchrome was required to report this information in response to the affiliation questionnaire. IDM at 28-29, Appx___. Commerce also found unavailing Kazchrome's reliance on its own financial statements. As Commerce explained, "the financial statements note does not indicate that ERG's ownership was 40 percent. Instead, it notes only that the GOK, through some undefined relationship, has an effect on ERG." IDM at 29, Appx___.

17

Because Commerce assigned Kazchrome a rate based on AFA, Commerce declined to address Kazchrome's arguments regarding the Corporate Income Tax Exemption as moot. *See* IDM at 45, Appx___.

## VIII. Commerce Amends the Final Determination and Kazchrome's Subsidy Rate

Following Commerce's final determination, the petitioners and YDD filed ministerial error comments and rebuttal comments. *See* Petitioners' Ministerial Error Comments March 31, 2025 (Petitioners' Ministerial Allegation) (P.R. 449, C.R. 293), Appx___, Appx___; YDD's Ministerial Error Allegation, March 31, 2025 (P.R. 450, C.R. 294), Appx___, Appx___. As a result, Commerce "amended the benefit calculation for the Customs Duty Exemption program" used by YDD. *Ferrosilicon From Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce May 20, 2025) (P.R. 460), Appx___, and accompanying Amended IDM at 2-3 (P.R. 454, C.R. 297), Appx___, Appx___. Because Kazchrome's subsidy rate was based in part on the calculated program-specific rates determined for YDD, *see* IDM at 14, Appx___, Commerce also amended

18

Kazchrome's estimated countervailing duty subsidy rate from 265.38 to 265.53 percent.  *See* Amended IDM at 3, Appx___.

## SUMMARY OF THE ARGUMENT

Commerce's use of facts otherwise available was warranted because Kazchrome failed to report its complete ownership and affiliation structure as required by Commerce's questionnaires and as discovered at the late stage of verification.  Kazchrome contends that a *footnote in an unaffiliated party's submission* was sufficient to notify Commerce of the information.  But Commerce cannot be required to examine a different party's submission on an unrelated topic for information that Commerce explicitly requested from Kazchrome.  Similarly, Kazchrome's own reporting could not have notified Commerce because the reporting did not state that the GOK had an ownership interest in ERG; it stated only that there was an undefined relationship between the GOK and ERG.  And in any event was not included as an answer to the affiliation and corporate structure questions, but as a note on a financial statement.

Kazchrome's decision not to report ERG's additional ownership information until verification also prevented Commerce from seeking

more information as to the relationship between the GOK and ERG and any funds provided to Kazchrome.  Kazchrome's belief that Commerce's regulations prohibited Commerce from finding transnational subsidies to be countervailable does not absolve Kazchrome from its reporting obligations.  Commerce (and not respondents) determines what information is necessary for its determination and, here, because of Kazchrome's refusal to provide such information, Commerce was prevented from even determining whether the transnational subsidies regulation applied.

Kazchrome's failure to provide complete information also called into question whether there was other information Kazchrome was withholding.  Accordingly, Commerce properly determined that there was necessary information missing from the record, that Kazchrome had withheld information, that Kazchrome failed to provide information timely and in the form and manner requested, and that Kazchrome had significantly impeded the investigation.  Commerce repeatedly explained that corporate structure, including direct government ownership, is a critical fact to determining whether what subsidies are received.

Commerce's application of AFA was also warranted because at no point did Kazchrome demonstrate or even allege that it was not aware of the GOK's ownership in ERG or that ERG had additional owners. Thus, the logical conclusion is that Kazchrome had this information regarding the affiliation and ownership structure but through inattentiveness, carelessness, inadequate record keeping, or choice, failed to disclose it to Commerce.  Any of those situations warrants application of AFA.

Finally, Commerce also correctly found that Kazchrome used and benefited from the Corporate Income Tax Exemption program because Commerce's application of AFA found Kazchrome benefited from initiated on by Commerce.

## ARGUMENT

### I.    Standard of Review

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as

reasonable mind might accept as adequate to support a conclusion."
*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir.
2003) (cleaned up).  The decision may not be overturned "simply
because the reviewing court would have reached a different conclusion
based on the same record."  *Cleo Inc. v. United States*, 501 F.3d 1291,
1296 (Fed. Cir. 2007) (citations omitted).

## II.    Commerce Properly Applied Facts Available to Kazchrome in Calculating Kazchrome's Subsidy Rate

Commerce reasonably resorted to facts available in calculating
Kazchrome's subsidy rate.  Commerce's Affiliation Questionnaire and
Initial Questionnaire instructed Kazchrome to report its entire
affiliation and ownership structure.  Initial Questionnaire at 48-49,
Appx___.  Kazchrome reported that it had eight parent companies and
that ERG was its ultimate parent company.  Kazchrome's Affiliated
Companies Response at 2-4, Appx___.  At verification, however,
Kazchrome officials reported that there were additional levels of
ownership beyond ERG, including the GOK.  By failing to report this
information in its questionnaire and affiliated questionnaire responses,
Kazchrome deprived Commerce of the opportunity to request more
information about the relationship and any subsidies between the GOK

and ERG, creating a gap in the record going to the heart of the subsidization inquiry.

## A.    Legal Standard

The parties before Commerce are typically the "party in possession of necessary information" sought by Commerce's requests for information. *Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993). However, at times, Commerce must supply facts not in the administrative record to complete its antidumping review. *See Dalian Meisen Woodworking Co., Ltd. v. United States*, 571 F. Supp. 3d 1364, 1370 (Ct. Int'l Trade 2021). If "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), "or" if a party (1) withholds requested information, (2) fails to provide information by established deadlines or in the form or manner requested, (3) significantly impedes the review, or (4) provides information that cannot be verified, *id.* § 1677e(a)(1), Commerce shall "use the facts otherwise available." *Id.* § 1677e(a)(2).

"Because the use of 'facts otherwise available' is a means for filling in gaps in the record, Commerce sometimes refers to using 'total' or 'partial' facts otherwise available. *See Dalian Meisen*, 571 F. Supp. 3d

23

at 1370 (citation omitted).  When none of the reported data is "reliable or usable," Commerce applies total facts available.  *See Mukan Ltd. v. United States*, 767 F.3d 1300, 1305 (Fed. Cir. 2014).

However, Commerce's use of facts otherwise available is limited by 19 U.S.C. § 1677m.  Commerce shall not decline to use information if the information is timely submitted, the information can be verified, the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, the party acted to the best of its ability, and the information can be used without undue difficulties. 19 U.S.C. § 1677m(e).

