# UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| **TNC KAZCHROME JSC,**<br><br>            **Plaintiff,**<br><br>        **v.**<br><br>**UNITED STATES,**<br><br>            **Defendant,**<br><br>        **and**<br><br>**CC METALS AND ALLOYS, LLC AND FERROGLOBE USA, INC,**<br><br>            **Defendant-Intervenors.** | **Court No. 25-00128**<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Removed from Brackets on Pages 27 and 34.** |

## DEFENDANT-INTERVENORS' RESPONSE BRIEF

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

Date:  March 24, 2026

*Counsel to Defendant-Intervenors CC Metals and Alloys, LLC and Ferroglobe USA, Inc.*

**NON-CONFIDENTIAL VERSION**

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ......................... v

RULE 56.2 STATEMENT .................................................................... 1

1.  The Administrative Determination Under Review ......................... 1

2.  The Issues Presented and Reasons Supporting Commerce's
    Determination ............................................................................ 2

    A.  Whether Commerce's application of FA and AFA to Kazchrome
        is supported by substantial evidence and is otherwise in
        accordance with law? ............................................................. 2

    B.  Whether Commerce properly found that Kazchrome benefitted
        under the Corporate Income Tax Exemption program? ............... 4

JURISDICTION ................................................................................ 4

STANDARD OF REVIEW ................................................................... 5

STATEMENT OF FACTS .................................................................... 7

1.  The Petition, Initiation, Respondent Selection, and
    Questionnaire Responses ............................................................ 7

2.  Preliminary Determination ....................................................... 13

3.  Verification .............................................................................. 14

4.  Case Briefs .............................................................................. 16

5.  Final and Amended Determinations .......................................... 18

SUMMARY OF THE ARGUMENT ..................................................... 22

**NON-CONFIDENTIAL VERSION**

ARGUMENT ..................................................................................................24

I.   COMMERCE'S APPLICATION OF FA AND AFA TO
     KAZCHROME IS SUPPORTED BY SUBSTANTIAL
     EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH
     LAW .................................................................................................24

   A.   Kazchrome's Reliance on 19 C.F.R. § 351.527(a) Is
        Misplaced.................................................................................25

   B.   Kazchrome's Assertion That the Information Presented at
        Verification Was Already on the Record Is Incorrect.................32

II.  COMMERCE PROPERLY FOUND THAT KAZCHROME
     BENEFITED UNDER THE CORPORATE INCOME TAX
     EXEMPTION PROGRAM.............................................................35

CONCLUSION ..............................................................................................39

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**CASES**

*Atl. Sugar Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ...................................................................6

*Cleo In. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007) ...................................................................6

*Consolidated Edison v. NLRB*,
   305 U.S. 197 (1938) .....................................................................................5

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) .....................................................................................6

*Fujitsu Gen'l Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) .....................................................................5

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...............................................6

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) .....................................................................5

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ...................................................................7

*PAM S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009) ........................................................... 5, 6, 7

*Timken Co. v. United States*,
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ......................................................6

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) .....................................................................................5

*Universal Camera Corp. v. N.L.R.B*,
   340 U.S. 474 (1951) .....................................................................................6

**STATUTES**

19 U.S.C. § 1516a(a)(2)(B)(i) ..............................................................................4

NON-CONFIDENTIAL VERSION

28 U.S.C. § 1581(c) ................................................................................................4

**REGULATIONS**

19 C.F.R. § 351.509(d) ................................................................. 14, 36

19 C.F.R. § 351.525(b)(5)(1) ...................................................................36

19 C.F.R. § 351.525(b)(6) ........................................................ 16, 27, 28, 30

19 C.F.R. § 351.525(b)(7) ...........................................................................28

19 C.F.R. § 351.527(a) ................................................................... 25, 26, 32

**ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS**

*Certain Epoxy Resins From Taiwan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,618 (Dep't of Commerce Apr. 3, 2025) ...........38

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) (final rule) .............28

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 31,133 (Dep't of Commerce Apr. 24, 2024) ......................................................................................8

*Ferrosilicon From Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce May 20, 2025)...................................................................................................2, 22

*Ferrosilicon From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,108 (Dep't of Commerce March 28, 2025)........................................................................ passim

*Ferrosilicon From the Republic of Kazakhstan: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 73,369 (Dep't Commerce Sep. 10, 2024) ........................................... passim

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766 (Dep't of Commerce, Mar. 25, 2024) ..................................................................................... 26, 37

NON-CONFIDENTIAL VERSION

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **AFA** | **Adverse Facts Available** |
| **CBP** | **U.S. Customs and Border Protection** |
| **C.R.** | **Confidential Record** |
| **Commerce** | **Department of Commerce** |
| **CVD** | **Countervailing Duty** |
| **GOK** | **Government of Kazakhstan** |
| **ERG** | **Eurasian Resources Group S.a.r.l.** |
| **FA** | **Facts Available** |
| **IDM** | **Issues and Decision Memorandum** |
| **Kazchrome** | **TNC Kazchrome JSC** |
| **PDM** | **Preliminary Decision Memorandum** |
| **P.R.** | **Public Record** |
| **Kazakhstan** | **Republic of Kazakhstan** |
| **TELF** | **TELF AG** |
| **YDD** | **YDD Corporation LLP** |

NON-CONFIDENTIAL VERSION

**RULE 56.2 STATEMENT**

Defendant-Intervenors CC Metals and Alloys, LLC and Ferroglobe USA, Inc., petitioners in the underlying investigation, respectfully submit this response to the Rule 56.2 motion for judgment on the agency record filed in this case by plaintiff Kazchrome, ECF No. 34 ("Kazchrome Br.").