Further, before relying on facts otherwise available, the statute requires that Commerce provide notice of a deficient response and an opportunity to explain or remedy the deficiency, subject to practicability.  *See* 19 U.S.C. § 1677m(d); *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1359 (Ct. Int'l Trade 2021).  "Inherent in the requirement of § 1677m(d)," however, "is a finding that Commerce was or should have been aware of the deficiency in the questionnaire response." *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018).  In other words, "{w}hen a {party} provides seemingly

24

complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire . . . to the effect of, 'Are you sure?'" *Id.* Further, "in the event of confusion or claimed ambiguity," the interested party bears the responsibility "to clarify its understanding of the questionnaire." *SeAH Steel Corporation v. United States*, 659 F. Supp. 3d 1318, 1326 (Ct. Int'l Trade 2023).

## B. Kazchrome's Failure To Report ERG's Ownership Structure Warranted The Use of Total Facts Available

Commerce reasonably determined that the use of facts available was appropriate. Commerce's purpose for requesting affiliate and ownership structure information is to establish the "full universe of entities that must provide information on their subsidization" so that Commerce may accurately "determine the level of subsidization of subject merchandise." IDM 5, 29, Appx___. This step is so critical that Commerce requires companies involved to submit this information "within 14 days of the date of the questionnaire." *Id.* at 5, Appx___; *see* Initial Questionnaire at 48-49, Appx___.

In the affiliation response, Kazchrome reported that it had only eight parent companies and that ERG was its ultimate parent company. *See* Kazchrome's Affiliated Companies Response at 2-4, Appx___.

Kazchrome's reporting did not show that there were any owners above ERG nor was it "even readily apparent from Kazchrome's own submission" that the GOK held a significant ownership interest in ERG. IDM at 29, Appx___.  Rather, the only reference to a relationship between ERG and the GOK was a single sentence in a note among Kazchrome's submitted financial statements, stating that "{t}he Republic of Kazakhstan is the Company's related party based on significant influence on ERG."   Kazchrome's Initial Questionnaire Response at Exhibit GEN-2, Appx___.  Thus, at the time of the preliminary determination, Commerce was unaware about existence of additional parent companies above ERG and that the GOK had "a 40 percent ownership of ERG."   *See* PDM at 7, Appx___; *cf. ABB Inc.*, 355 F. Supp. 3d at 1222 ("Commerce was not in a position to know that {company's} responses were incomplete and inaccurate.").

Commerce first discovered the true nature of ERG and the GOK's relationship at verification, including that the GOK owned 40 percent of ERG.  Verification Report at 2, 4, and Exhibit VE-3, Appx___.  Thus, verification revealed that Kazchrome's reporting in its responses to Commerce's questionnaires and supplemental questionnaires was

26

incomplete.  *See* IDM at 5, Appx\_\_\_.  But, "[v]erification represents a point of no return," where Commerce "test[s] information provided by a party for accuracy and completeness."  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (citing *Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997).  Kazchrome could not cure its incomplete reporting at verification after the close of factual submissions.

In the final determination, Commerce determined that necessary information was missing from the record because Kazchrome's untimely reporting of additional owners in and GOK ownership of ERG deprived Commerce of "the opportunity to timely request information from ERG regarding subsidies, if any, it received from the GOK that would affect Commerce's subsidy calculation for Kazchrome."  *Id*.

In the final determination, Commerce also determined that Kazchrome had improperly withheld ERG's ownership information; failed to provide ERG's ownership information by deadlines set and in the form and manner requested; and, significantly impeded Commerce's investigation.  IDM at 6, Appx\_\_\_ (citing 19 U.S.C. § 1677e(a)(2)(A)-(C)).  As the record demonstrates, Kazchrome submitted previously

27

unreported ownership information concerning ERG, for the first time,

at verification.  Verification Report at 2, 4, Exhibit VE-3, Appx___.

Kazchrome, however, was required to provide that information in

response to the Initial Questionnaire.  IDM at 29, Appx___ (citing

Initial Questionnaire at 48-49, Appx___).

Moreover, Commerce provided Kazchrome with a second

opportunity to submit this information by issuing a supplemental

questionnaire, in which Commerce requested Kazchrome to provide an

affiliation chart "starting with Kazchrome, its ultimate owners (parent

holding companies, grandparents, *etc.*),[3] and companies in which

Kazchrome may own a percentage."  Affiliation Supp. Questionnaire at

4-5 (emphasis added), Appx___.  Once again, Kazchrome failed to report

the complete information regarding its affiliated companies that

Commerce requested.

---

[3]  Kazchrome argues that Commerce defined "ultimate owners" in its supplemental questionnaire as "parent/grandparent companies." Kazchrome Br. at 41.  Kazchrome asserts that because the GOK is neither a parent nor grandparent company, it did not have to report the GOK affiliation.  *Id.*  However, Commerce's instructions do not limit the definition of "ultimate owners" to "parent/grandparent companies" as they use "etc." immediately following "grandparents".  Affiliation Supp. Questionnaire at 4, Appx___.

Reiterating the statutory standards, Commerce found that Kazchrome had withheld information requested because "a reasonable conclusion is that Kazchrome had {ERG's ownership information} but . . . failed to disclose it to Commerce."  IDM at 30, Appx___; *see Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) ("The specific determination we make is 'whether the evidence and *reasonable inferences* from the record support the {Commerce} finding.") (emphasis added)).  Further, because the reporting of additional ownership information concerning ERG should have been reported to Commerce on May 31, 2024, when Kazchrome's Affiliation Questionnaire response was due to Commerce, Commerce also found that Kazchrome had "failed to provide requested information within the established deadlines."  IDM at 30, Appx___.

Finally, Commerce determined that Kazchrome had significantly impeded the investigation in submitting previously unreported information at verification.  "The purpose of verification is to test information provided by a party for accuracy and completeness," and it

is not an opportunity for parties to submit factual information that clarifies and provides a substantive response to certain questionnaire responses in the first instance, as Kazchrome did here. *Goodluck India Ltd.*, 11 F.4th at 1343-44; IDM at 30, Appx___.

Still, Kazchrome argues that Commerce's determination to apply facts available is flawed because "the record fails to demonstrate the satisfaction of any statutory criteria for the application of FA." Kazchrome Br. at 37-45. Kazchrome argues that ERG's additional ownership information was on the administrative record in "targeted submissions and in Kazchrome's core financial exhibits," and not voluminous submissions. *Id.* at 47-53. Kazchrome further contends that even if ERG's ownership information is missing from the record that it was not necessary for Commerce's subsidy analysis because Commerce would have been prohibited from finding that provision of funds to ERG by the GOK constituted countervailable subsidies under Commerce's transnational subsidies regulation at the time of initiation. *Id.* at 46-47, 57-59. Lastly, Kazchrome contends that Commerce failed to provide a deficiency notice within the meaning of section 1677m(d). *Id.* at 53-57.

### i.    ERG's Ownership Information Was Necessary Information and Kazchrome Deprived Commerce of the Opportunity To Request Further Information

Commerce correctly determined that ERG's ownership information was necessary information in calculating Kazchrome's subsidy rate because subsidies provided by the GOK to Kazchrome, through ERG, would affect Kazchrome's subsidization rate.