## 1. The Administrative Determination Under Review

The administrative determination under review is the final determination in the U.S. Department of Commerce's ("Commerce") countervailing duty ("CVD") investigation of ferrosilicon from the Republic of Kazakhstan ("Kazakhstan"), covering the period of investigation of January 1, 2023 through December 31, 2024. *Ferrosilicon From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,108 (Dep't of Commerce March 28, 2025) ("Final Determination"), P.R. 448, Appx___, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 442, Appx___,[1] as amended by *Ferrosilicon From Kazakhstan: Amended*

---

[1] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R." Business proprietary information from confidential documents is designated

1

NON-CONFIDENTIAL VERSION

*Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce May 20, 2025), P.R. 460, Appx__, and accompanying Amended IDM at 2-3, P.R. 454, C.R. 297, Appx___, Appx___.

## 2. The Issues Presented and Reasons Supporting Commerce's Determination

### A. Whether Commerce's application of FA and AFA to Kazchrome is supported by substantial evidence and is otherwise in accordance with law?

**Yes.** Commerce correctly determined that TNC Kazchrome JSC ("Kazchrome") failed to act to the best of its ability by withholding necessary affiliation and ownership information until verification. This prevented Commerce from conducting a full attribution analysis. In addition to supporting the arguments presented in the brief from the Defendant, the United States, Defendant-Intervenors assert that Kazchrome's claim that Commerce's transnational subsidy regulation circumscribes Commerce's investigatory reach is misplaced and should be rejected. First, the transnational subsidy rule does not apply to the

_____

using square brackets and is redacted from the public version of the brief, in accordance with Rule 5(g) of the Court's Rules.

**NON-CONFIDENTIAL VERSION**

factual scenario present in this case regarding the Government of Kazakhstan ("GOK"). Second, Kazchrome's view of the transnational subsidy regulation would improperly block Commerce from investigating specific conduits of subsidization if government merely forms an offshore holding company. Finally, Kazchrome's arguments only relate to the GOK ownership of ERG, but do not address the non-governmental ownership discovered at verification.

Furthermore, Kazchrome's assertion that any information on the affiliation and corporate structure of ERG given to Commerce at verification was already on the record of the investigation in the exact same form is patently false. The hole in the record created by Kazchrome's failure to completely respond to Commerce's affiliation and ownership questions undermined the entire investigation.

Accordingly, Commerce's determination to apply total facts available with adverse inferences ("AFA") to Kazchrome is supported by substantial evidence and is otherwise in accordance with law.

3

NON-CONFIDENTIAL VERSION

### B. Whether Commerce properly found that Kazchrome benefitted under the Corporate Income Tax Exemption program?

**Yes.** Kazchrome asserts that the corporate income tax exemption it received under the Entrepreneur Code is tied to the production of non-subject merchandise, and, therefore, cannot be found to provide a countervailable benefit. First, Defendant-Intervenors agree with Defendant that as long as total AFA is applied to Kazchrome, the company's arguments on this point are moot. However, assuming, *arguendo*, that if AFA was no longer applied, Kazchrome is mistaken that Commerce cannot find the corporate tax exemption provided a countervailable subsidy. For income tax subsidies, Commerce's long-standing practice is that these subsidies are not tied to specific merchandise, particularly when the subsidy benefits the overall operations of a company, as is the case here.

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under 19 U.S.C. § 1516a(a)(2)(B)(i).

4

NON-CONFIDENTIAL VERSION

## STANDARD OF REVIEW

In reviewing Commerce's antidumping duty ("AD") or CVD determinations, the Court of International Trade must sustain "any determination, finding or conclusion found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). "The specific factual findings" on which Commerce relies "in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record."

5

*Cleo In. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007).  As the

Supreme Court has held, substantial evidence is "less than the weight

of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent" an agency

determination from being "supported by substantial evidence."  *Consolo*

*v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its

judgment for that of Commerce in choosing between two fairly

conflicting interpretations of the facts on the record.  *See Timken Co. v.*

*United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink*

*Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade

2006).  Further, the Court of Appeals for the Federal Circuit ("Federal

Circuit") has held that "substantial evidence on the record means 'more

than a mere scintilla' and such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion," even if some

evidence on the record detracts from the agency's ultimate

determination.  *Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63

(Fed. Cir. 1984) (citing *Universal Camera Corp. v. N.L.R.B*, 340 U.S.

474, 477 (1951)); *PAM S.p.A. v. United States*, 582 F.3d 1336, 1339

NON-CONFIDENTIAL VERSION

(Fed. Cir. 2009).  As the Federal Circuit has held, the substantial evidence standard is a "high barrier" for a challenging party to overcome.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

## STATEMENT OF FACTS

### 1. The Petition, Initiation, Respondent Selection, and Questionnaire Responses

On March 28, 2024, CCMA and Ferroglobe, American producers of ferrosilicon, filed a CVD petition with Commerce, alleging that the GOK was unfairly subsidizing Kazakstani producers and exporters of ferrosilicon sold to the United States.[2]  Petition Vol. V (Mar. 28, 2024), P.R. 1-9, C.R. 1-9, Appx___, Appx___.

On April 24, 2024, Commerce initiated a CVD investigation of ferrosilicon from Kazakhstan covering 21 subsidies.  *Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 31,133, 31135 (Dep't of

---

[2] Petitioners also filed an antidumping petition on ferrosilicon from Kazakhstan, which resulted in an affirmative determination and imposition of an order.

Commerce Apr. 24, 2024), P.R. 34, Appx___.  Soon afterward, Commerce selected the two mandatory respondents for individual examination in the investigation, TELF AG ("TELF") and YDD Corporation LLP ("YDD"), the "only listed two producer/exporters of ferrosilicon from Kazakhstan" based on U.S. Customs and Border Protection ("CBP") entry data.  *Ferrosilicon From the Republic of Kazakhstan: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 73,369 (Dep't Commerce Sep. 10, 2024) ("Preliminary Determination"), P.R. 388, Appx___, and accompanying Preliminary Decision Memorandum ("PDM") at 6, P.R. 378, Appx___.