Kazchrome substitutes its own judgment for that of Commerce and this Court, arguing "it is undisputed that ERG is a Luxembourg company . . . {w}ithout information that would demonstrate otherwise, under 19 C.F.R. § 351.527(a), Commerce was precluded from attributing any alleged support from the GOK received by ERG to Kazchrome." Kazchrome Br. at 47.  Kazchrome's argument "puts the proverbial cart before the horse" and is misinformed.  IDM at 30, Appx___.

Commerce, not Kazchrome, determines what information is necessary to make its determination.  *See Bebitz Flanges Works Pvt. Ltd. v. United States*, 433 F. Supp. 3d 1297, 1305 (Ct. Int'l Trade 2020). The purpose of Commerce's investigation of ferrosilicon from Kazakhstan is "to determine whether imports of ferrosilicon from . . . Kazakhstan . . . *benefit from countervailable subsidies conferred by the .*

31

. . *GOK.*" *Initiation Notice*, 89 Fed. Reg. at 31,135, Appx___ (emphasis

added). To accurately "determine the level of subsidization of subject

merchandise Commerce issues its Affiliation Questionnaire and Initial

Questionnaire, which seek to uncover the "full universe of entities that

must provide information on their subsidization." IDM 5, 29, Appx___.

Kazchrome's responses to the Affiliation Questionnaire and the Initial

Questionnaire did not disclose the GOK's ownership interest in ERG.

*See* Kazchrome's Affiliated Companies Response at 2-4, Appx___;

Kazchrome's Affiliated SQR at 1-3, Appx___; *see generally* Kazchrome

Initial Questionnaire Response, Appx___. Thus, while ERG may be a

Luxembourg company, if Commerce was "without information that

would demonstrate otherwise," it was because that information was not

provided by Kazchrome in its initial reporting. *See* Kazchrome Br. at

47. Indeed, Kazchrome waited until verification to submit information

indicating that ERG not only had additional levels of ownership but

that the *GOK had a significant ownership interest in ERG. See id.* at 2,

4, Exhibit VE-3, Appx___ (emphasis added).

Still, as Kazchrome points out, *see* Kazchrome Br. at 46-47, 57-59, at the time that Commerce initiated this investigation,[4] Commerce's regulations stated that "a subsidy does not exist *if the Secretary determines* that funding for the subsidy is supplied . . . by a government of a country other than the country in which the recipient firm is located." 19 C.F.R. § 351.527(a) (emphasis added).  The regulation, however, requires *Commerce* to make the determination of whether a "subsidy is supplied . . . by a government of a country other than the country in which the recipient firm is located."  19 C.F.R. § 351.527(a). Moreover, the regulation does not impose an absolute rule but contains exceptions, as evidenced by the following language: "except as otherwise provided in {19 U.S.C. § 1671(d)} (subsidies provided to international consortia) and {19 U.S.C. § 1677-1} (upstream subsidies) . . . ."  19 C.F.R. § 351.527.  This requires Commerce to engage with record information, which it could not do because of Kazchrome's failure to

---

[4]  The applicable regulatory language for this proceeding was established in 1998.  *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,417 (Dep't of Commerce Nov. 25, 1998).  The regulation has since been updated.  *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,841 (Dep't of Commerce March 25, 2024) (effective April 24, 2024).

report ERG's ownership information until verification.  *See Giorgio Foods, Inc. v. United States*, 2024 WL 3534491, at *7 (Ct. Int'l Trade 2024) ("Congress has not authorized the Department to exercise its Tariff Act powers based on speculation, conjecture, divination, or anything short of factual findings based on substantial evidence.") (quoting *Fla. Gas. Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010)).

Keeping in mind Commerce's purpose in initiating this investigation—to determine whether imports of ferrosilicon from Kazakhstan benefit from countervailable subsidies by GOK—the GOK's ownership in ERG is obviously germane to Commerce's determination as to Kazchrome's level of subsidization.  It follows that if the GOK had an ownership interest in ERG, it is possible that the GOK, through ERG, provided subsidies to a Kazakhstani company, Kazchrome. Commerce could have determined that such a circumstance does not implicate 19 C.F.R. § 351.527(a) if Commerce had the opportunity to request more information.

Specifically, "Kazchrome deprived Commerce of the opportunity to even determine whether 19 C.F.R. § 351.527(a) applied because

34

Commerce was deprived of the affiliation information necessary to make that decision." IDM at 30, Appx___; *see also Saha Thai Steel Pipe Public Company Ltd. v. United States*, 663 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2023) (sustaining Commerce's application of AFA to a respondent who failed to disclose information about potentially affiliated companies). Thus, Commerce did not have "all of the information that it needed to determine the applicability of 19 C.F.R. § 351.527(a)." Kazchrome Br. at 59. Kazchrome's failure to report this ownership information rendered Commerce unable to determine the applicability of 19 C.F.R. § 351.527(a). In other words, far from "destroy{ing} Commerce's rationale for the application of FA," Kazchrome Br. at 47, the fact that Kazchrome submitted previously unreported information—at verification—indicating that ERG has additional levels of ownership and that the GOK has a significant ownership interest in ERG, supports Commerce's decision to use total facts otherwise available.

### ii. Kazchrome Was Required To Report ERG's Ownership Information

Commerce's Affiliation Questionnaire and Affiliation Supplemental Questionnaire make clear that Kazchrome should have

reported ERG's ownership information.  *See* Initial Questionnaire at 48-49, Appx___; Affiliation Supp. Questionnaire at 4-5, Appx___.

Underpinning Kazchrome's argument to the contrary, is the flawed notion that Commerce never requested Kazchrome's complete ownership structure.  Kazchrome Br. at 39-41 ("Commerce's incorrect view relies entirely on mischaracterization of its own questionnaires.").

According to Kazchrome, Commerce's Affiliation Supplemental Questionnaire "was the first and only instance when Commerce requested information about Kazchrome's ownership structure." Kazchrome Br. at 41.  Kazchrome continues, arguing that Kazchrome had "reported all of Kazchrome's parent companies up to the ultimate parent" and, thus, its reporting "cannot lawfully be considered non-responsive or incomplete." *Id.* at 41.  Kazchrome concludes that "assuming *arguendo* that Commerce did request the information it its questionnaires," Commerce failed to explain why it could not have relied on Kazchrome's reporting regardless.  Kazchrome's "interpretation" of Commerce's questionnaires is wrong.

The Affiliation Questionnaire instructs companies to "identify all companies with which {a} company is affiliated," including cross-owned

companies, and to "describe in detail the nature of the relationship between {the} company and those companies listed" as affiliated. Initial Questionnaire at 49, Appx___. Commerce cautions that a response "must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling interest in your company." *Id.* at 50, n. 9, Appx___. Commerce also cautions that if a responding party has "questions during the course of this investigation, *we urge you to consult with the officials in charge.*" Initial Questionnaire at 4, Appx___ (emphasis added).