On May 14, 2024, TELF submitted comments in both the antidumping and CVD investigations on ferrosilicon from Kazakhstan regarding the address of TELF listed in the CBP data.  TELF Comments on Company Address (May 14, 2024) ("TELF Comments") P.R. 50, C.R. 20, Appx___, Appx___.  This submission also argued that TELF should not be selected as a mandatory respondent because it believed that the correct entity to respond to Commerce's questionnaires is Kazchrome, the "unaffiliated Kazakh ferrosilicon

8

producer and exporter from which TELF purchased subject merchandise" under a business agreement. *Id.* at 2-3 (emphasis omitted), Appx___, Appx___. TELF also asserted in a footnote that it was not affiliated with Kazchrome, citing publicly available webpage information that the GOK held an ownership interest in the Eurasian Resources Group S.a.r.l ("ERG"), Kazchrome's ultimate parent company. *Id.* at n.6 & Exhibit 3, Appx___, Appx___.

After Commerce issued questionnaires to both TELF and Kazchrome to clarify whether TELF acted as an exporter, TELF and Kazchrome submitted documentation alleging that that Kazchrome was the exporter of record. Kazchrome Respondent Selection Supplemental Questionnaire Response (May 23, 2024) at 2-5 and Attachments A-E, P.R. 69, C.R. 22, Appx___, Appx___.

Despite an additional request for reconsideration from TELF, TELF remained a mandatory respondent. Commerce determined that, as TELF purchased subject merchandise "produced by Kazchrome, an unaffiliated producer in Kazakhstan, and sold it to its U.S. affiliate," TELF fell within the "trading company attribution regulation, pursuant to 19 C.F.R. § 351.525(c), because it was involved in the exportation of

9

subject merchandise produced by an unaffiliated producer." PDM at 6, Appx___; *see also* IDM at 1, Appx__ (identifying the mandatory respondents as TELF and YDD).

Kazchrome was never selected as a mandatory respondent; instead, Kazchrome was required to respond to Commerce's questionnaires as TELF's unaffiliated supplier of subject merchandise. *See* TELF's Affiliated Companies Questionnaire Response (Jun. 4, 2024) at 2-3, P.R. 82, C.R. 27, Appx___, Appx___; Kazchrome's Affiliated Companies Questionnaire Responses (May 31, 2024) at 1-2, P.R. 77, C.R. 26, ("Kazchrome Affiliated Companies Response"), Appx___, Appx___; *see also* Initial Questionnaire (May 3, 2024) ("Initial Questionnaire") at 49, P.R. 40, Appx___ ("If your company sells the subject merchandise to an export trading company which then exports the subject merchandise to the United States, then you must submit complete questionnaire responses for all such trading companies.").

Kazchrome was required to provide information on all of its affiliated companies, including cross-owned companies, and to "describe in detail the nature of the relationship between {the} company and those companies listed" as affiliated. Initial Questionnaire at 49,

Appx___.  In addition, Commerce required a "complete questionnaire response for those affiliates where 'cross-ownership' exists, and . . . the cross-owned company is a holding company or a parent company."  *Id.* at 50, Appx___.  Commerce specified this request further in the questionnaire, instructing that a response "must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling interest in your company."  *Id.* at 50 n.9, Appx___. Commerce also provided Kazchrome an avenue for help: if they "have questions during the course of this investigation" they should "consult with the officials in charge." *Id.* at 4, Appx___.

Kazchrome's response to the affiliation questionnaire, submitted on May 31, 2024, listed eight parent companies, with ERG as its ultimate parent company.  Kazchrome Affiliated Companies Response at 4, Appx___, Appx___.  Kazchrome failed to provide questionnaire responses for ERG, claiming that because ERG is not a "Kazakhstani compan{y} or located in Kazakhstan", ERG was "not required to respond to the questionnaire." *Id.*

On June 7, 2024, Commerce issued a supplemental questionnaire which instructed Kazchrome to provide an affiliation chart "starting

11

with Kazchrome, its ultimate owners (parent holding companies, grandparents, *etc.*), and companies in which Kazchrome may own a percentage." Affiliation Supplemental Questionnaire for TELF and Kazchrome (June 7, 2024) at 4-5 (emphasis added), P.R. 88, C.R. 28, Appx___, Appx___. In this supplemental questionnaire, Commerce provided an example for Kazchrome to follow when creating the affiliation chart. *Id.* at 5, Appx___. Therefore, Commerce not only set out in the plain language of the questionnaire, but also in the example chart, that Commerce was requiring Kazchrome to set out the complete ownership structure of Kazchrome including and above the grandparent level – which would consequently include the ownership of ERG. *See id.* On June 13, 2024, Kazchrome responded with an ownership chart that stopped at ERG. Kazchrome's Affiliation Supplemental Questionnaire Responses (Jun. 13, 2024) at 2 & Exhibit AFFILSUPP-2, P.R. 97-98, C.R. 29, Appx___, Appx___.