Kazchrome reported that it had eight parent companies, and that ERG was its ultimate parent company. Affiliated Companies Response at 2-4, Appx___. In its supplemental questionnaire response, Kazchrome provided a chart illustrating its ownership structure, which ended at ERG. *See* Affiliation SQR at 2, Exhibit AFFILSUPP-2, Appx___. As Commerce discovered at verification, this reporting was incomplete because Kazchrome officials informed Commerce that there were additional layers of ownership above ERG, including ownership by the GOK. Verification Report 2, 4, and Exhibit VE-3, Appx___. Therefore, a complete response to the Affiliation Questionnaire,

37

*irrespective of any other information on the record*, would have included the ownership layers above ERG, including the GOK.

In other words, a "plain-text reading," *SeAH Steel*, 659 F. Supp. 3d at 1325, of Commerce's affiliation questionnaire would have alerted Kazchrome to the fact that it was required to report on ERG's ownership structure. Kazchrome need not have been a "mind-reader" nor possessed "clairvoyance" to know that it was required to submit ERG's full ownership structure because Commerce had "clearly and definitively ask{ed}" Kazchrome to "describe in detail the nature of the relationship" between Kazchrome and each affiliated company and specified that Kazchrome's "response must cover all . . . holding companies." Kazchrome's Affiliated Company Response at 4, and n. 1, Appx___; *cf.* Kazchrome's Br. at 56-57 (citing *Saha Thai Steel Piper Company v. United States*, 605 F. Supp. 3d 1348, 1365 (Ct. Int'l Trade 2022)). If Kazchrome was confused as to whether it had to report the additional ownership layers above ERG it should have sought clarification from Commerce, as instructed in the Initial Questionnaire. *See* Initial Questionnaire at 4, Appx___ (urging responding companies to consult with Commerce if questions arise); *see also SeAH Steel*, 659

F. Supp. 3d at 1326 ("{I}t has long been established that the burden falls on a respondent to clarify its understanding of Commerce's directives and instructions rather than rely on its own interpretation.").

In *Bebitz*, this Court similarly sustained as reasonable Commerce's expectation of affiliation information because it is "key to its investigation and [that] Commerce could not accurately calculate [a] CVD rate without it."  433 F. Supp. 3d at 1308.  Just as there, Kazchrome should have known it was required to provide this critical but missing information about the GOK's ownership.

### iii.    Commerce's Determination that ERG's Ownership Information Was Missing From The Record Is Supported by Substantial Evidence

Commerce reasonably determined that ERG's ownership information was missing from the record.  Prior to verification, the only information on the record detailing the GOK's ownership in ERG appeared in another party – TELF's – respondent selection submission, and in a single sentence in one note in Kazchrome's submitted financial statements.  TELF's Comments on Company Address at n. 6, Appx___; Kazchrome's Initial Questionnaire Response at Exhibit GEN-14, Appx___.  First, TELF argued that it "is neither an exporter nor

39

producer of subject merchandise, and therefore should not be selected as a mandatory respondent." TELF's Comments at 1-2, Appx___. In a single footnote, TELF discusses only ERG's direct owners, which mentioned the GOK. *Id.* at n. 6, Appx___.

Second, Kazchrome's reporting never mentioned additional layers of ownership above ERG or the GOK's ownership interest. The only reference is a single sentence in a note on the bottom of page 52 of Kazchrome's financial statements:

> Government related entities: The Republic of Kazakhstan and related legal entities. The Republic of Kazakhstan is the Group's related party based on significant influence on ERG.

Kazchrome's Initial Questionnaire Response at Exhibit GEN-14, Appx___. This is not notice that Kazchrome's ultimate parent company was 40% owned by the GOK and does not appear in the answer to the affiliation/corporate structure questions.

In the final determination, Commerce found that Kazchrome failed to provide necessary affiliation information "*in the form and manner requested.*" IDM at 28, Appx___ (citing *Sugiyama Chain Co. v. United States*, 797 F. Supp. 989, 994 (1992)); *Corinth Pipeworks Pipe Indus, SA v. United States*, 633 F. Supp. 3d 1314, 1324 (Ct. Int'l Trade 2023)) (emphasis in original). With respect to Kazchrome's reliance on

TELF's footnote, Commerce determined that "including data in a submission filed later in a proceeding, as well as information derived from another, unaffiliated party's submission, does not constitute an adequate or beneficial response to Commerce's *initial affiliation inquiries*." IDM at 29, Appx___ (emphasis added). In other words, Kazchrome was required to report that information and should have, irrespective of whether TELF had (incompletely) reported it. Commerce's use of total facts available would have been entirely avoided had Kazchrome done what is expected of a reasonable respondent: fully comply with Commerce's requests for information.

With respect to Kazchrome's own submission, Commerce also determined that it was not "even readily apparent from Kazchrome's own submission" that the GOK held an ownership interest in ERG because the note only indicates that "the GOK, through some undefined relationship, has an effect on ERG." *Id.* As Commerce explained, "that is not 'disclosure.'" *Id.*

Kazchrome, however, argues that the "information was not hidden in a voluminous or convoluted data dump—it appeared in early, targeted submissions and in Kazchrome's core financial exhibits."

41

Kazchrome Br. at 51. But Kazchrome does not articulate how TELF's request not to be selected as a respondent is a "targeted" submission such that Commerce should divine Kazchrome's ownership structure from it. Nor does Kazchrome cite any authority for the proposition that Commerce needs to sift through submissions of an unaffiliated party to get the information it clearly and directly asked Kazchrome. Indeed, TELF's purpose in submitting respondent selection comments was for Commerce to reconsider its selection of TELF as a mandatory respondent. Nor does TELF's submission absolve Kazchrome because Kazchrome reported additional levels of ownership above what TELF's footnote contained. *Compare* TELF's Comments on Company Address at n. 6, Appx___, *with* Kazchrome's Initial Questionnaire Response at Exhibit GEN-14, Appx___ *and* Verification Report at 2, and Exhibit VE-3, Appx___. Thus, Kazchrome's reliance on TELF's comments is misplaced.

Further, Kazchrome does not address the fact that its financial statements said nothing about the GOK's actual ownership interest in ERG, and its initial questionnaire narrative response failed to report all layers of ownership or even reference the GOK's relationship to ERG.

42

Kazchrome's financial statements only state that there is a relationship between the GOK and ERG, again in a single sentence. Thus, far from "disclos{ing} the GOK's interest in ERG," Kazchrome entirely failed to report the GOK's ownership interest in ERG despite being asked. Yet, Kazchrome seeks to place blame on Commerce for not divining information known to Kazchrome that was not reported accurately by Kazchrome. The predicament Kazchrome finds itself in is entirely of its own making because it failed its burden to build an adequate record. IDM at 28, Appx___ (citing *Sugiyama Chain*, 797 F. Supp. at 993; *Corinth Pipeworks*, F. Supp. 3d at 1314).