On June 17, 2024, Kazchrome submitted a response to the general questions of the initial questionnaire. Kazchrome's Initial Questionnaire Response (June 17, 2024), P.R. 107-113, C.R. 32-41 ("Kazchrome IQR"), Appx___, Appx___. In that response, Kazchrome

included financial statements covering 2021, 2022, and 2023 for itself and its cross-owned companies.  *Id.* at 2-7, 12 & Exhibits GEN-1 – GEN-16, Appx___, Appx___.  Some of the financial statements included a note stating "{t}he Republic of Kazakhstan is the Company's related party based on significant influence on ERG."  *See, e.g., id.* at Exhibits GEN-2 (Note 4), Appx___.  However, these financial statements did not make any other claims regarding ownership of ERG, including if there were other owners, what the ownership structure was, or what any ownership share percentages were.  *See id.*

### 2. Preliminary Determination

On September 10, 2024, Commerce published its Preliminary Determination, calculating a company-specific subsidy rate of 2.37 percent for Kazchrome.  *See* Preliminary Determination, 89 Fed. Reg. at 73,369, Appx___.  In doing so, Commerce found that Kazchrome had used and benefited from the Corporate Tax Exemption program, which provided "companies with investment priority projects" up to a "100 percent reduction in their calculated corporate income tax on income received from the implementation of the activities specified in the investment contract."  PDM at 17, Appx___.  Although the tax

13

NON-CONFIDENTIAL VERSION

exemption was related to a new smelter not connected to the production of ferrosilicon, Commerce determined, pursuant to 19 C.F.R. § 351.509(d), that the tax exemption benefitted the entire firm, and thus included the benefit in the subsidy calculations by attributing the subsidy to all of Kazchrome's sales. *See* PDM at 18, Appx___.

### 3. Verification

Commerce conducted an in-person verification of Kazchrome from September 18, 2024 to September 20, 2024. Verification of Questionnaire Responses TNC Kazchrome JSC Corporation LLP (Nov. 19, 2024) ("Verification Report") at 1, P.R. 412, C.R. 283, Appx___, Appx___. Prior to verification, Commerce understood that Kazchrome had a certain number of parent companies, "including its ultimate parent ERG," based on Kazchrome's questionnaire responses. *Id.* at 3-4, Appx___, Appx___ (citing Kazchrome Affiliated Companies Response at 2-4, Appx___). During the course of verification, however, Kazchrome officials "provided an overview of the ownership structure for Kazchrome and explained that there were <u>additional parent companies and individual owners above ERG that {were} previously unreported</u>." *Id.* at 4 (emphasis added).

14

**NON-CONFIDENTIAL VERSION**

Commerce then "requested additional ownership information of ERG." *Id.* at 2, Appx___, Appx___.  In response, Kazchrome company officials provided previously unreported information that "ERG, and therefore Kazchrome, is ultimately owned by three private individuals, and the Government of Kazakhstan ("GOK") who holds a 40 percent share in ERG."  *Id.*

More specifically, Kazchrome officials provided an ownership structure chart for ERG that included additional parent companies and individual owners above ERG that were previously unreported, including the GOK's 40 percent share.  *Id.* at 4, Appx___, Appx___; Kazchrome Verification Exhibits (Sep. 26, 2024) ("Verification Exhibits") at Exhibit VE-3, P.R. 401, C.R. 273-275, Appx___, Appx___. None of previously unreported parties, or any affiliated parties to those previously unreported parties, contained in the corporate structure verification exhibit were examined at verification or at any other point during the investigation on ferrosilicon from Kazakhstan.

At verification, Commerce also examined Kazchrome's reporting with respect to the Corporate Income Tax Exemption program and

15

other programs, and found no inconsistencies.  Verification Report at 5, Appx___.

### 4. Case Briefs

In their case brief, the petitioners argued that Commerce should apply total AFA to Kazchrome for its failure to provide complete information about ownership and affiliation before verification, which prevented Commerce from conducting a complete investigation of the subsidies to Kazchrome and its cross-owned affiliates.  Petitioners' Case Brief (Dec. 6, 2024) at 8-11 & 18-21, P.R. 422, C.R. 289, Appx___, Appx___.

Under 19 C.F.R. § 351.525(b)(6)(iii), Commerce must investigate and countervail subsidies to holding or parent companies.  By failing to report the additional holding companies, Kazchrome withheld necessary information and deprived Commerce of the opportunity to do so.  *Id*. at 10, Appx___.  Petitioners also specifically pointed out that Kazchrome's refusal to provide complete information regarding ERG prevented Commerce from discovering the true nature of the GOK's relationship with ERG and Kazchrome and properly assessing the true nature of all transactions between Kazchrome, ERG, and the GOK, particularly

16

**NON-CONFIDENTIAL VERSION**

given that Kazchrome's 2023 financial statements showed that ERG and Kazchrome exchanged funds. *Id*. at 10-11, Appx___.

Kazchrome responded that GOK's ownership share in ERG was included in TELF's respondent selection comments, and that Kazchrome had disclosed the GOK's ownership in ERG through its financial statements. Kazchrome's Rebuttal Brief (Dec. 20, 2024) at 7-8, P.R. 426, Appx___. Kazchrome argued that even if Commerce found that the information had not been disclosed until verification, AFA would be inappropriate because ERG is a Luxembourg company and, therefore, any provision of subsidies to ERG by the GOK would be transnational subsidies. *Id*. at 8, Appx___. Kazchrome argued that Commerce should be precluded from finding transnational subsidies to be countervailable under its regulations in place at the time. *Id*. at 9, Appx___. Kazchrome, however, only addressed the failure to disclose the GOK's ownership interest in ERG in its case brief, but did not address the other parent companies and individual owners discovered at verification. *Id*. at 7-8, Appx___.

Kazchrome also argued that the Corporate Income Tax Exemption program was limited to the production of non-subject merchandise and,

17

therefore, that Commerce could not find the program countervailable. *See* Kazchrome's Case Brief (Dec. 6, 2024) at 5-11, P.R. 419, C.R. 286, Appx___, Appx___.

Petitioners rebutted this argument, pointing out Commerce's longstanding practice of not finding income tax incentives to be tied to specific products, as well as the facts on the record showing that the income tax exemption was reported on Kazchrome's income tax return and reduced the firm's income tax liability and benefitted the overall operations of that firm.  Petitioners' Rebuttal Brief (Dec. 20, 2024) at 19-20, P.R. 429, C.R. 290, Appx___, Appx___.