Far from being "disingenuous," Kazchrome's Br. at 49, Commerce's reliance on *Sugiyama Chain* highlights the flaws in Kazchrome's view. In *Sugiyama Chain*, Commerce declined to make certain corrections to erroneously submitted credit expense data. 797 F. Supp. at 993-94. Commerce argued that it was the plaintiffs' burden to create an adequate record and that plaintiff "should have at least proofread after submission and promptly notified Commerce about what errors and corrections should have been made." *Id.* at 994. This Court agreed, observing that "if the burden of compiling, checking, rechecking,

and finding mistakes in the submission of {parties} were placed upon
Commerce, it would transform the administrative process into a
futility." *Id.* Further, this Court faulted the plaintiffs for waiting "until
Commerce relied upon the {erroneous} data and completed the
preliminary results and was preparing for its final determination before
claiming the errors occurred." *Id.* It concluded that "Plaintiffs must
prepare their own data accurately. They cannot expect Commerce to be
a surrogate to guarantee all of their submissions are correct." *Id.*

Like in *Sugiyama Chain*, Kazchrome waited until after the
preliminary determination was published to alert Commerce to errors
in its reporting. *See* Verification Report at 2, Exhibit VE-3, Appx___
("Kazchrome company officials explained that there are additional
holding companies and private individuals who hold ownership of
ERG."); *cf.* Kazchrome's Br. at 56 ("Kazchrome also understood that
information . . . was already on the record."). Thus, Kazchrome's
inaccurate and incomplete reporting in response to the Initial
Questionnaire was not inadvertent, nor was it obvious. *See Sugiyama
Chain*, 797 F. Supp. at 995.

*Corinth Pipeworks* is similarly relevant.  In *Corinth Pipeworks*, the plaintiff deviated from Commerce's instructions for submitting a cost reconciliation.  633 F. Supp. 3d at 1326.  Further, the plaintiff alleged that "had Commerce complied with {their} instructions as to how to read {their} submissions," then Commerce would have been able to fully reconcile their costs.  *Id.* at 1325.  Commerce applied total AFA based on plaintiffs failure to submit a cost reconciliation in the form and manner requested by Commerce, and because plaintiffs, despite multiple opportunities did not submit a complete cost reconciliation.  *Id.* at 1323, 1327.  This Court approved, reasoning that it was the plaintiffs' burden to build an adequate record and "the mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination.  *Id.* (quoting *Nippon Steel*, 337 F.3d at 1381).

Here, Kazchrome did not submit its complete ownership structure in the form and manner requested by Commerce when it presented that information for the first time at verification because it was required to report the additional levels of ownership above ERG in its Affiliation

45

Questionnaire and Initial Questionnaire.  *See* Initial Questionnaire at 48-49, Appx___.  Instead, Kazchrome submitted a voluminous response to the Initial Questionnaire from which it was not "even readily apparent" that there were additional levels of ownership because only a single sentence in one note to its financial statements even discussed a relationship between ERG and the GOK, and did not state that there was GOK ownership.  IDM at 29, Appx___ (citing Kazchrome's Initial Questionnaire Response at Exhibit GEN-14, Appx___).

Kazchrome argues that Commerce should have just read the "short narrative submissions or easily-navigable exhibits."  Kazchrome Br. at 51.  But it was not readily apparent from Kazchrome's financial statements that there were additional ownership layers above ERG, let alone that the GOK held a significant ownership interest in ERG.  Nor has Kazchrome articulated a reason why Commerce should rely on TELF's respondent selection submission for information about Kazchrome's ownership structure, when Commerce explicitly asked Kazchrome for its ownership structure.  Thus, this Court should find that Kazchrome's "attempts to clarify the record by detailing Commerce's alleged errors only serve to support the finding that {its}

46

submissions were inadequate." *Corinth Pipeworks*, 633 F. Supp. 3d at 1326.

Taken together, *Sugiyama Chain* and *Corinth Pipeworks* stand for the proposition that when Commerce explicitly requests information, a party cannot hide behind voluminous and inaccurate reporting to defend that its submission was responsive. *See* IDM at 28, Appx___. Kazchrome's own inaccurate and incomplete reporting is made worse by the fact that Kazchrome acknowledges it knew of these additional ownership levels and seemingly chose not to report that information. *See* Verification Report at 2, and Exhibit VE-3, Appx___; *see also* Kazchrome Br. at 56.

### iv.   19 U.S.C. § 1677m(d) Does Not Apply

Kazchrome argues that "Commerce never notified Kazchrome of any deficiencies with respect to ERG's ownership information (and never requested it either)." Kazchrome Br. at 53.  Because notification of deficiencies is a prerequisite for the use of facts available, Kazchrome argues that Commerce's use of facts available is in error. *See id.* (citing *Saha Thai*, 605 F. Supp. 3d at 1369).  Section 1677m(d) does not apply here.  Even if it did, Commerce satisfied its notification requirement

under § 1677m(d) through issuance of the supplemental questionnaire. *See Bebitz*, 433 F. Supp. 3d at 1306-07.

Section 1677m(d) requires Commerce "to provide a respondent with notice of deficient responses, and an opportunity to remediate, before deciding to rely on facts available." *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1359 (Ct. Int'l Trade 2021) (citing 19 U.S.C. § 1677m(d)). "Inherent in the requirement of § 1677m(d)", however, "is a finding that Commerce was or should have been aware of the deficiency in the questionnaire response." *ABB Inc.*, 355 F. Supp. 3d at 1222. Thus, when a party provides "seemingly complete, albeit inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire . . . to the effect of, 'Are you sure?'" *Id.*

Commerce requested Kazchrome's entire ownership and affiliation structure. Commerce "requests affiliation information . . . to determine the full universe of entities that must provide information on their subsidization." IDM at 29, Appx___; *see Bebitz*, 433 F. Supp. 3d at 1306. Commerce provides the criteria for what affiliation and ownership information responding parties are required to report. *See* Initial Questionnaire at 48-49, Appx___; *see also Bebitz*, 433 F. Supp. 3d at

48

1306.  Thus, Commerce "clearly and definitively ask{ed} for what it want{ed}," Kazchrome's entire ownership and affiliation structure. *Saha Thai*, 605 F. Supp. 3d at 1363; *see also Bebitz*, 433 F. Supp. 3d at 1306 ("Intentional obtuseness on the part of {a} respondent does not obviate Commerce's clear request for the relevant information.").