## 5. Final and Amended Determinations

On March 24, 2025, Commerce published the Final Determination, applying total AFA to Kazchrome.  *See* Final Determination, Appx___.

As a company involved in the sale of subject merchandise by mandatory respondent TELF, Kazchrome was required to complete the affiliation and ownership questionnaire.  IDM at 5, Appx___.  While Kazchrome reported that it had eight parent companies including ERG in its questionnaire responses from May 2024, information was

18

presented at verification that showed Kazchrome's questionnaires were incomplete. *Id.* Specifically, Kazchrome "waited until verification in September 2024 to report {} additional layers of ownership, including the GOK's 40 percent ownership of ERG." *Id.* As Kazchrome "withheld necessary information that Commerce requested, failed to provide information within the established deadlines, and significantly impeded this investigation by failing to fully respond to the affiliation section of Commerce's initial questionnaire," Commerce relied on FA. *See id.* at 5-6, Appx___.

Furthermore, as Kazchrome failed to act to the best of its ability to disclose information available to it despite clear instructions to do so, Commerce applied an adverse inference pursuant to 19 U.S.C. § 1677e(b). *Id.* at 6, Appx___.

As the failure of Kazchrome to provide complete affiliation information prevented Commerce from fully investigating the additional layers of ownership discovered at verification, as AFA, Commerce found that Kazchrome had used all 21 of the programs initiated "in the absence of reliable record evidence concerning Kazchrome{'s} usage of the subsidy programs at issue." *Id.* at 15,

19

**NON-CONFIDENTIAL VERSION**

Appx___.  Then, following its CVD AFA Hierarchy, Commerce applied the "highest calculated program-specific rates determined for a cooperating respondent", YDD.  *Id.* at 12, Appx___.  For the programs not used by YDD, Commerce applied, where available, "the highest above *de minimis* rate calculated for the same or comparable programs in a CVD investigation or administrative review involving Kazakhstan." *Id.* at 14, Appx___.  Commerce calculated a company-specific subsidy rate of 265.38 percent for Kazchrome as an unaffiliated producer.  *Id.* a 14-15, Appx___.

Commerce found the arguments presented in Kazchrome's Rebuttal Brief – that the ownership interest held by the GOK in ERG was disclosed prior to verification in the footnote of a submission from TELF and in a note to Kazchrome's financial statements – to be unpersuasive.  Commerce found Kazchrome's reference to TELF's comments lacking because the information appeared in a footnote of an unaffiliated party's submission, not in Kazchrome's responses.  *Id.* at 29, Appx___.  Kazchrome's reliance on its own financial statements was also misplaced, as "the financial statements note does not indicate that ERG's ownership was 40 percent.  Instead, it notes only that the GOK,

20

through some undefined relationship, has an effect on ERG." *Id.* In short, Commerce found that "including data in a submission filed later in a proceeding, as well as information derived from another, unaffiliated party's submission, does not constitute an adequate or beneficial response to Commerce's initial affiliation inquiries." *Id.* As the provision of affiliation information "is a critical step for Commerce to determine the full universe of entities that must provide information on their subsidization," vital information was missing from the record "because Commerce did not have the opportunity to request more information on ERG and potential subsidies that ERG received, which could have a direct impact on Commerce's calculation of the subsidy rate assigned to Kazchrome." *Id.* As such, Kazchrome's argument that even if the information was presented for the first time at verification, AFA was not warranted because ERG is a Luxembourgish company, was inapplicable given that Commerce was deprived of the affiliation information necessary to make any such decision. *Id.* at 30, Appx___.

In addition, because Commerce assigned Kazchrome a rate based on AFA, Commerce found Kazchrome's arguments regarding the Corporate Income Tax Exemption to be moot. *Id.* at 45, Appx___.

21

Following Commerce's Final Determination, Commerce "amended the benefit calculation for the Customs Duty Exemption program" used by YDD in response to ministerial error comments. *Ferrosilicon From Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce May 20, 2025), P.R. 460, Appx___, and accompanying Amended IDM at 2-3, P.R. 454, C.R. 297, Appx___, Appx___. Because Kazchrome's rate was based in part on the calculated program-specific rates determined for YDD, Commerce amended Kazchrome's CVD rate from 265.38 to 265.53 percent. *See id*. at 3, Appx___.

Plaintiff timely appealed. *See* Summons, ECF No. 1; Compl. ECF No. 13.

## SUMMARY OF THE ARGUMENT

Kazchrome's reliance on Commerce's transnational subsidy regulation is misplaced and should be rejected. The transnational subsidy rule does not apply to the factual scenario present in this case. Kazchrome's view of the transnational subsidy regulation would improperly block Commerce from investigating specific conduits of

22

**NON-CONFIDENTIAL VERSION**

subsidization merely by governments forming an offshore holding company.  Also, Kazchrome's arguments only potentially relate to the GOK ownership of ERG, but do not address the additional non-governmental ownership discovered at verification.

Furthermore, Kazchrome's assertion that any information on the affiliation and corporate structure of ERG given to Commerce at verification was already on the record of the investigation in the exact same form is patently false.  The hole in the record created by Kazchrome's failure to completely respond to Commerce's affiliation and ownership questions prior to verification undermined the entire investigation.

In addition, Kazchrome is mistaken that the corporate income tax exemption it received cannot be found to provide a countervailable benefit, given Commerce's long-standing practice that income tax subsidies are not tied to specific merchandise, particularly when the subsidy benefits the overall operations of a company, as is the case here.