Kazchrome certified that it had provided its entire ownership and affiliation structure contrary to the requirement that responding parties "be diligent."  Kazchrome Br. at 56 (citing *Saha Thai*, 605 F. Supp. 3d at 1365).  In its supplemental questionnaire response, Kazchrome, once again, certified that the chart provided encompassed its entire ownership and affiliation structure.  Kazchrome's Affiliated Companies Supplemental Response at 2-3, Appx___.  But at verification, after fact submission had closed, Kazchrome officials submitted previously unreported information indicating that Kazchrome's ownership and affiliation structure went beyond ERG, and that the GOK has a significant ownership interest in ERG.  Verification Report at 2, 4, Exhibit VE-3, Appx___.

When Kazchrome provided "seemingly complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue

a supplemental questionnaire . . . to the effect of, 'Are you sure?.'" *ABB Inc.*, 355 F. Supp. 3d at 1222. It was not until verification that Commerce could have known from Kazchrome's own reporting that Kazchrome's ownership structure was inaccurate. *See id.* Thus, Commerce was not "statutorily mandated to provide {Kazchrome} a subsequent opportunity to remedy the deficiency" in its incomplete reporting, though it did through its affiliation supplemental questionnaire. *See id.* at 1223. Requiring Commerce to do so would incentivize parties to withhold requested information so long as their response was facially complete, safe in the knowledge that any later discovery of incompleteness could be remedied without consequence.

Kazchrome's reliance on *Saha Thai* is misplaced. In *Saha Thai*, Commerce applied AFA to the respondent, Saha Thai, for a failure to report a substantial part of its U.S. sales. In its original reporting, Saha Thai had reported U.S. sales of standard pipe but "did not include dual-stenciled pipe sales in its U.S. sales database." *Saha Thai*, 605 F. Supp. 3d at 1355. "To clarify its submitted data," Saha Thai explained that the dual-stenciled pipe was subject to an ongoing scope inquiry and thus Saha Thai did not consider it to be subject merchandise. *Id.* In

50

the preliminary results, Commerce did not take issue with Saha Thai's reporting.  The ongoing scope inquiry was concluded before Commerce issued the final results, and dual-stenciled pipe was found to be in-scope merchandise.  *Id.* at 1356.

Unlike in *Saha Thai*, Kazchrome's omission of its complete ownership and affiliation structure was not "transparently disclosed" nor was it "immediately provided" given Kazchrome waited until verification to provide that information.  *See Saha Thai*, 605 F. Supp 3d at 1367.  At the time of Saha Thai's reporting of its U.S. sales database, dual-stenciled pipe had not yet been determined to be subject merchandise, and Saha Thai explicitly addressed why it was not submitting sales data with respect to dual-stenciled pipe.  *Id.* at 1355.

In contrast, here, Commerce explicitly asked for Kazchrome's complete ownership and affiliation structure.  Such reporting would have provided Commerce the opportunity "to determine the full universe of entities that must provide information on their subsidization," which is the purpose of Commerce's questionnaires requesting a company's complete ownership and affiliation structure. *See* Initial Questionnaire at 4, Appx___.  Commerce cannot be faulted

then for believing that Kazchrome had reported its complete ownership
and affiliation structure, when it certified to Commerce that it had. *See
ABB Inc.*, 355 F. Supp. 3d at 1222 ("Commerce was not in a position to
know that Hyundai's responses were incomplete and inaccurate.").

Even if 19 U.S.C. § 1677m(d) were to apply, Commerce satisfied
its burden to notify Kazchrome of deficiencies in its ownership and
affiliation structure reporting by issuing Kazchrome a supplemental
questionnaire requesting "Kazchrome provide a 'chart . . . starting with
Kazchrome, its ultimate owners (parent holding companies,
grandparents, etc.)." In response to the supplemental questionnaire,
Kazchrome still failed to provide its full ownership and affiliation
structure as discovered at verification**.** Verification Report at 2, 4,
Exhibit VE-3, Appx___. "Intentional obtuseness on the part of
{Kazchrome} does not obviate Commerce's clear request for the relevant
information." *Bebitz*, 433 F. Supp. 3d at 1306; *see NSK Ltd. v. United
States*, 481 F.3d 1355, 1360, n.1 (Fed. Cir. 2007) ("Commerce, however,
satisfied its obligations under section 1677m(d) when it issued a
supplemental questionnaire specifically pointing out and requesting
clarification of NTN's deficient responses."). Thus, Commerce satisfied

any requirement it had to give Kazchrome an opportunity to remedy its deficient report when it issued the supplemental questionnaire.  *See* 433 F. Supp. 3d at 1307 ("Moreover, to the extent that Bebitz intended to suggest that Commerce failed to provide Bebitz an opportunity to remedy a deficient response, as provided in 19 U.S.C. § 1677m(d), Commerce's Supplemental Questionnaire satisfied that requirement.").

### v.   19 U.S.C. § 1677m(e) Does Not Apply

Notwithstanding Kazchrome's incomplete and inaccurate reporting, the statute requires Commerce to consider certain information if the circumstances meet all five of the following elements:

> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by {Commerce} . . .with respect to the information, and
> (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).  Kazchrome argues that "Commerce failed to explain why these provisions do not apply."  Kazchrome Br. at 43.

Kazchrome does not acknowledge that its failure to disclose caused two independent problems that, taken together, make section

53

1677(m)(e) inapplicable.  First, Kazchrome failed to submit critical information before the close of fact discovery.  Second, the failure meant that Commerce did not have enough information to ask important follow up questions to discern the nature and extent of the relationship between the GOK and Kazchrome's parent company.  This information could have had "a direct impact on Commerce's calculation of the subsidy rate assigned to Kazchrome."  IDM at 29, Appx___; *see also Saha Thai*, 663 F. Supp. 3d at 1375-76 ("Even accepting the premise that Commerce had all the data it needed to calculate an accurate antidumping margin, the agency lacked the data necessary to flag the companies as affiliates until {petitioner} provided the rest of the story.").  In other words, even if Kazchrome's untimely reporting of ERG's ownership information met all of the other criteria of 19 U.S.C. § 1677m(e), the deprivation of the opportunity to request more information would not disturb Commerce's determination.  At most, it would only confirm that ERG had additional ownership, including the GOK.  This deprivation of opportunity alone makes 19 U.S.C. § 1677m(e) inapplicable.

Section 1677m(e) is inapplicable for still other reasons, which Commerce addressed.  First, the information was untimely.  The deadline established for the Affiliation Questionnaire was May 31, 2024.  Kazchrome, however, did not report these additional layers of ownership until September 18, 2024, and thus the information was untimely submitted.  IDM at 30, Appx___; *see* Verification Report at 1, Appx___ (detailing verification dates).  Second, Commerce inferred from Kazchrome's untimely reporting at verification that "Kazchrome had this information but . . . failed to disclose it to Commerce" and, therefore, did not act "to the best of its ability to comply with Commerce's request for Kazchrome's affiliation and ownership structure."  *Id.*  Kazchrome does not refute that it had this information; instead, it concedes it had it.  *See* Kazchrome Br. at 56 ("Kazchrome also understood that information . . . was already on the record.").  Accordingly, 19 U.S.C. § 1677m(e) is also inapplicable for either of those reasons, notwithstanding the fact that Kazchrome deprived Commerce of an opportunity to request more information.