NON-CONFIDENTIAL VERSION

## ARGUMENT

### I.    COMMERCE'S APPLICATION OF FA AND AFA TO KAZCHROME IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW

As a preliminary matter, Defendant-Intervenors support and agree with the arguments presented in the response brief by Defendant, the United States.  Kazchrome "withheld necessary information that Commerce requested, failed to provide information within the established deadlines, and significantly impeded this investigation by failing to fully respond to the affiliation section of Commerce's initial questionnaire."  *See* IDM at 5-6, Appx___.  Commerce's decision to apply AFA is thus supported by the record evidence and in accordance with law for all of the reasons set out in Defendant's brief.  Def. Br. at 22-55.  Moreover, Kazchrome's disclosure of additional affiliation and ownership information for the first time at verification highlighted the gap in necessary information from the record.

Likewise, Commerce's application of AFA to Kazchrome was also supported by evidence and in accordance with law, given the massive hole in the record created by Kazchrome's withholding of affiliation information, which impeded the investigation.  Def. Br. at 56-66.

24

However, in addition to the arguments presented by the Defendant, Defendant-Intervenors also add the following points.

### A. Kazchrome's Reliance On 19 C.F.R. § 351.527(a) Is Misplaced

Kazchrome argues that "it is undisputed that ERG is a Luxembourg company . . . {w}ithout information that would demonstrate otherwise, under 19 C.F.R. § 351.527(a), Commerce was precluded from attributing any alleged support from the GOK received by ERG to Kazchrome." Kazchrome Br. at 47. Kazchrome goes on to claim that this "regulatory bar rendered ERG's ownership details—and any further information that Commerce might have requested about ERG—immaterial to Commerce's analysis and calculation of Kazchrome's rate." *Id.* Kazchrome concludes that "even if certain information about ERG was missing from the record, none of that information was necessary for Commerce's analysis." *Id.* In short, Kazchrome claims that 19 C.F.R. § 351.527(a) prevents Commerce from even requesting information on ERG's ownership structure. Kazchrome, however, ultimately misapplies 19 C.F.R. § 351.527(a) in an attempt to impermissibly circumscribe Commerce's investigatory reach based on the location of ERG's headquarters.

**NON-CONFIDENTIAL VERSION**

The restriction Kazchrome attempts to place on Commerce to prevent inquiry into the ownership in ERG is not supported by 19 C.F.R. § 351.527(a).  Prior to its elimination, this regulation restricted Commerce from finding a subsidy to exist when a subsidy program is funded "{b}y a government of a country other than the country in which the recipient firm is located…."  19 C.F.R. § 351.527(a).  This regulation was based on "Commerce's self-imposed restriction on its ability to countervail subsidies only if those subsidies were provided to entities of a country solely by the government of that country."[3]  *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,826 (Dep't of Commerce, Mar. 25, 2024).  Plaintiff ignores that subsidization under this restricted view can exist even when the funds or a cross-ownership affiliation go

---

[3] When Commerce eliminated 19 C.F.R. § 351.527(a), the agency noted that its bar on transnational subsidies was overly restrictive and not required by statute, as "Section 701 of the Act does not impose geographic limitations on countervailing unfair foreign subsidies," and, as such, was "inconsistent with the very purpose of the CVD law." *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,826 (Dep't of Commerce, Mar. 25, 2024).

through holding companies in another country based on the agency's attribution regulations.  19 C.F.R. § 351.525(b)(6).  This is the case here.

In this investigation, Commerce discovered for the first time at verification that Kazchrome failed to disclose additional holding companies or the fact that the GOK has a 40 percent ownership interest in ERG, and therefore, Kazchrome is ultimately owned in substantial part by the GOK.  Commerce explicitly noted in the verification report:

> {D}uring the course of Commerce's examination of Kazchrome's corporate structure, Kazchrome company officials explained that there are additional holding companies and private individuals who hold ownership of ERG.  We requested additional ownership information of ERG, *see* Exhibit VE-3.  The information provided indicates that ERG, and therefore Kazchrome, is ultimately owned by three private individuals, and the Government of Kazakhstan (GOK) who holds a 40 percent share in ERG.  This information was previously unreported.

Verification Report at 2, Appx___, Appx___.  In fact, the GOK owns [

*relative size*     ].  Verification Exhibits at Exhibit VE-3, Appx___,

Appx___.  Commerce has expressly recognized that such a 40 percent voting interest or "golden share" is significant, as it may result in cross-

27

ownership in certain circumstances. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998) (final rule).

Kazchrome's failure to provide complete information pertaining to its affiliates, despite Commerce's request, precluded the possibility of a fulsome investigation of the subsidies used by Kazchrome and its cross-owned affiliates. Complete affiliation information is necessary to ensure that Commerce is able to investigate all cross-owned affiliates that may have received countervailable subsidies. Under 19 C.F.R. § 351.525(b)(6)(iii),[4] Commerce must investigate and countervail subsidies to holding or parent companies and their subsidiaries. In other words, Commerce must follow the money. By failing to report all of the additional holding companies until verification, Kazchrome deprived Commerce of the opportunity to do just that.

---

[4] 19 C.F.R. § 351.525(b)(6)(iii) is not solely limited to holding companies in the subject country either. Not only does the language of 19 C.F.R. § 351.525(b)(6) contain no country-based restrictive language regarding corporations with cross-ownership, 19 C.F.R. § 351.525(b)(7) is also instructive as it instructs how Commerce should attribute subsidies for firms with production facilities in two or more separate countries. Moreover, in the investigation at issue here, Commerce determined, and no party has appealed, that "19 CFR 351.525(c) requires Commerce to examine subsidies conferred upon on a trading company," even when that trading company, TELF, is located outside of the subject country. IDM at 25, Appx___.