Commerce's determination to use total facts available, therefore, is supported by substantial evidence and in accordance with law.

55

### III.  Commerce Properly Applied AFA to Kazchrome In Calculating Kazchrome's Subsidy Rate

Commerce reasonably applied an adverse inference to Kazchrome in calculating Kazchrome's subsidy rate because as evidenced at verification, Kazchrome provided incomplete responses to Commerce's questionnaires requesting its complete ownership and affiliation structure.

### A.  Legal Standard

Provided that "necessary information is not available on the record," or a party (1) withholds requested information, (2) fails to provide information by established deadlines or in the form or manner requested, (3) significantly impedes the review, or (4) provides information that cannot be verified, if Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b).

A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to

all inquiries." *Nippon Steel*, 337 F.3d at 1382.  The standard requires

that respondents "conduct prompt, careful and comprehensive

investigations of all relevant records that refer or relate to the imports

in question." *Papierfabrik August Koehler SE v. United States*, 843 F.3d

1373, 1379 (Fed. Cir. 2016).  Thus, the statutory trigger for an adverse

inference "is simply a failure to cooperate to the best of respondent's

ability, *regardless of motivation or intent*." *Nippon Steel*, 337 F.3d at

1383 (emphasis added).  To then determine whether an adverse

inference is warranted, Commerce examines a "respondent's actions

and assesses the extent of respondent's abilities, efforts, and

cooperation in responding to Commerce's requests for information." *Id*.

at 1382.

## B. Commerce Properly Determined That Kazchrome's Failure To Report ERG's Ownership Structure Warranted An Adverse Inference

As explained above, Commerce properly determined that

Kazchrome failed to act to the best of its ability when Kazchrome failed

to report its full ownership and affiliation structure, despite clear

instructions that it was required to report this information.  IDM at 6,

30, Appx___.  In other words, Kazchrome's omission of ERG's additional

ownership was not merely a "failure to respond" on Kazchrome's part. *See Nippon Steel*, 337 F.3d at 1383. Rather, it was "reasonable for Commerce to expect that" when it asked Kazchrome for a complete ownership and affiliation structure, "more forthcoming responses should have been made" than Kazchrome waiting until verification to finally report its full ownership and affiliation structure. *Id.* Because Kazchrome waited until verification to fully report its complete ownership and affiliation structure, "a reasonable conclusion is that Kazchrome had this information but either through "inattentiveness, carelessness, or inadequate record keeping," or a choice not to provide it, failed to disclose it to Commerce." IDM at 30, Appx___. Accordingly, an adverse inference is warranted under section 1677e(b)(1).

Kazchrome argues that "Commerce cannot apply AFA based on alleged failure by Kazchrome to supply information that is entirely unnecessary for Commerce's subsidy analysis," relying on *Shangdon Huarong Machinery*. Kazchrome Br. at 60 (citing *Shandong Huarong Machinery Co., Ltd. v. United States*, 435 F. Supp. 2d 1261, 1297-98 (Ct. Int'l Trade 2006)). In *Shandong*, Commerce determined that the application of AFA was *unwarranted* where the respondents failed to

report data on cast tampers. *Id.* at 1298. That was because cast tampers were not subject merchandise under review. *Id.*

Here, Commerce requests complete ownership and affiliation data to determine which companies are required to respond to its questionnaires. As explained above, the GOK's ownership in ERG is germane to determining Kazchrome's level of subsidization. Thus, far from being "entirely unnecessary for Commerce's subsidy analysis," Kazchrome Br. at 60, Kazchrome's complete ownership and affiliation structure is "crucial to the initial stages of the investigation." IDM at 29, Appx___.

Commerce reasonably determined that Kazchrome failed to act to the best of its ability when Kazchrome reported only its complete ownership and affiliation structure at verification. As Commerce explained, "{a}t no point does Kazchrome submit that it was not aware of the GOK's 40 percent ownership of ERG" or that there were additional levels of ownership." IDM at 6, Appx___. Rather, Kazchrome waited until verification to supplement incomplete questionnaire responses and, therefore, "a reasonable conclusion is that Kazchrome had this information but failed to disclose it to Commerce."

59

*Id.* Such a circumstance is a basis to find that Kazchrome had failed to act to the best of its ability. *See Nippon Steel*, 337 F.3d at 1382 ("{The best of its ability standard} does not condone inattentiveness, carelessness, or inadequate recordkeeping.").

Indeed, this Court has previously sustained the application of AFA in a nearly identical situation, in which a plaintiff failed to accurately report its affiliation and ownership structure, in *Bebitz Flanges*. 433 F. Supp. 3d at 1301. There, the plaintiff had disclosed that another company, Viraj Profiles Limited, was part of a "Personal Family Grouping" and a "producer of subject merchandise" but "asserted that it had no cross-owned affiliates." *Id.* Thus, it was obvious from Bebitz's own reporting that it should have reported Viraj as a cross-owned affiliate. Commerce issued a supplemental questionnaire directing Bebitz to submit a full response for Viraj. *Id.* Bebitz failed to timely respond, and Commerce applied total AFA to Bebitz. *Id.* at 1302-03.

In *Bebitz*, this Court assessed nearly identical arguments to Kazchrome's arguments. First, "Bebitz assert{ed} that it was not responsible for reporting information from Viraj in response to the

60

Initial Questionnaire because the questionnaire did not 'explicitly' request that information." *Id.* at 1306; *cf.* Kazchrome Br. at 54 (Commerce alleged . . . that it explicitly requested the ownership structure of ERG in its questionnaires.  As explained above, it did not.") (internal citations omitted).  Second, Bebitz claimed "that it lacked notice regarding the need to provide information concerning Viraj until Commerce issued the supplemental questionnaire."  433 F. Supp. 3d at 1306; *cf.* Kazchrome Br. at 41 ("{The Affiliation Supplemental Questionnaire} was the first and only instance when Commerce requested information about Kazchrome's ownership structure.").

     As the *Bebitz* Court reasoned:

> The purpose of the questionnaire is to allow Commerce to gather information from the respondent. Commerce does this by asking questions and providing the criteria for responding. Commerce provided criteria for identifying affiliated and cross-owned companies and required Bebitz to identify those companies that met the criteria. *Commerce also instructed Bebitz to request further guidance if it was unclear as to which companies to include.* As the party in possession of the necessary information, the burden is on Bebitz to develop the record, not Commerce.