Moreover, Kazchrome's refusal to provide a complete questionnaire response on behalf of ERG prevented Commerce from discovering the true nature of the GOK's relationship with ERG and Kazchrome and properly assessing the true nature of all transactions between Kazchrome, ERG, and the GOK.  Such information is necessary to investigate and evaluate the extent of countervailable subsidies that the GOK may have provided to ERG and Kazchrome.

Kazchrome's 2023 financial statements show that ERG and Kazchrome have exchanged significant funding.  Kazchrome received finance income from its parent company ERG of KZT 43,966,727,000 in 2022 and 4,052,768,000 in 2023.  Kazchrome's Supplemental Questionnaire Response (Aug. 14, 2024) at Exhibit SQ1-1, P.R. 306-307, C.R. 203-205, Appx___, Appx___.  Kazchrome also reported loans receivable of KZT 21,921,895,000 for ERG and financial guarantees of KZT 17,282,712,000 as liabilities to ERG in 2022.  *Id*. at 13, Appx___, Appx___.  Kazchrome's failure to report that the GOK owns 40 percent of ERG — until Commerce compelled it to do so at verification — prevented Commerce from investigating any GOK involvement in these funding flows.

29

NON-CONFIDENTIAL VERSION

Commerce, however, would not limit its inquiries to the direct funding between the GOK, ERG, and Kazchrome. Failing to report the GOK's ownership interest in ERG also restricted Commerce from looking into other GOK-owned firms, such as state-owned enterprises in Kazakhstan, as potential cross-owned affiliates that could be sources of attributable subsidies for Kazchrome under any of the corporations with cross-ownership described in 19 C.F.R. § 351.525(b)(6). This unknown universe of cross-owned affiliates caused by Kazchrome's failure to report undercuts Kazchrome's claims that Commerce verified GOK responses that Kazchrome did not use certain subsidy programs, therefore Commerce's application of AFA to Kazchrome was improper. Pl. Br. at 22. The verification of Kazchrome is hollow, given that verification was based on a record devoid of any information regarding the unknown number of cross-owned enterprises whose subsidization could be found attributable to Kazchrome.

Furthermore, given the scenario present in the record here, Kazchrome's arguments, if accepted by this Court, would present a real danger to the CVD laws. Kazchrome is ultimately arguing that if a government of a subject country incorporates a holding company in

30

**NON-CONFIDENTIAL VERSION**

another country, this would block Commerce's ability to investigate subsidies for production in that subject country simply because of the incorporation. Put another way, if the government of Country A incorporates a holding company in Country B, and that holding company owns a widget producer in Country A, then the government of Country A could freely rout subsidy funds through the Country B holding company to the widget producer in Country A, and then, based on Kazchrome's transnational subsidy argument, all respondent parties could withhold any information regarding this subsidy conduit from Commerce in a CVD investigation on widgets from Country A. This would lead to an absurd result where all governments would have a get out of jail free card to avoid disclosure of their countervailable subsidies by merely forming an offshore holding company.

While such an outcome would undermine the CVD laws, it is also important to note that Kazchrome's transnational subsidy regulation argument is based on the GOK's ownership of ERG, ignoring other, non-governmental levels of ownership, This is likely because such relationships avoid the specific GOK to non-Kazakhstani relationship found between the GOK and ERG that Kazchrome uses for its

31

regulatory gymnastics. There is still, however, a significant percentage of ERG's owners (60 percent) which are not the GOK, and Commerce would need to investigate the entire universe of these entities to look at the potential that these other owners could be found to be cross-owned affiliates that could have provided subsidization to the company in Kazakhstan.

Commerce was unable to make these inquiries due to Kazchrome's failure to provide requested, necessary information. To avoid the ramifications of its choice to withhold information, the company attempts to rely on 19 C.F.R. § 351.527(a) to restrict Commerce's reach. As shown above, this reliance is misplaced when applied to the GOK's ownership of ERG, and completely unavailable with regard to the other owners of ERG. This Court should reject Kazchrome's assertions and sustain Commerce's application of AFA in its determination.

### B. Kazchrome's Assertion That The Information Presented At Verification Was Already On The Record Is Incorrect

In its brief, Kazchrome claims that the information provided by TELF included "a narrative description of the ownership of Kazchrome's ultimate parent, ERG and supporting documentation from ERG's

32

**NON-CONFIDENTIAL VERSION**

website, which also expressly detailed ERG's complete ownership in the exact form that was later viewed at verification in Kazakhstan."[5]  Pl. Br. at 9.  Kazchrome further claims that at verification, "Commerce also reviewed Kazchrome's corporate background and a copy of the ownership structure of ERG that was already on the record."  *Id*.  This is patently false.

At verification, Kazchrome company officials provided previously unreported information that "ERG, and therefore Kazchrome, is ultimately owned by three private individuals, and the Government of Kazakhstan ("GOK") who holds a 40 percent share in ERG."  Kazchrome Verification Report at 2, Appx___, Appx___.  More specifically, Kazchrome officials provided an ownership structure chart for ERG that not only listed the three private individuals (with varying

---

[5] Although Kazchrome claims that the information provided at verification was the same as what TELF included in its filing, Kazchrome has no answer for why, after TELF publicly described the ERG ownership structure in general in its May 14, 2024 submission, it did not include this information in its Affiliation SQR two months later on June 13, 2024.  Moreover, Kazchrome has never explained why, if disclosure of the GOK's "significant influence" on ERG was required for its financial statements in accordance with IFRS, why Kazchrome did not include that information in its ownership structure chart.  Kazchrome Initial QR at Exhibit Gen-14, Appx___, Appx___.

**NON-CONFIDENTIAL VERSION**

ownership share percentages) and the GOK (with, at 40 percent, [ *relative size* ]), but also [ *number* ] holding companies involved in the corporate structure for ERG that are nowhere to be found in TELF's submission.  *Compare* TELF Comments at n.6 & Exhibit 3, Appx___, Appx___, *with* Verification Exhibit VE-3, Appx___, Appx___.  These details are also not found in the financial statements provided in the Kazchrome IQR.  In other words, not only did Kazchrome fail to present any of this information in the requested form, but nobody provided this information on the [ *number* ] holding companies until Kazchrome did so at verification.