*Bebitz*, 433 F. Supp. 3d at 1306 (internal citations omitted) (emphasis added).  The Court concluded that "{i}ntentional obtuseness on the part of a respondent does not obviate Commerce's clear request for the

relevant information." *Id.* (quoting *Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331, 1341-42 (Ct. Int'l Trade 2018) (internal quotations omitted).

Yet Kazchrome's position is worse than Bebitz's. The flaw in Bebitz's reporting was that Bebitz did not correctly classify Viraj as a cross-owned affiliate, but had otherwise identified its ownership and affiliate structure. Here, however, Kazchrome neglected to report the full universe of ownership and affiliation because, as discovered at verification, there were additional ownership levels above ERG. *See* Verification Report at 2, 4, Exhibit VE-3, Appx___. The result, however, is the same because both Bebitz and Kazchrome failed to report information Commerce expressly requested. *See* Initial Questionnaire at 48-49, Appx___.

Still, like in *Bebitz*, Commerce provided Kazchrome another opportunity to provide its full ownership and affiliation structure and issued a supplemental questionnaire. In the supplemental questionnaire, Commerce requested that "Kazchrome provide a 'chart . . . starting with Kazchrome, its ultimate owners (parent holding companies, grandparents, etc.)." Kazchrome represented to Commerce

62

*and this Court* that it "provided this chart identifying all parent entities, including its ultimate parent." Kazchrome Br. at 11-12. At verification, however, Kazchrome provided previously unreported ownership information. Verification Report at 2, 4, Exhibit VE-3, Appx___.

Like in *Bebitz*, this Court should sustain Commerce's application of an adverse inference to the total facts otherwise available.

### C. Commerce Properly Determined As AFA That Kazchrome Used All Programs Initiated On In This Investigation

Kazchrome argues that Commerce "committed legal and factual error in selecting the appropriate AFA rate," asserting that the record confirms "Kazchrome and its cross-owned affiliates' non-use of <u>all</u> programs at issue." Kazchrome Br. at 62.

As Commerce explained, Kazchrome's "decision not to provide *complete information* in the investigation," made the record evidence unreliable as to the extent of Kazchrome's usage of the subsidy programs at issue.  IDM at 15, Appx___ (emphasis added).  The basis for Commerce's adverse inference was Kazchrome's failure to report its complete ownership and affiliation structure.  IDM at 29, Appx___. Indeed, Kazchrome only alerted Commerce to *ERG's additional*

*ownership,* and did so at verification. *Id.* (emphasis added). Keeping in

mind that Commerce requests affiliation information to determine the

full universe of entities that must provide information, the logical

inference is that if Kazchrome withheld ERG's additional ownership, it

could have withheld other affiliation information as well and Commerce

would have had no way of knowing, especially because ERG's additional

ownership was disclosed at verification. Thus, Commerce concluded

that there was an "absence of reliable record evidence concerning

Kazchrome{'s} usage of the subsidy programs at issue." IDM at 15,

Appx___. In other words, where Kazchrome's behavior shows that it

withheld information, it follows logically that Kazchrome could have

withheld other information still. Given that Kazchrome's disclosure

was at verification, and that Kazchrome is the party in possession of its

ownership and affiliation structure information, Commerce could not

ask about and would not know the full extent of Kazchrome's if there

were more unreported affiliates.

Commerce's determination that Kazchrome used and benefited

from all programs at issue is not inconsistent with its other findings.

Irrespective of whether Kazchrome itself was eligible for certain

subsidies, Kazchrome could have had additional affiliates that it did not

report who were received countervailable benefits that would be

attributed to Kazchrome.   *See* Kazchrome Br. at 62-63.  Similarly,

Commerce could verify that "Kazchrome and its cross-owned affiliates

did not maintain agreements with the GOK required for receipt of

various alleged subsidies," *id.* at 63, but that would only prove non-use

as to affiliates Kazchrome reported, and not any unreported affiliates.

Similarly, Kazchrome's business records could show that Kazchrome

did not use certain programs, but they would not show any unreported

affiliates' uses of certain programs.  *See id.*  This logical exercise would

have been entirely avoided had Kazchrome submitted its full ownership

and affiliation structure as required by the Affiliation Questionnaire

and the Initial Questionnaire.

Additionally, Commerce's recalculation of Kazchrome's rate in the

*Amended Final Determination* is in accord with Commerce's AFA

methodology.  Commerce explained that it was selecting as AFA, "the

calculated program-specific above zero rates determined for YDD, the

cooperating respondent in this investigation."  IDM at 14, Appx___.

Thus, if Commerce corrected a program specific rate for YDD, that

would lead to an adjustment of Kazchrome's AFA rate. Again that
Commerce "verified *Kazchrome's* non-use" is not mutually exclusive
with Commerce's finding that the evidence on the record was unreliable
as to whether Kazchrome could have benefited from a subsidy
nonetheless through an *undisclosed affiliate* give that it failed to report
its entire ownership and affiliation structure in the first instance, and
thus its reporting cannot be trusted.

## IV. Commerce Properly Found That Kazchrome Benefited Under The Corporate Income Tax Exemption Program

In its case brief Kazchrome argued that it did not receive a
countervailable benefit under the Corporate Income Tax Exemption
Program, because, according to Kazchrome, the benefit under the
program is tied to non-subject merchandise. Kazchrome Case Br. at 5-
11, Appx___. Commerce ultimately concluded that, because it was
applying an AFA rate to Kazchrome based on all the programs for
which it was eligible, Kazchrome's arguments regarding the Corporate
Income Tax Exemption Program were moot. IDM at 45, Appx___.
Kazchrome argues that "to the extent Commerce revisits its decision to
apply AFA to Kazchrome . . . Commerce must reverse its position from
the Preliminary Determination and find that the corporate income tax

exemption for the Ferrochrome Priority Investment Project was tied to the production of . . . non-subject merchandise," and "{a}s a result, Commerce must find that this program did not provide a countervailable benefit to Kazchrome in this investigation." Kazchrome Br. at 65. As explained in detail above, Commerce's determination to apply total AFA to Kazachrome and find that it benefited from all programs, including the Corporate Income Tax Investment Program, is based on substantial evidence and in accordance with law. However, if this Court were to remand to Commerce its application of AFA and the countervailability of the Corporate Income Tax Investment Program, Commerce would consider all arguments relevant to the remand order.

## CONCLUSION

For these reasons, we respectfully request that the Court deny Kazchrome's motion for judgment upon the agency record, sustain Commerce's final determination in all respects, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
Ruslan Klafehn
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

<u>/s/ Collin T. Mathias</u>
COLLIN T. MATHIAS
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0315
Collin.T.Mathias@usdoj.gov

March 10, 2026

Attorneys for Defendant

68

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 14,000 word limitation authorized by the Court's scheduling order because the brief 11,639 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

I also certify that this submission was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

<u>*/s/ Collin T. Mathias*</u>
Collin T. Mathias

1