Given the importance of the affiliation and corporate structure in Commerce's investigation to determine the universe of cross-owned affiliates, particularly those owned by the subject government, for the purpose of Commerce's attribution analysis Kazchrome significantly undermined Commerce's investigation due to its withholding of information.  As none of these previously unreported parties, or any affiliated parties to those previously unreported parties, contained in the corporate structure verification exhibit were examined at verification or at any other point during the investigation on ferrosilicon

34

from Kazakhstan, this left a massive hole in the record where an unknown number of conduits for subsidization could pass to Kazchrome without Commerce knowing about it.  In short, Kazchrome's attempt to hide the ownership structure of ERG undermined the entire investigation.  This Court should uphold Commerce's application of AFA for Kazchrome's failure to report information Commerce expressly requested.

## II.   COMMERCE PROPERLY FOUND THAT KAZCHROME BENEFITED UNDER THE CORPORATE INCOME TAX EXEMPTION PROGRAM

Kazchrome asserts that the corporate income tax exemption it received under the Entrepreneur Code is tied to the production of ferrochrome at its Aktobe Ferroalloys Plant, and, therefore, cannot be found to provide a countervailable benefit.  Pls. Br. at 66-67.  Commerce expressly rejected Kazchrome's position in the Preliminary Determination and found it moot in the Final Determination.  PDM at 18, Appx___; IDM at 45, Appx___.

As a preliminary matter, Defendant-Intervenors agree with Defendant that as long as Commerce applies an AFA rate to Kazchrome based on all the programs for which it was eligible, as it should continue

35

**NON-CONFIDENTIAL VERSION**

to do, Kazchrome's arguments regarding the Corporate Income Tax Exemption Program are moot. Def. Br. at 66. Kazchrome is mistaken, however, that if "Commerce revisits its decision to apply AFA to Kazchrome . . . Commerce must reverse its position from the Preliminary Determination and find that the corporate income tax exemption for the Ferrochrome Priority Investment Project was tied to the production of . . . non-subject merchandise," and "{a}s a result, Commerce must find that this program did not provide a countervailable benefit to Kazchrome in this investigation." Kazchrome Br. at 65.

Kazchrome relies on 19 C.F.R. § 351.525(b)(5)(1) regarding the general attribution of subsidies tied to a particular product to support this claim. This reliance is misplaced, given Commerce's long-standing practice regarding income tax subsidies, such as the program at issue here, as codified at 19 C.F.R. § 351.509(d). The regulation states:

> If a program provides for a full or partial exemption, reduction, credit, or remission of an income tax, {Commerce} normally will consider any benefit to be not tied with respect to a particular market under § 351.525(b)(4) or <u>to a particular product under § 351.525(b)(5)</u>. (emphasis added)

36

**NON-CONFIDENTIAL VERSION**

Tellingly, Kazchrome fails to cite to any instance where Commerce has found an income tax incentive to be tied to a specific product, instead relying on a Commerce determination regarding a grant program (with a "*see, e.g.*" signal) to support its claim. Pl. Br. at 66 (citing *Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review*; 2022, 89 Fed. Reg. 82,566 (Dep't of Commerce Oct. 11, 2024) and accompanying PDM at 49-50). This is because income taxes are a different animal than other programs, such as grant programs. As Commerce explained,

> Income taxes are based on a firm's total taxable income which is comprised of the overall tax liability generated from all the firm's production and sales. Thus, these types of direct tax programs benefit the overall production of a firm. <u>This fundamental element of a program that provides for a full or partial exemption, reduction, credit, or remission of an income tax does not change whether the granting of the income tax exemption, reduction, remission, or credit is based on a specific market or product.</u>

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. at 20,824 (emphasis added). As such, Commerce has found that income tax programs are not tied to

specific merchandise when they reduce a company's "overall tax liability which benefits all of the company's domestic production and sales." *Certain Epoxy Resins From Taiwan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,618 (Dep't of Commerce Apr. 3, 2025) and accompanying IDM at Comment 5 (citing *Large Residential Washers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 75,975 (Dec. 26, 2012), and accompanying IDM at 41-42).

Commerce verified this exact scenario in this investigation. The corporate income tax exemption was reported on Kazchrome's income tax return filed during the period of investigation. Verification Report at 5, Appx___, Appx___. In that tax return, Kazchrome's overall income tax liability was reduced due to the income tax exemption. *Id.* at VE-5, Appx___, Appx___. As this corporate income tax reduction reduced Kazchrome's firm-wide income taxes, this program benefitted the overall operations of Kazchrome. Consequently, if Commerce determines that total AFA can no longer be applied to Kazchrome, then Commerce should attribute the benefit from Kazchrome's corporate income tax exemption to the company's total sales during the period of

38

NON-CONFIDENTIAL VERSION

investigation.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that this Court deny Plaintiffs' motion for judgment on the agency record and sustain Commerce's Final Determination as supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

Date:  March 24, 2026

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to Defendant-Intervenor CC Metals and Alloys, LLC and Ferroglobe USA, Inc.*

39

NON-CONFIDENTIAL VERSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 6.484 words and therefore complies with word count limitation in the Scheduling Order.

I also certify that the foregoing brief contains 16 unique words (including numbers) marked confidential. This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

I also certify that this submission was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts – such as, but not limited to, ChatGPT or Google Bard.

/s/ Adam H. Gordon
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701
*Counsel to Defendant-Intervenor CC Metals and Alloys, LLC and Ferroglobe USA, Inc.*